UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EILEEN DICK,<br>Plaintiff, ) ) ) ) | |
| v. ) | DOCKET NO: 05-10446-GAO |
| ) | |
| AMERICAN AIRLINES, INC. and ) <br>WORLDWIDE FLIGHT SERVICES, INC. ) <br>Defendants. ) ) | |

## DEFENDANT WORLDWIDE FLIGHT SERVICE'S INC. MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Worldwide Flight Services, Inc. (hereinafter "Worldwide"), by and through the undersigned counsel, hereby submits this Memorandum of Law in addition to a Statement of Uncontested Facts in support of this Motion, the exhibits and all pleadings on file in this action.

## INTRODUCTION

On 25 February 2002, plaintiff Eileen Dick and her 92-year-old mother, Iris Bazzey, were traveling on American Airlines Flight No. 1818 from the Port of Spain, Trinidad to Toronto, Canada, via Miami, Florida. As part of the trip, arrangements were made for Ms. Bazzey to receive wheelchair assistance at the Miami-Dade International Airport.

Upon arrival in Miami, Ms. Dick and Ms. Bazzey were met by a Worldwide wheelchair attendant who was to transport Ms. Bazzey to her connecting gate. As they were proceeding to the connecting gate, the Worldwide wheelchair attendant informed them that the needed elevator was inoperable, and, that as a result, they would be required to take the escalator. It was during the use of this escalator that Ms. Bazzey, who was using a cane for support, stumbled and toppled backwards onto Ms. Dick. As a result of this incident, Ms. Dick sustained injuries to her right knee.

At the time of the alleged incident, Worldwide was under contract with American Airlines to provide wheelchair attendant services to American passengers at the Miami-Dade International Airport.   Ms. Dick now brings this negligence action against Worldwide and American alleging only Massachusetts state common law causes of action.

As this alleged incident occurred on an international flight originating in Trinidad and terminating in Canada, the plaintiff's claims must be adjudicated pursuant to the provisions of the Convention for the Unification of Certain Rules Relating to International Transportation by Air, October 12, 1929 (hereinafter "Warsaw Convention"), of which both Trinidad and Canada are signatories.  This Convention completely preempts all state law claims that fall within its scope.  See El Al Israel Airlines, Ltd. v. Tseng, 525 U.S. 155, 161, 119 S. Ct. 662 (1999); Langadinos v. American Airlines, Inc., 199 F.3d 70, n.2 (1st Cir. 2000); Shah v. Pan Am World Servs. Inc., 148 F.3d 84, 97-98 (2d Cir. 1998).

### UNDISPUTED STATEMENT OF MATERIAL FACTS [1]

A.    **The Parties**

1.    Plaintiff, Eileen Dick is a resident of both Dorchester, Massachusetts and Toronto Canada.  Deposition of Eileen Dick (hereinafter "Dick Deposition") at 4-5, attached hereto at Exhibit A.

2.    Defendant, American Airlines, Inc. ("American") provides domestic and international carrier service for passengers.

3.    Worldwide Flight Services, Inc. ("Worldwide") is a Texas corporation which provides airport flight services for certain passengers.

---

[1]    Defendant Worldwide Flight Services, Inc. also adopts those factual statements made by defendant American Airlines, Inc. in its Motion for Summary Judgment related to the location of the alleged accident and the entity which exercised control over the same.

2

4.      Pursuant to a contract with American, Worldwide provides wheelchair assistance and related services to American passengers. Restated Amendment of Airline Services Contracts Between AMR Services Corporation and American Airlines, Inc. (hereinafter "Contract"), attached hereto at Exhibit B.[2]

**B.      The International Flight**

5.      Ms. Dick and her husband purchased airline tickets from American for a round trip between Toronto, Canada and Port of Spain in Trinidad and Tobago ("Trinidad"). Dick depo. at 15-16

6.      The flight was an international flight leaving Toronto, Canada to Trinidad, via Miami, Florida. Dick depo. at 48

7.      The plaintiff and her husband left on January 27, 2002 with tickets for a return trip from Trinidad to Toronto, via Miami, Florida, on February 25, 2002. Dick depo. at 15-17, 20-21.

8.      As part of the trip, Ms. Dick and/or her husband made wheelchair arrangements for Ms. Dick's 97 year-old mother who resided in Trinidad and who would be returning with Ms. Dick on the return trip from Trinidad on February 25, 2002. Dick depo. at 17-19; 21; 48.

**C.      The Incident At Miami International Airport En Route To Connecting Flight**

9.      On the return trip from Trinidad on February 25, 2002, plaintiffs arrived in Miami, Florida and were to connect with their continuing flight onto Toronto, Canada. Dick depo. at 48.

10.      After arrival at the Miami International Airport on February 25, 2002, Ms. Dick's mother was provided wheelchair assistance to the connecting flight from Miami to Toronto. Dick depo. at 28.

---

[2]      AMR Services was the precursor to Worldwide Flight Services, Inc.

3

58005.1

11.    The wheelchair assistance included a wheelchair and an attendant which was provided by Worldwide. See Exhibit B.

12.    Plaintiff alleges that American owned and controlled "the premises" where the incident occurred. Plaintiff alleges that American owned and controlled "the premises" where the incident occurred. See Complaint, attached hereto at Exhibit C.

13.    Ms. Dick and her mother, who was provided wheelchair assistance, were escorted by the attendant from their arrival gate from Trinidad to their scheduled departing and connecting and continuing flight to Toronto, Canada. Dick depo. at 30-31

14.    Ms. Dick and her mother already had their boarding passes, their luggage was already on the plane, they were inside the security checkpoints, and they were on their way to their connecting flight for the last leg of their international flight. Dick depo. at 31, 48-49, 71.

15.    Ms. Dick, her mother and their escort/attendant arrived at the escalator and elevator used exclusively by American ticketed passengers. Dick depo. at 31-32.

16.    According to Ms. Dick, she and her mother were informed by the Worldwide attendant/escort that the elevator was not working and that they were to take the escalator. Dick depo. at 32-33.

17.    The attendant/escort instructed Ms. Dick and her mother that they would have to use the escalator to proceed to their connecting flight. Dick depo. at 32-33.

18.    Both Ms. Dick and her mother got on the escalator as purportedly instructed by the attendant/escort. Dick depo. at 33.

19.    The attendant/escort was to meet Ms. Dick and her mother at the end of the escalator. Dick depo. at 36.

4

20.    About a quarter of the way up the escalator, Ms. Dick's mother who was standing with her cane toppled backward onto Ms. Dick. Ms. Dick grabbed her mother and grabbed onto the side of the escalator. Dick depo. at 35-37.

21.    Ms. Dick did not fall but bent down to her knees and "stretched out her knee" while holding her mother. Dick depo. at 36-37.

22.    An ambulance and paramedics were called by the attendants and arrived to examine Ms. Dick and her knee. Dick depo. at 40-41.

23.    Ms. Dick was examined by the paramedics and asked if she wanted to go to the hospital. She stated she did not, but wanted to continue on her trip home. Dick depo. at 40-42.

24.    Ms. Dick and her mother then continued onto their departing and connecting flight to Toronto. Dick depo. at 43-44.

25.    At the time of the incident, Ms. Dick and her mother were inside the airport terminal restricted to American ticketed passengers. Dick depo. at 31, 48-49; 71.

26.    At the time of the incident, Ms. Dick and her mother already had their boarding passes, their baggage was on board the planes and they were in route to their connecting flight to Toronto. Dick dep. at 31, 48-49; 71.

27.    At the time of the incident, the attendant was directing Ms. Dick and her mother to the gate for the continuing flight onto Toronto. Dick depo. at 48-49, 70, 78.

28.    At the time of the incident, Ms. Dick and her mother were under the direction and control of the attendant. Dick depo. at 70, 78.

29.    The incident took place within five minutes of arriving and shortly before the scheduled flight was to leave and, as a result, Ms. Dick and her mother missed their connecting flight to Toronto. Dick depo. at 44.

58005.1

30.    Plaintiff initiated this action on February 1, 2005 more than two years after the

incident.  See Complaint.

## ARGUMENT

Plaintiff's Complaint fails to set forth a cause of action pursuant to the Warsaw

Convention.  As such, the plaintiff's state law claims are pre-empted and she is foreclosed from

amending her Complaint to include a federal cause of action based upon the Convention's two-

year statute of limitations.  See Warsaw Convention, Article 29.  Accordingly, it is respectfully

submitted that the defendant is entitled to summary judgment against the plaintiff.

## I.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where "there is no genuine issue of material fact … the

moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c).[3]

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but

rather, as an integral part of the Federal Rules as a whole, which are designed to 'secure the just,

speedy and inexpensive determination of every action.'"  Celotex Corp. v. Cartrett, 477 U.S.

317, 327 (1986).

As the party bringing this motion, the defendant has the burden of persuasion that "there

is no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  For the plaintiff to successfully oppose the defendant's motion, it "must set forth

specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A party's

speculation or mere conclusory statements are an insufficient defense to a summary judgment

motion.  Id.

---

[3]  A factual dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict
for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A disputed fact is
"material" only if its resolution "might affect the outcome of the suit under the governing law." Id.

If the plaintiff "fail[s] to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial," summary judgment is proper. Celotex, 477 U.S. at 322. As no such issue of material fact exists in this case, the Court may rule on summary grounds.

## II.    THE WARSAW CONVENTION APPLIES TO PLAINTIFF'S ALLEGATIONS AGAINST WORLDWIDE

Article 17 of the Warsaw Convention renders air carriers liable for injuries sustained to a passenger "if the accident which caused the damage so sustained took place on board the aircraft or in the course of any operations of embarking or disembarking." 49 U.S.C. § 40105 (1994). Based on this standard, it is respectfully submitted that the Warsaw Convention should apply to the plaintiff's claims against defendant Worldwide, and that accordingly, those claims should be dismissed.

### A.    Worldwide is a "Carrier" as defined by the Warsaw Convention

It is well settled that an agent of an air carrier is entitled to claim the protections afforded to carriers under the Convention. Waxman v. C.I.S. Mexican de Avacion, S.A., 13 F. Supp.2d 508, 513 (S.D.N.Y. 1998) citing American Home Assurance Co. v. Jacky Maeder (Hong Kong) Ltd., 969 F. Supp. 184, 191 (S.D.N.Y. 1997); see also Lerakoli, Inc. v. Pan American World Airways Inc., 783 F.2d 33, 36 (2d Cir.), cert denied, 479 U.S. 827 (1986); In re Air Crash Disaster Near Peggy's Cove, Nova Scotia on September 2, 1998, 2002 U.S. Dist. LEXIS 3308, *13-14, (E.D. Pa. February 27, 2002); Banishashemrad v. Lufthansa Cargo AG, 28 F. Supp.2d 1014, 1018 (W.D. Texas 1998)(agents of the carrier who act in the scope of carriage are "carriers" for the purpose of the Warsaw Convention); Rhodes v. American Airlines Inc., 1996 WL 1088897 *1 (E.D.N.Y. 1996); Kabbani v. Int'l Total Servs., 805 F. Supp. 1033, 1039 (D.

7

D.C. 1992) (finding that Convention applies to agents of an air carrier that provided security services).

The rationale behind this decision is a simple one: the protections afforded to a carrier should be extended to a carrier's agents when the agent is performing a function that the carrier would or could otherwise perform itself. See Waxman, 13 F. Supp.2d at 514 citing Julius Young Jewelry Mfg. Co. v. Delta Air Lines, 67 A.D.2d 148, 414 N.Y.S.2d 528,529-30 (1st Dep't 1979). Through the provision of wheelchair services to American passengers, defendant Worldwide was performing a function that otherwise would have been performed by American. See Contract, attached hereto at Exhibit B.

Accordingly, the protections of the Warsaw Convention are available to defendant Worldwide in this matter. [4]

B.      The Plaintiff's Allegations Constitute an Accident Under Warsaw

As the term is intended under the Warsaw Convention, an accident "arises only if a passenger's injury is caused by an unexpected or unusual event or happening that is external to the passenger." Air France v. Saks, 470 U.S. 392, 404 (1985).  Accidents occurring during embarkation and disembarkation have all been held to constitute an accident under the Convention.

It is clear, therefore, based solely on the allegations averred in the Complaint and elicited during depositions, and without conceding the viability of the same, that the plaintiff's alleged injury is an accident under the Warsaw Convention as that term has been defined by the Courts.

---

[4] The defendants do not concede that the plaintiff sustained an "accident" as that term is used in the Warsaw Convention and defined by the Courts. Rather, as the plaintiff is asserting that she was injured during the process of embarkation, the plaintiff was required to plead claims pursuant to the Warsaw Convention, but failed to do so.

C.     The Alleged Accident Occurred During Embarkation

In order to assess whether a passenger was engaged in the course of embarkation, courts have engaged in a multi-pronged inquiry focusing on: (1) the passenger's location at the time of the injury; (2) the passenger's activity at the time of the injury; and (3) the degree of control exercised by the airline over the passengers. See McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 317 (1st Cir. 1995); see also Fazio v. Northwest Airlines, Inc., 2004 U.S. Dist. 8423, *9 (W.D. Mich. March 15, 2004); Kalantar v. Lufthansa German Airlines, 276 F. Supp.2d 5, 10 (D. D.C. 2003); Alleyn v. the Port Authority of New York and New Jersey, 58 F.Supp.2d. 15, 19 (E.D.N.Y. 1999).

Although the courts approach this analysis on a case by case basis, some general trends have evolved.  Generally, the Warsaw Convention's limitation of liability will apply to injuries when the passengers had passed through security checkpoints, were in areas restricted to passengers and were being directed by airline personnel.  See Marotte v. American Airlines, Inc., 296 F.3d 1255, 1261 (11th Cir. 2002)(Warsaw applied as passenger had already passed through security and was in section of airport that was not open to the general public but rather only to ticketed passengers); Day v. Trans World Airlines, Inc., 528 F.2d 31, 33 (2d Cir. 1975)(plaintiffs in course of embarking when assembled at departure gate at direction of airline employees and about to undergo weapons search as prerequisite of boarding); Alleyne, 58 F. Supp.2d at 21-22 (plaintiff's injuries had occurred before she reached the terminal common area, while she was still under the control of the airlines and acting on the direction of airline personnel); Barratt v. Trinidad & Tobago Airways, Corp., 1990 U.S.  Dist. LEXIS 20947 (E.D.N.Y. Aug. 28,

1990)(Warsaw applied to injuries sustained while descending steps to tarmac prior to boarding aircraft).

At the time of the accident, Ms. Dick was in possession of her boarding pass, was in a restricted area of the airport limited to ticketed passengers, was being provided wheelchair assistance and escort services, was specifically directed to take the escalator and was in the process of continuing on to her connecting flight from Miami, Florida to Toronto, Canada. See Dick Deposition, pp. 28, 30-33, 48-49 and 71, attached hereto as Exhibit A. Moreover, the area in which the accident allegedly occurred, Concourse E, was restricted solely to passengers and airport personnel, was within the security checkpoints and was controlled by American Airlines. Id. See generally, McCarthy, 56 F.3d at 318. [5]

In a case strikingly similar to the one at bar, Fazio v. Northwest Airlines, Inc., the plaintiff was injured while riding on an escalator at the Da Vinci, Rome, Italy airport after the defendant failed to provide him with requested wheelchair assistance. Contrary to the plaintiffs' assertions that the accident occurred in the terminal and not during the embarkation or disembarkation phases of travel, the district court determined that the plaintiff's allegations "indisputably pertain to the 'operations of embarking and disembarking' and are governed by the Warsaw Convention." 2004 U.S. Dist. 8423, *9 (W.D. Mich. March 15, 2004).

As in Fazio, Worldwide's liability is premised on its alleged failure to transport the plaintiff and her mother to their next departure gate by wheelchair and in such a manner that they would not be required to maneuver the escalator as they made their way through the airport to the next aircraft for boarding. See Fazio, 2004 U.S. Dist. 8423, *8. As this accident occurred

---

[5] In McCarthy v. Northwest Airlines, Inc., the court held that the claimant, who was injured on an escalator in the public areas on the terminal prior to her flight was not "embarking" as that term has been defined by the courts. 56 F.3d 313 (1st Cir. 1995). The court noted that the "most important" factor in its decision to extend the Warsaw limitations to Northwest Airlines was the fact that the incident took place "in the part if the terminal not restricted to passengers." Id. at 318.

during a period in which Worldwide was directing the plaintiff and her mother to utilize the escalator in order to continue their carriage, and while the plaintiff and her mother were located in an area of the airport that was restricted to ticketed passengers only, it is clear that the accident occurred during the embarkation process.  Any other result would be contrary to established law in this and other circuits.  See McCarthy, 56 F.3d at 318; Marotte. 296 F.3d at 1261; Fazio, 2004 U.S. Dist. 8423, *8.

Based upon the foregoing, there is no doubt that the plaintiff's accident occurred during the embarkation process, as that term has been defined by these Courts, and that Worldwide, as an agent of defendant American Airlines, may seek the protections of the Warsaw Convention.

## III.    PLAINTIFF'S COMPLAINT AND CLAIMS ARE TIME-BARRED UNDER THE CONVENTION

As it is clear that plaintiff's claims are governed by the Warsaw Convention, any remedy, if available at all, must be found in the Convention itself. Plaintiff, however, cannot recover under the Convention as any claim is time-barred.

Article 29 of the Convention provides as follows:

> (1) The right to damages shall be extinguished if an action is not brought within two years, reckoned from the date of arrival at the destination or from the date on which the aircraft ought to have arrived, or from the date on which the transportation stopped.

Article 29(1) is unequivocal in its terms requiring any suit against a carrier to be brought within two years of arrival, planned arrival, or where the transportation stopped.  The two year time period is a "condition precedent to suit."  Fishman v. Delta Airlines, 938 F. Supp. 228 (D.C.N.Y. 1996), aff'd 132 F.3d 138 (2nd Cir. 1998); Scott v. American Airlines, Inc., 187 F. Supp. 2d 557 (D. Mary. 2002); Mitchell, Shackelton & Co. v. Air Exp. Int'l Corp., 704 F. Supp.

524, 526 (S.D.N.Y. 1989); Kahn v. Trans World Airlines, 82 A.D. 2d 696, 443 N.Y.S. 2d 79, 87

(App Div. 1981).[6]

Here, it is undisputed that the alleged injury occurred in February, 2002 and that plaintiff

did not file this action until February, 2005. See Plaintiff's Complaint, attached hereto as Exhibit

C. The Convention preempts and bars plaintiff's claim as it is untimely as a matter of law

entitling the defendants to summary judgment.

## IV.     THE WARSAW CONVENTION COMPLETELY PRE-EMPTS PLAINTIFF'S STATE LAW CLAIMS

As a treaty of the United States, the Warsaw Convention is the supreme law of the land

and pre-empts all state law claims within its scope. See El Al Israel Airlines, Ltd. v. Tseng, 525

U.S. 155, 161, 119 S. Ct. 662 (1999); Langadinos v. American Airlines, Inc., 199 F.3d 70, n.2

(1st Cir. 2000); Fishman v. Delta Air Lines, Inc., 132 F.3d 138,141 (2d Cir. 1998); Shah v. Pan

Am World Servs. Inc. 148 F.3d 84, 97-98 (2d Cir. 1998); Maxwell v. Aer Lingus, 122 F.

Supp.2d 210, 211, fn. 1 (D. Mass. 2000); DeGeorge v. American Airlines, Inc., 2002 WL

31356266, *2 (S.D.N.Y. 2002).  As a logical consequence of this rule, a complaint which is

comprised solely of state law claims that falls within the scope of the Warsaw Convention is

subject to dismissal for failure to state a claim upon which relief can be granted. Id.

---

[6] Article 29 has been strictly construed in an effort to ensure uniformity and to be consistent with the goals and purposes of the Convention.  The two year period has, in fact, been held not to allow for tolling by local law. See, e.g., Husmann v. TWA, 169 F.3d 1151 (8th Cir. 1999) (no tolling for bankruptcy filing); Fishman v. Delta Airlines, 938 F. Supp. 228 (D.C.N.Y. 1996), aff'd 132 F.3d 138 (2d Cir. 1998) (two year limitation not tolled by infancy); Scott, 187 F. Supp. 2d 557 (D. Mary. 2002) (no tolling based on infancy); Kadir v. Singapore Airlines, Inc., 1999 U.S. Lexis 6131 (N.D. Ill. 1999)(Article 29 not subject to equitable tolling); Magnus Electronics and Royal Bank of Canada and Aerolineas Argentinos, 611 F. Supp. 436 (D.C. Ill. 1985)(no tolling for fraudulent concealment); Goldberg v. El Al., 13 Avi. 18191 (D.C. N.Y. 1975)(no tolling); Kadir v. Singapore Airlines, Inc., 1999 U.S. Lexis 6131 (N.D. Ill. 1999)(Article 29 not subject to equitable tolling).

58005.1

In the instant case, the plaintiff's claims are based solely upon violations of Massachusetts state law. <u>See</u> Plaintiff's Complaint, attached hereto as Exhibit C. The Complaint is silent as to the Warsaw Convention. <u>See</u> <u>Miller v. Continental Airlines, Inc.</u>, 260 F. Supp.2d 931, 936 (N.D. Cal. 2003). As such, the plaintiff has not asserted a cognizable claim, and it is respectfully submitted that this Court must dismiss the plaintiff's Complaint, with prejudice, as against defendant Worldwide. <u>Id.</u>; <u>see also</u> <u>DeGeorge</u>, 2002 WL 31356266, *3.

## <u>CONCLUSION</u>

In light of the foregoing, defendant Worldwide Flight Services, Inc. respectfully requests that this Court grant its Motion and dismiss the plaintiff's Complaint with prejudice.

Respectfully submitted,

Worldwide Flight Services, Inc.
By its attorneys,

_/s/ Geoffrey M. Coan_____
Maynard M. Kirpalani, BBO# 273940
Geoffrey M. Coan, BBO# 641998
Wilson Elser, LLP
155 Federal St., 5th Floor
Boston, MA 02110
(617) 422-5300

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 16, 2006.

/s/ Geoffrey M. Coan
Geoffrey M. Coan

58005.1

1

Volume I, Pages 1-81

Exhibits: See Index

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - -

EILEEN DICK

          Plaintiff

vs.                Docket No. 05-10446-GAO

AMERICAN AIRLINES, INC., and

WORLDWIDE FLIGHT SERVICES, INC.

          Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - -


DEPOSITION OF EILEEN M. DICK

Monday, April 10, 2006, 10:00 a.m.

Morrison Mahoney LLP

250 Summer Street

Boston, Massachusetts


- - - - - - - Reporter:  Joan M. Cassidy, RPR, CRR - - - - - - -

EPPLEY COURT REPORTING

P.O. Box 382

Hopedale, Massachusetts 01747

**Eileen M. Dick**
**April 10, 2006**

(Pages 2 to 5)

2

APPEARANCES:
  Spillane Law Offices
  Kathleen L. Kane, Esq.
  1212 Hancock Street, Suite 200
  Quincy, Massachusetts 02169-4300
  617-328-9100  Fax: 617-328-8373
  kkane@spillanelawoffices.com
  for Plaintiff

  Morrison Mahoney LLP
  Tory A. Weigand, Esq.
  250 Summer Street
  Boston, Massachusetts 02210
  617-439-7500  Fax: 617-439-7590
  tweigand@morrisonmahoney.com
  for Defendant American Airlines, Inc.

  Wilson Elser Moskowitz Edelman & Dicker LLP
  Geoffrey M. Coan, Esq.
  155 Federal Street
  Boston, Massachusetts  02110
  617-422-5300  Fax: 617-423-6917
  geoffrey.coan@wilsonelser.com
  for Defendant Worldwide Flight Services, Inc.

3

          P R O C E E D I N G S
    MR. WEIGAND:  Usual stipulations?
    MS. KANE:  Yes.
    MR. WEIGAND:  All objections, except as
to form, are reserved till the time of trial.  All
motions to strike are reserved as well.  The witness
will read and sign within 30 days.
    MS. KANE:  Yes.  Waive notary?
    MR. WEIGAND:  Waive notary, yes.  No
need for filing.
       Eileen M. Dick, Sworn
       DIRECT EXAMINATION
BY MR. WEIGAND:
    Q.  Ms. Dick, my name is Tory Weigand, and I
represent American Airlines in this matter.  I have
a few questions to ask you today about your flight
and the incident at the Miami Dade International
airport.  If at any time you do not understand me,
let me know, and I'll rephrase the question.
    A.  Yes.
    Q.  If you need a break at any time, just let
us know.  I don't expect us to be here that long
this morning, but if you need to take a break or
anything like that, let us know.  All right?

4

1    A.  All right.
2    Q.  Also, since we have a stenographer, she's
3  taking down everything we say, so she'll be taking
4  down my questions and your answers.  It's important
5  for you to wait till I get my question out and then
6  go ahead and answer.  Okay?
7    A.  All right.
8    Q.  And also, she can't take down nods of the
9  head and that kind of thing, so please answer
10  audibly.  All right?
11    A.  All right.
12    Q.  Okay.  Could you please state your full
13  name.
14    A.  Eileen Maenola Dick.
15    Q.  And where do you currently reside?
16    A.  I reside in Boston.
17    Q.  And what's the address there?
18    A.  106 Greenbrier Street, Dorchester, Mass.
19    Q.  And how long have you resided there?
20    A.  I've resided there since 1984.
21    Q.  Do you have any other residences?
22    A.  I sometimes spend a lot of time in Toronto
23  'cause my husband still has got a home there.  He's
24  from there.

5

1    Q.  And what's the address in Toronto?
2    A.  66 Oak Meadow Boulevard, Toronto, Ontario.
3    Q.  Is there any particular times of year that
4  you spend in one place versus the other, Boston or
5  Toronto?
6    A.  No.  We just go back and forth.  We'll be
7  here for three months, we'll just go up for a
8  weekend, spend two weeks, come back, that kind of
9  thing.
10    Q.  Okay.  And what is your date of birth?
11    A.  May 1, 1938.
12    Q.  And you're married?
13    A.  I am married.
14    Q.  And what's your husband's name?
15    A.  Joseph Emmanuel Dick.
16    Q.  And do you have any children?
17    A.  I do have two sons.
18    Q.  And their ages?
19    A.  One's 39 and one's 37.
20    Q.  Do you have any grandchildren?
21    A.  Yes, I do.
22    Q.  How many do you have?
23    A.  I have six grandchildren.
24    Q.  Why don't you tell me a little bit about

2

**6**

1  your background.  Where are you from originally?
2      A.  I was born in Trinidad.
3      Q.  And when did you first come to the United
4  States?
5      A.  I first came to the United States in 1975.
6      Q.  And have you been in the United States
7  since that time?
8      A.  I have.
9      Q.  And what year did you get married?
10     A.  I got married in 1996.
11     Q.  1996?
12     A.  This is my second marriage.
13     Q.  Okay.  So the second marriage was in 1996?
14     A.  Yes.
15     Q.  And were you married previously?
16     A.  I was.
17     Q.  And when were you first married?
18     A.  I was married in London, England, in 1961.
19     Q.  Okay.  And when did that marriage end?
20     A.  That marriage ended in 19 -- I think it's
21  87.  That could be corrected.
22     Q.  Okay.  Could you tell me a little bit about
23  your educational background, where you went to high
24  school and what other training you may have had.

**7**

1      A.  I went to high school -- finished high
2  school in Trinidad in the West Indies; and I
3  migrated to London, England, when I was 18.  I went
4  to nursing school, graduated from Edgware General
5  Hospital in England.  I stayed there until 1972.
6  And my former husband was from Jamaica, and we moved
7  to Jamaica that year.  Then I moved to Boston in
8  1975.
9      Q.  So you are originally from Trinidad.  Then
10  when you were 18 you moved to London?
11     A.  England, yes.
12     Q.  And you went to nursing school there?
13     A.  Yes.
14     Q.  What kind of degree do you hold in nursing?
15     A.  It was hospital-based.  It's a nursing
16  degree or RN, SRN.
17     Q.  RN?
18     A.  Right.
19     Q.  And where did you obtain that degree?
20     A.  In England.
21     Q.  And what was the name of the school?
22     A.  The hospital, Edgware General.  The first
23  part of my lesson was at a hospital called Napsbury
24  Hospital in Hertfordshire; and then when I finished

**8**

1  that -- that was psychiatry -- I moved to -- for two
2  years -- three years to Edgware General.
3      Q.  Did you actually get a degree that says you
4  are a registered nurse?
5      A.  Yes, hospital.  Yes, it's registered with
6  the Nursing Council for England.
7      Q.  And how long did you -- did you work
8  full-time as a nurse?
9      A.  Yes.
10     Q.  Until you moved to Jamaica?
11     A.  Jamaica (nodding).
12     Q.  And did you continue to work as a nurse in
13  Jamaica?
14     A.  I did.
15     Q.  And in 1975 you mentioned you came to
16  Boston?
17     A.  Yes.
18     Q.  Is that when you first began to live in
19  Dorchester?
20     A.  I lived in Dorchester, but I did not own a
21  property then.  I wasn't living where I live now.
22     Q.  And what did you do for work once you came
23  to Boston?
24     A.  I worked as a nurse tech.  I never did my

**9**

1  boards here.  I worked for Spaulding Rehab, and then
2  I went to the Floating Hospital for Children, and I
3  worked in pediatrics until I retired.
4      Q.  How many years did you work at Spaulding
5  Rehab?
6      A.  I'm not sure.  I think it was about -- it
7  could be two years.  It was not for a very long
8  period of time.
9      Q.  So approximately 1975 to 1977, thereabouts?
10     A.  Yes, around that.  Actually, I -- yes,
11  that's -- it's about that time, yes.
12     Q.  Then you joined the Floating Hospital for
13  Children?
14     A.  Yes.
15     Q.  And how long were you there?
16     A.  Until I retired, which was -- now I don't
17  have -- I retired in -- it's coming up to five
18  years.  I think it's November 2000.  2000, I think,
19  November 2000.
20     Q.  Or thereabouts?
21     A.  Thereabouts, yes.
22     Q.  Did you work full-time at the Floating
23  Hospital from 1977 to 2000?
24     A.  Yes, I worked full-time, I worked

Eileen M. Dick
April 10, 2006

(Pages 10 to 13)

|  | 10 |
|---|---|
| 1 | full-time. |
| 2 | Q. Until the time of your retirement? |
| 3 | A. Yes. |
| 4 | Q. Did you ever sit for the nursing boards at |
| 5 | all? |
| 6 | A. No, I didn't. |
| 7 | Q. Have you ever been deposed before? What we |
| 8 | are doing here is a deposition in connection with a |
| 9 | lawsuit. Have you ever been through this before? |
| 10 | A. No. |
| 11 | Q. Have you ever been a party to a lawsuit at |
| 12 | all? |
| 13 | A. No. |
| 14 | Q. I believe I read somewhere your husband was |
| 15 | a school teacher, your current husband? |
| 16 | A. My current husband. He's a retired school |
| 17 | principal. |
| 18 | Q. And what did your first husband do? |
| 19 | A. Musician. |
| 20 | Q. Now, looking at the records -- and I'm |
| 21 | going to talk to you more about it in a minute, the |
| 22 | trip that you took in 2002 -- |
| 23 | A. Yes. |
| 24 | Q. -- I believe you were traveling with your |

|  | 11 |
|---|---|
| 1 | mother, Iris or -- Iris Baggin? |
| 2 | A. Iris Bazzey, B-a-z-z-e-y. |
| 3 | Q. So it's Bazzey? |
| 4 | A. Yes. |
| 5 | Q. Okay. Is she still alive? |
| 6 | A. She's very much alive. |
| 7 | Q. Good for her. How is she doing? |
| 8 | A. She's doing good. You know, she has a bit |
| 9 | of -- at 97 she's got a little bit of forget -- you |
| 10 | know, she will ask me a question twice or three |
| 11 | times in one day, but -- it's not Alzheimer's, but |
| 12 | she's -- |
| 13 | Q. Well, I might ask you the same question |
| 14 | three or four times, and I'm not 97. |
| 15 | A. That's right. |
| 16 | Q. Where does she live? |
| 17 | A. Well, right now she's in Trinidad. She did |
| 18 | reside with me off and on. Since the accident, she |
| 19 | doesn't -- she does not like traveling alone. She |
| 20 | used to travel alone, but she -- I have to -- if she |
| 21 | wants to travel, I have to go get her now, so she -- |
| 22 | you know, she doesn't want to be -- so she spends -- |
| 23 | she worked in Boston as well, so she spent a lot of |
| 24 | her time -- after she retired, she would go to |

|  | 12 |
|---|---|
| 1 | Trinidad because, believe it or not, she's got a lot |
| 2 | of siblings there. The youngest is 82. So she |
| 3 | would go there and come here in the summer and, you |
| 4 | know, do -- come to England with me sometimes, come |
| 5 | to Jamaica with me sometimes. |
| 6 | Q. How many siblings does she have? |
| 7 | A. Oh, right now? There was twelve of them |
| 8 | all together. Right now it's five of them. |
| 9 | Q. Does she live with somebody that helps to |
| 10 | take care of her? |
| 11 | A. She does not live with somebody, and we had |
| 12 | a tough time getting her to get someone to come in |
| 13 | to clean and stuff. Now she's accepted it for the |
| 14 | past year when she's there. |
| 15 | Q. All right. Now, you said she lived a |
| 16 | period of time in Boston. When did she do that? |
| 17 | A. She came to Boston in 1972. It was the |
| 18 | year that I left London, yes, uh-huh. |
| 19 | Q. How long was she here for, approximately? |
| 20 | A. She's been here until -- she's 97 now. |
| 21 | Well, she's here all the time, but it's just that |
| 22 | she spends a lot of time in Trinidad. |
| 23 | Q. Is she an American resident? |
| 24 | A. American citizen, yes. |

|  | 13 |
|---|---|
| 1 | Q. Citizen? |
| 2 | A. Yes. |
| 3 | Q. And did she work for a period of time in |
| 4 | Boston? |
| 5 | A. She did. |
| 6 | Q. What did she do for work? |
| 7 | A. She worked at -- it's in City Hospital, but |
| 8 | she worked for BU. They hadn't merged then. It's |
| 9 | just work she did -- she worked for BU. It was a |
| 10 | research unit called Thorndike Research, and she |
| 11 | worked in the dietary section there. |
| 12 | Q. So if she wants to travel now, you go |
| 13 | arrange to get her or meet with her? |
| 14 | A. Yes. |
| 15 | Q. Okay. Have you traveled with your mother |
| 16 | since the incident in February of 2002? |
| 17 | A. Yes, I have. |
| 18 | Q. Okay. How often have you traveled with her |
| 19 | since February of 2002? |
| 20 | A. Since that time in 2002 -- |
| 21 | Q. The approximate number of times. |
| 22 | A. -- I traveled with her about three times. |
| 23 | Q. Did your mother suffer any injury as a |
| 24 | result of the fall in Miami? |

4

**Eppley Court Reporting**
**(508) 478-9795**

**14**

1   A. Not a physical injury, but she was very
2   frightened and shocked, you know, and this is --
3   she's -- she was very scared, but not an injury like
4   I did, not physically. But she was really -- it
5   really, really shook her up for quite a bit.
6   Q. Now, the incident I have noted took place
7   in February -- on February 25, 2002?
8   A. Yes.
9   Q. And that was part of a trip that you were
10  taking with your mother?
11  A. Yes.
12  Q. Okay. I think I've -- your counsel has
13  produced some records here. I want to do this.
14      MR. WEIGAND: Can we have that marked as
15  the first exhibit.
16      (Marked, Exhibit 1, Documents produced
17  by plaintiff in response to record request.)
18  Q. I didn't make extra copies here, but
19  counsel has produced some records here, and I'm
20  going to individually mark them. Did you have a
21  chance to look at these before you came here today?
22  A. No.
23      MR. WEIGAND: I will get back to this
24  with you at least, Counsel. We can agree that these

**15**

1   records were responsive to the record request that
2   was a part of the deposition?
3       MS. KANE: Correct.
4       MR. WEIGAND: Okay, all right.
5   Q. Now, as part of the trip, who else went on
6   this trip besides yourself and your mother?
7   A. We were on our way back from Trinidad, and
8   my husband had gone on the trip with us, but he had
9   left before we did, he came back before.
10  Q. Looking at some records, which I will show
11  you in a minute, it looks like the trip originated
12  from Toronto?
13  A. No.
14  Q. No, okay. Why don't you tell me about the
15  trip.
16  A. The trip originated from Trinidad.
17  Q. Okay. But was this part of a trip where
18  you left Toronto on January 27, and you were
19  returning back to Toronto on February 25?
20  A. Yes.
21  Q. Okay. So the incident took place on the
22  leg of the trip when you landed in Miami?
23  A. On the return trip.
24  Q. But when you booked the flight, you booked

**16**

1   the flight in -- to leave in January, did you not?
2   A. I probably did, yes.
3   Q. Maybe we can help you a little bit with
4   this.
5       MR. WEIGAND: Let me have this marked as
6   the next exhibit.
7       (Marked, Exhibit 2, Printout of
8   itinerary.)
9   Q. Ms. Dick, I'm going to show you a document
10  that's been marked as Exhibit 2 and just ask you if
11  you recognize that.
12  A. (Witness reviews document.) Yes.
13  Q. And is that a printout of your itinerary
14  for the trip that began on January 27 and returned
15  on February 25, 2002?
16  A. Yes.
17  Q. Now, again, it was you, your husband, and
18  your mother that left together on the trip?
19  A. My mother -- no, my mother wasn't on -- did
20  not leave on this trip.
21  Q. So when you left Toronto, was it just you
22  and your husband on the 27th?
23  A. Yes.
24  Q. Okay. And at some point did you meet up

**17**

1   with your mother?
2   A. In Trinidad.
3   Q. Okay. And then she came with you on the
4   return trip?
5   A. Yes.
6   Q. Did you book this through a travel agency;
7   do you recall?
8   A. I didn't. My husband did, and he might
9   have done it on-line.
10  Q. I take it you take some trips with your
11  husband fairly frequently?
12  A. Very frequently.
13  Q. And does he normally book the trips
14  on-line?
15  A. Normally, yes.
16  Q. Before you left on the 27th, was it your
17  plan to come back in February with your mother?
18  A. Yes.
19  Q. Okay. Before you left on the 27th, did you
20  make any arrangements for wheelchair assistance or
21  other special assistance?
22  A. I always do.
23  Q. Did you do that before you left?
24  A. Before I left Toronto?

Eileen M. Dick
April 10, 2006

(Pages 18 to 21)

18

1    Q.  Yes.  Or did you do it when you got to
2  Trinidad?
3    A.  That I'm not sure about.  I'm not -- I'm
4  trying to -- I'm -- more than likely we probably
5  bought this ticket for my mother here, like in
6  Toronto, before we left, more than likely.  I'm not
7  swearing to that, but we've done this often that
8  I'm -- that's what I usually do.
9    Q.  Get the ticket ahead of time?
10    A.  Get the ticket ahead of time, and then we
11  pick it up down there or -- yeah, book the ticket
12  ahead of time, yes.
13    Q.  And when you book the ticket ahead of time,
14  that's when you would have requested some wheelchair
15  assistance?
16    A.  I always do.
17    Q.  Your mother, was she able to walk at all on
18  her own, or was she always in a wheelchair?
19    A.  My mother can walk.  She walks with a cane.
20    Q.  So the wheelchair assistance would be just
21  to meet her from the plane and to go to a connecting
22  flight or to get out of the airport?
23    A.  Yes.
24    Q.  But once she's out of the airport, she's

19

1  able to walk and get into her car?
2    A.  With a cane, yes.
3    Q.  Okay.  When you would ask for wheelchair
4  assistance, what is the -- do you remember asking
5  for wheelchair assistance on this particular
6  occasion?
7    A.  Well, it would not be me, my husband would
8  do it.  He booked on-line, but we always do -- my
9  mother has been traveling with wheelchair assistance
10  now for many years, because over the years -- as I
11  said, she's 97, and since she was in her 80s, she's
12  had bad knees.  She has consequently, since then,
13  had knee replacement surgery.
14    Q.  She had both knees replaced?
15    A.  She had both knees replaced at 90.
16    Q.  So it's your understanding your husband
17  would have made the arrangements for the wheelchair
18  assistance?
19    A.  If I booked the thing, I would make the
20  arrangements for the wheelchair.
21    Q.  If you did it, what would be your process?
22  Do you do it on the phone, or do you do it on-line?
23    A.  I would do it on the phone, call the office
24  and do it.

20

1    Q.  Do you remember who and how it was done on
2  this particular occasion in February of 2002?
3    A.  As I said before, I think it was done
4  on-line.
5    Q.  Okay.  And by that you mean the wheelchair
6  request for assistance?
7    A.  The wheelchair assistance is always done
8  when we purchase the ticket.  It's not something we
9  go to the airport and say, "Could I have a
10  wheelchair."
11    Q.  Okay.  So you -- prior to leaving on
12  January 27, did you get a copy -- oh, did you pick
13  up -- strike that.  Did you pick up your tickets
14  when you went to the airport?
15    A.  Yes.
16    Q.  Did you pick up all of your tickets, your
17  return ticket, or just the ones to Trinidad?
18    A.  No, return tickets.
19    Q.  So you got the whole -- all tickets?
20    A.  Yes.
21    Q.  For the whole trip, okay.  And again, that
22  was a round trip between Toronto and Trinidad with a
23  connecting flight in Miami; is that correct?
24    A.  Yes.

21

1    Q.  And that was true on the way there, that
2  is, you'd leave from Toronto, stop in Miami, change
3  planes, and go to Trinidad?
4    A.  Yes.
5    Q.  And the same thing on the way back, which
6  was on the 25th:  You would leave Trinidad, arrive
7  in Miami, and connect on to Toronto; is that
8  correct?
9    A.  Yes.
10    Q.  On your trip there in January, you were
11  with your husband; is that correct?
12    A.  Yes.
13    Q.  And you got to Trinidad at some point; is
14  that right?
15    A.  Yes.
16    Q.  Did you have any discussions with anybody
17  from American or anyone about the need for
18  wheelchair assistance for your trip back at that
19  point?
20    A.  Not for my trip back, no.  I never --
21    Q.  How about for your mother; did you talk
22  with anybody about wheelchair assistance?
23    A.  When I landed?
24    Q.  Yes.

6

**Eppley Court Reporting**
**(508) 478-9795**

22

1    A.  No, because that's not the way I usually do
2   it.  I usually do it -- we usually do it -- I book
3   the ticket, get the wheelchair.  When we check in, I
4   remind them that I need a wheelchair, and they
5   usually have it and bring me a wheelchair.
6    Q.  Okay.  So you were in Trinidad.  Were you
7   in Trinidad for the whole month?
8    A.  I was.
9    Q.  Okay.  And at some point you, your husband,
10  and now your mother were returning to Toronto; is
11  that right?
12    A.  Yes, but my husband was not there on that
13  return.  My husband returned before we did.  I don't
14  remember exactly when, but I know he left before us,
15  so it was just my mother and I.
16    Q.  Okay.  So your husband -- did he return
17  earlier?
18    A.  He did.
19    Q.  All right.  And so on February 25 it was
20  just you and your mother; is that correct?
21    A.  Yes.
22    Q.  And did you already have a ticket for your
23  mother?
24    A.  I did.

23

1    Q.  Okay.  And according to what you told me,
2   you would have bought the ticket at the same time
3   that you and your husband got your ticket?
4    A.  More than likely, but I can't swear on
5   this.  I will have to go back and look at this, you
6   know, but more than likely that's what we did.
7    Q.  All right.  So now, when you left Trinidad
8   on Monday, the 25th, backing up a little bit, you
9   were just with your mother, correct?
10    A.  Yes.
11    Q.  And you went to the airport?
12    A.  Yes.
13    Q.  And at that point when you checked in at
14  the airport, did you have baggage with you?
15    A.  I did.
16    Q.  Did your mother have baggage?
17    A.  Yes, she did.
18    Q.  And you checked that baggage?
19    A.  I did.
20    Q.  And you already had your ticket to return,
21  right?
22    A.  Yes.
23    Q.  And did you pick -- did you already have
24  your ticket for your mother at that point?

24

1    A.  I did.
2    Q.  And once you got there, did you talk to
3   anybody about making sure you had wheelchair
4   assistance?
5    A.  I did.
6    Q.  Do you remember who you spoke to?  Was it
7   American personnel or someone else?
8    A.  No, it's an American personnel because we
9   checked in with American Airlines.
10    Q.  And were you provided a wheelchair?
11    A.  I was.
12    Q.  All right.  Just so I can picture it in my
13  mind, you and your mother come to the airport, you
14  check in, you ask for the wheelchair, a wheelchair
15  is brought.  And is that how your mother gets around
16  the airport?
17    A.  That's how she gets around the airport.
18    Q.  Now, did you have an escort or someone
19  helping you with the wheelchair --
20    A.  Yes, yes.
21    Q.  -- or did you push it?
22    A.  No, I did not push it.
23    Q.  So you got to the airport, you checked in,
24  you got a wheelchair, and I take it you made your

25

1   flight?
2    A.  I did.
3    Q.  Okay.  And looking at your itinerary, which
4   has been marked as Exhibit 2, it indicates that you
5   left -- the flight was scheduled to leave a little
6   bit before 9 o'clock; do you see that?  At 8:53?
7    A.  Yes.
8    Q.  And it arrives in Miami a little bit before
9   12:00 or 11:55; do you see that?
10    A.  Yes.
11    Q.  Do you recall whether or not those were in
12  fact the times or roughly the times that you left
13  and arrived at -- from Trinidad and Miami?
14    A.  Yes, it would be about the time.  I know
15  there was a delay on the -- but that was the one
16  from Miami to Toronto.
17    Q.  Okay.  And you arrived in Miami?
18    A.  Yes.
19    Q.  And that's an airport that you've been to
20  before?
21    A.  Yes.
22    Q.  How many times would you say you've been to
23  the Miami airport prior to February of 2002?
24    A.  Many times.  I don't have an exact number;

Eileen M. Dick
April 10, 2006

(Pages 26 to 29)

| 26 |
| --- |

1  but even when I am leaving from Boston, I'm using
2  American. We always go to Miami.
3      Q. So roughly how many times a year do you
4  travel to Trinidad?
5      A. Many once a year, but sometimes twice, and
6  sometimes if there's something I have to go for,
7  like an emergency, a death in the family or
8  something, that's -- yeah.
9      Q. But on average, you'd go at least once?
10     A. At least once.
11     Q. Maybe a couple more times, depending?
12     A. Maybe.
13     Q. And was this trip here, which was January
14 to February of 2002, part of your annual trip that
15 you would do?
16     A. Yes.
17     Q. Okay.
18     A. That's usually the time when I would do the
19 one annual trip. I just got back.
20     Q. When you do this annual trip, is it your
21 normal practice to have your mother come back with
22 you?
23     A. Sometimes. She did not come back this year
24 with me.

| 27 |
| --- |

1      Q. Okay. Have you ever used any other airline
2  besides American to make that trip?
3      A. Well, this present year I have just used
4  Air Canada.
5      Q. That's the first time that you have used a
6  different airline?
7      A. No, not the first time I've used a
8  different airline. Usually, I use American a lot of
9  the time. It's not the first time I've used a
10 different airline.
11     Q. Now, you arrived in Miami. Prior to your
12 arrival, did you talk with anybody from American
13 about the need for an escort or wheelchair for your
14 mother?
15     A. No, because on flight they know. They
16 asked all the wheelchair passengers to wait until
17 the flight is finished, and they usually know who
18 the wheelchair passengers are. They might not know
19 them by name, but they will see the -- they know
20 they have four wheelchairs or however many, and they
21 always you get off the flight last.
22     Q. You recall there being an announcement for
23 the wheelchair passengers to wait?
24     A. That's right.

| 28 |
| --- |

1      Q. So you and your mother waited to get off
2  the airplane, right?
3      A. Yes.
4      Q. And when you got off the airplane, was
5  there somebody there to meet you with a wheelchair?
6      A. Yes.
7      Q. Was there more than one person?
8      A. For us or for other people?
9      Q. For you.
10     A. No, the wheelchair arrived and the
11 wheelchair person.
12     Q. Do you recall any conversations with
13 anybody from American Airlines prior to your mother
14 getting into the wheelchair?
15     A. Just when they announced the wheelchair
16 passengers, you know, to remain in your seats and
17 you will be picked up, you know, and just, you know,
18 they might say to you, as one of the wheelchair
19 people, "The wheelchair is coming, just sit there."
20     Q. So you help your mother walk off the plane,
21 and then she sits in the wheelchair?
22     A. Yes.
23     Q. Did you have any conversation with the
24 person who met you with the wheelchair at that time?

| 29 |
| --- |

1      A. Pleasantries: "Hi," "Good morning," "How
2  are you."
3      Q. Was it a male or female that met you?
4      A. A female.
5      Q. Do you recall her name?
6      A. I do not recall her name because we were
7  not introduced. I have seen her name since then,
8  but...
9      Q. Do you know who she worked for?
10     A. I did not know at the time who she worked
11 for.
12     Q. All right. So you leave -- strike that.
13 Do you know what gate you arrived at in Miami at
14 that time, that is, on February 25, on your trip
15 from Trinidad to Miami?
16     A. No, I do not.
17     Q. Okay.
18     A. It might be somewhere on my ticket, but I
19 do not.
20     Q. If I were to suggest that it was at Gate
21 11 -- but if you are not sure, I want you to tell
22 me, but if that rings a bell with you, you can also
23 tell me that. Do you know if it was Gate 11 where
24 you arrived?

8

---

**30**

1   A. I do not -- well, you might be right 'cause
2   Gate 11E -- is that what that means (indicating)?
3   Q. No, that might be your seat, actually.
4   A. Oh, all right. No, I cannot recall.
5   Q. Why don't you tell me what happened after
6   you got off the airplane and your mother was --
7   well, strike that. Was it your understanding that
8   you were now going to try to meet your connecting
9   flight to Toronto?
10  A. Yes.
11  Q. And do you know how much time you had
12  before your flight left?
13  A. I cannot recall.
14  Q. And this connecting flight from Miami to
15  Toronto was part of your round-trip itinerary that
16  you had arranged; is that right?
17  A. Yes.
18  Q. All right. So why don't you tell me what
19  happened after your mother got in the wheelchair and
20  you left with the attendant.
21  A. We were on our way through the airport and
22  going, and we came to an area -- after a bit of a
23  ride, we came to an area where there were elevators
24  and escalators and --

---

**31**

1   Q. Let me stop you there, if you don't mind.
2   How long -- how many minutes did it take you to
3   reach that area of the airport?
4   A. Maybe about five minutes. I'm not sure.
5   I'm really not sure.
6   Q. Okay. Did you understand that you were
7   heading toward the gate for your connecting flight?
8   A. Yes.
9   Q. Okay. Were you going anywhere else at that
10  times, as far as you knew?
11  A. Apart from the gate for the connecting
12  flight?
13  Q. Right, right.
14  A. Not as far as I know. We were going for my
15  connecting flight.
16  Q. And did you and your mother have your
17  boarding passes with you?
18  A. Yes.
19  Q. Okay. And did you understand that to be a
20  restricted area of the airport, that is, only
21  ticketed passengers could be in that area?
22  A. Yes.
23  Q. All right. So you arrive at the area where
24  there's an elevator and an escalator, you said?

---

**32**

1   A. Yes -- well, of course, I -- the attendant
2   stopped in front of the elevators and the escalator.
3   There were other passengers going up and down the
4   escalators, so that's why it was quite clear.
5   Q. Did you understand you had to go up or
6   down?
7   A. We were going up.
8   Q. And do you know what gate you were trying
9   to get to?
10  A. I have no idea.
11  Q. Why don't you --
12  A. I did at that point, but I don't know now.
13  Q. All right, okay. Why don't you tell me
14  what happened after you got to the elevator and the
15  escalator area.
16  A. We were standing in front of the elevator,
17  and she tried to get the elevator, pushed the
18  button, and the elevator was not coming. She
19  waited -- we waited for a while, and there was no
20  elevator.
21  Q. What happened next?
22  A. So she said to me -- she turned around, got
23  the wheelchair, and said to me, "The elevator is not
24  working." And I had said, "What do we do now?" And

---

**33**

1   she said to me -- she said to me -- she turned to my
2   mother and said, "You can walk," because she had
3   seen my mother walking to the chair. And I said,
4   "She certainly walks, but what are we going to do
5   now?" And she said, "Well, she'll have to get up
6   and go up on the escalator." And I said, "I do not
7   think that's a good idea." And she said to me,
8   "Well, it's not working." And I said to her, "Is
9   there not another elevator?" And she said no.
10  Q. Okay. And what was the next thing that was
11  done or said after she told you that?
12  A. Well, we got closer to the escalators. She
13  helped my mother out. My mother got her cane. I
14  took my mother's bag, and we sort of waited until it
15  looked clear. And then my mother got on, and I got
16  on immediately behind her.
17  Q. Now, your mother had a cane with her,
18  right?
19  A. Yes.
20  Q. And she had one of -- did she have a
21  handbag?
22  A. I took it away from her.
23  Q. And what were you carrying, if anything?
24  A. I was carrying my handbag and my mother's

---

Eileen M. Dick
April 10, 2006

(Pages 34 to 37)

---

**34**

1 handbag, and I had a small carry-on bag which I put
2 next to me.
3    Q. The carry-on bag, did it have wheels on it,
4 or was it a separate bag you carried?
5    A. Wheels, a small one.
6    Q. So when you were walking from the plane to
7 the escalator/elevator area, you were dragging the
8 small carry-on bag and you had your own handbag?
9    A. Yes.
10    Q. And your mother was sitting in the chair
11 with her cane and her own handbag?
12    A. That's right.
13    Q. So when she stood up, you had to take her
14 handbag?
15    A. Yes.
16    Q. And you both got on the escalator?
17    A. Yes.
18    Q. Okay. What happened after that?
19    A. I got on immediately behind her.
20    Q. Now, there are separate steps. Were you on
21 a different step?
22    A. Yes.
23    Q. But the step right behind her; is that
24 right?

---

**35**

1    A. Yes.
2    Q. Okay. Why don't you tell me what was the
3 next thing that happened?
4    A. We started to ascend, and about a quarter
5 of the way up, I just heard my mother start to
6 scream. She toppled back. She started to scream,
7 and I grabbed her and we both went -- I'm
8 grabbing -- I'm holding onto her, she's screaming,
9 so -- I will show you.
10    Q. Okay.
11    A. (Demonstrating) Because I'm -- she's coming
12 back. I'm grabbing her --
13    Q. And the escalator is going up, correct?
14    A. The escalator is going up. And there are
15 people screaming, "Stop." And the attendant,
16 she's -- 'cause she was coming up with the chair, so
17 she and somebody else at the bottom -- I really
18 don't know how it stopped; but in the meantime, my
19 mother comes toppling back. I'm grabbing her,
20 holding one side, holding my mother, and my legs --
21 because the escalator is moving, so I'm stretching
22 like this (demonstrating). And I started -- I
23 realize I'm going to fall. And this is how we
24 stopped when it stopped. My mother is back. I'm

---

**36**

1 hanging back and --
2    Q. That chair's got wheels on it. I don't
3 want you to go flying.
4    A. This is what happened (demonstrating).
5    Q. Did the attendant get on the escalator
6 behind you?
7    A. She was getting on with the -- on the other
8 side, on -- she was getting up with the -- on the
9 steps with -- I think it's steps -- with the
10 wheelchair. She was bringing the wheelchair.
11    Q. So she was bringing the wheelchair up the
12 regular stairway?
13    A. I think so.
14    Q. Okay. And was that right next to the
15 escalator?
16    A. She was behind me, so I don't know where --
17 but I know she said she will bring the wheelchair
18 up.
19    Q. When your mother fell back into you, you
20 said you grabbed onto the side of the escalator?
21    A. Well, I am holding and I grabbed my mother.
22    Q. Right. What prevented you from falling?
23    A. Well, I was the one who -- I did.
24    Q. Did you actually fall down?

---

**37**

1    A. I -- by this time the elevator -- someone
2 ran and stopped it. So I'm holding here, and I'm
3 stretching, so I didn't, like, fall with my head
4 back or anything, but my knees are bending and, you
5 know, I'm stretching this one and holding my mother
6 (demonstrating).
7    Q. Did you actually go down to your knees?
8    A. Bend over, yes.
9    Q. Your knees were touching the stairwell?
10    A. My right knee was stretched out because
11 there wasn't another stairwell, and this one was
12 kind of jammed against the side of the escalator.
13    Q. Did some people come to your help?
14    A. Yes.
15    Q. And what was the next thing that happened?
16    A. The next thing that happened is they helped
17 us up, you know, people came and helped us up
18 slowly.
19    Q. How did you get off the escalator?
20    A. They had to get me a wheelchair.
21    Q. So they helped your mother off?
22    A. Yes.
23    Q. Was she able to walk off the escalator?
24    A. She was able to -- they met her with a

---

10

**Eileen M. Dick**
**April 10, 2006**

38

1 wheelchair right there. We stood right there, and
2 they met her; and I couldn't move, so they came --
3 they got me a wheelchair as well.
4     Q. What kind of problems were you having
5 causing you unable to move --
6     A. I --
7     Q. I just need to get my question out. Go
8 ahead.
9     A. Yeah. I was on my -- my knee was painful.
10     Q. Which knee?
11     A. My right knee.
12     Q. Okay. And so now your mother and you are
13 in a wheelchair, and you have some pain in your
14 right knee?
15     A. Yes.
16     Q. At this point in time, did you talk with
17 the attendant that had brought you the wheelchair
18 and was escorting you to the gate?
19     A. I do not remember saying anything to her at
20 that time, but I remember her colleague saying to
21 her something at that time: "I told you not to do
22 that."
23     Q. Now, at some point are you saying that
24 there was another -- you were saying there was a

39

1 colleague of this woman?
2     A. There was another wheelchair sitting at
3 the -- another person at the bottom of the stairs in
4 a wheelchair, and the other person was still there
5 with her.
6     Q. Do you recall, was this person a male or
7 female?
8     A. A female.
9     Q. And do you remember her name?
10     A. I didn't ask her name.
11     Q. So when you got down to the bottom of the
12 escalator, your mother got in the wheelchair, and
13 you got in your wheelchair?
14     A. Yes.
15     Q. And it's at that point you recall the
16 attendant saying something?
17     A. The person -- the other person.
18     Q. Yes, the other person.
19     A. The other person.
20     Q. And what did she say?
21     A. "I told you not to do that."
22     Q. And what did the first attendant say?
23     A. She didn't say anything.
24     Q. Did you or your mother say anything at that

40

1 time?
2     A. No.
3     Q. What was the next thing that happened?
4     A. Well, the next thing that happened -- I
5 don't know who all those people were, like, maybe
6 American Airline attendants. Somebody for the
7 elevator came along, and they brought me along to an
8 area; and they got a supervisor or something and
9 started to look at me and ask me if I was all right.
10 And I told them what -- I was in pain and what was
11 happening. And then they got -- they said, well,
12 wait, they will get an attendant, and
13 that sort of thing. So the ambulance came about ten
14 minutes later with -- I mean, I didn't see the
15 ambulance, but they told me that.
16     Q. So paramedics came?
17     A. Paramedics came, yes.
18     Q. So in about ten minutes some paramedics
19 came to take a look at you and your knee?
20     A. Yes, yes.
21     Q. And what did they do for you?
22     A. Well, it was beginning to -- they asked me
23 would I like to go to the hospital; and I said,
24 "Well, it's difficult because I have my mother."

41

1 They looked at my mother, asked if she was all
2 right. She was really scared and, you know,
3 frightened. She was kind of looking at herself to
4 see if she was hurt. And she kept saying no, she's
5 all right and she was just frightened and in shock
6 kind of thing. And she was asking me if I was all
7 right.
8         And so they asked me -- when I looked at
9 it, it was beginning to get swollen a little bit at
10 this time -- if I would like to go to the hospital.
11 I thought about it for a bit; and I said no, I would
12 rather go home.
13     Q. And did they provide you some ice for your
14 knee?
15     A. Yes, they did.
16     Q. Other than ice, did they provide you
17 anything else?
18     A. No. They did offer me if I wanted any,
19 like, pain medication and if I was sure I didn't
20 want to go to the hospital; and I said, "Not right
21 now."
22     Q. Okay. Now, during this time when you were
23 being attended to by the paramedics, do you recall
24 anything that any of the attendants said, the

11

**Eileen M. Dick**
**April 10, 2006**

(Pages 42 to 45)

| | |
|---|---|
| 42 | 44 |

**42**

1  wheelchair attendants said?
2    A.  No.
3    Q.  Do you recall anything that any American
4  Airlines personnel said to you at that time?
5    A.  No.
6    Q.  How long would you say --
7    A.  As a matter of fact, I don't even know if I
8  saw any American Airlines personnel at that time.
9    Q.  Do you understand that the attendants with
10  the wheelchair were not employees of American
11  Airlines?
12    A.  Not at the time, I did not.
13    Q.  Do you understand that now?
14    A.  I do now, but not at the time.
15    Q.  I may have just asked you this, but how
16  long were the paramedics with you, attending to your
17  knee?
18    A.  It could be about ten, fifteen minutes.
19    Q.  Okay.  And what happened next after they
20  took care of your knee and you indicated you wanted
21  to go home, you didn't feel like you wanted to go to
22  the hospital, that you wanted to continue your trip
23  home?
24    A.  We sat there for a while, of course, icing

**43**

1  it down; and then we got to the -- they took me
2  along to the other area where I was supposed to go
3  for the flight.
4    Q.  For the flight?
5    A.  For the flight.  And do not ask me what
6  area or what was -- I have no idea.  I was just
7  pushed along to the area where I was supposed to go
8  for the flight.
9    Q.  So after the paramedics attended to you,
10  did -- were the same two wheelchair attendants with
11  you that took you two onto the gate for your
12  departing flight?
13    A.  The same wheelchair attendant, yes.
14    Q.  You had one pushing you and one pushing
15  your mother?
16    A.  Yes.
17    Q.  Okay.
18    A.  I only picked up a wheelchair attendant
19  after the incident.
20    Q.  That's right.
21    A.  Yes.
22    Q.  So you were taken -- so the next thing you
23  recall after being taken care of by the paramedics
24  was going on to the gate --

**44**

1    A.  Yes.
2    Q.  -- where your flight was leaving; is that
3  right?
4    A.  Yes.
5    Q.  During that time do you recall any
6  conversations with the wheelchair attendants?
7    A.  No.
8    Q.  Did you make it in time to meet your
9  connecting flight?
10    A.  No.  I'm thinking that I -- the flight --
11  I'm not sure if the flight was delayed or if we
12  missed the flight.  I have -- I think the flight was
13  delayed, but I'm not sure, but I know we got on,
14  because we did not get to Toronto until very late
15  that night.  And I know there was some kind of
16  delay, but whether it was -- to be fair, I do not
17  know if it was an American delay or if we missed the
18  flight because of the incident.
19    Q.  Okay.  You just remember that there may
20  have been some delay in the flight?
21    A.  Yes.
22    Q.  Do you know how long you waited for the
23  flight before you left?
24    A.  I waited for quite a bit, quite a bit.

**45**

1    Q.  Do you remember how long?
2    A.  No, I do not.
3    Q.  Now, once you got to the gate area with
4  your boarding pass, did you -- did the attendants
5  stay with you, or did they just leave you there?
6    A.  They left me there.
7    Q.  Did you have any conversations with either
8  one before they left?
9    A.  No.
10    Q.  Do you recall them saying anything to you
11  before you left?
12    A.  No.
13    Q.  While you waited for your plane, did you
14  talk to anybody from American Airlines that you can
15  recall?
16    A.  No, not until I was going to board the
17  plane and, you know, I asked if I could get some ice
18  again; and then they said, when I get on board, so
19  then they started giving me ice.  They knew what had
20  happened by then.
21    Q.  So --
22    A.  I do not know -- let me go back on this.
23    Q.  Sure.
24    A.  I remember there was an incident report.  I

12

46

1  do not know if that's American Airlines.
2  Q. So before you left on your -- before you
3  left on your connecting flight from Miami to
4  Toronto, did you fill out an incident report?
5  A. In the airport when it happened, there was
6  something.
7  Q. I'm going to show you what's been marked as
8  Exhibit 1. And I'm going to show you a page of a
9  document and just see if that's the incident report
10 you recall filling out.
11 A. (Witness reviews document.) Yes.
12 Q. Is that your signature down at the bottom,
13 or did you sign it anywhere there that you can see?
14 A. I'm not seeing my signature on here.
15 Q. Okay. Can I just see that for a second,
16 please. So the squiggly marks down at the bottom --
17 A. That's not me.
18 Q. That's not you. All right.
19    MR. WEIGAND: Why don't we have this
20 marked as 1A.
21    (Marked, Exhibit 1A, Incident report.)
22 Q. What's been marked as 1A, Ms. Dick, just so
23 we are clear, that's a copy of the accident report
24 that you recall filling out or participating in?

47

1  A. Participating in, yes.
2  Q. Do you recall who you spoke with?
3  A. No, I do not. Some suited guy they went
4  and got in an office.
5  Q. Did you go to an office to speak to him?
6  A. I didn't go. They came to me.
7  Q. Did they come to you right where --
8  A. Right where I was sitting in the
9  wheelchair.
10 Q. At the escalator?
11 A. No, just as we moved a little bit away from
12 the escalator, in a sitting area right there.
13 That's where the ambulance attendants came to.
14    MR. WEIGAND: Can I have that marked the
15 next exhibit.
16    (Marked, Exhibit 3, Copy of witness's
17 receipt for ticket and travel in January and
18 February 2002.)
19 Q. Ms. Dick, I'm just going to show you what's
20 been marked as Exhibit 3. And I believe that's a
21 copy of your receipt for your ticket and travel for
22 January and February 2002. Does that sound right to
23 you?
24 A. (Witness reviews document.) Yes.

48

1  Q. Okay. And again, the ticket indicates a
2  trip from Toronto to Miami, Miami to Trinidad, and
3  then back on the 25th of February from Trinidad to
4  Miami, and Miami on to Toronto, correct?
5  A. Yes.
6  Q. All right. When you -- while you were at
7  the Miami airport and you were traveling -- strike
8  that. When you were with the wheelchair attendant,
9  were they directing you where to go while you were
10 in Miami?
11 A. Were they directing me where to go?
12 Q. Yes.
13 A. They were taking me to where I was going.
14 They weren't giving me directions because I was in
15 the wheelchair, so they were pushing me to where --
16 they knew what flight I was going to and what gate I
17 was going to.
18 Q. How about before the incident, when you got
19 off the plane and before you fell on the escalator,
20 you were with a wheelchair attendant; was she
21 directing you and showing you where to go?
22 A. She was leading the way, yes.
23 Q. Okay. You did not pass out through
24 security at any time before you left Miami; is that

49

1  correct?
2  A. Excuse me? Say that again.
3  Q. You didn't pass out through the security
4  part of the airport before you left; is that
5  correct?
6  A. No, I did not. You mean, did I get out of
7  the airport to go through security?
8  Q. Right.
9  A. No, I didn't.
10 Q. And your bags were already checked,
11 correct, your carry-on -- other than your carry-on
12 bags, did you bring other luggage with you on the
13 trip?
14 A. Yes, I had other luggage on the trip.
15 Q. And they were already on the plane?
16 A. Yes.
17 Q. Did you go through customs at all while you
18 were in Miami, or did that take place when you got
19 to Toronto?
20 A. I went through customs when I was in Miami.
21 Q. Okay.
22 A. Yes, that's what I was trying -- yes, we
23 went through customs.
24 Q. Did you go through customs before you got

Eileen M. Dick
April 10, 2006

(Pages 50 to 53)

| 50 |
| --- |

1  on the escalator or after?
2      A.  That I cannot remember.  More than likely
3  it is before, yes.  That I cannot remember.
4      Q.  How many minutes would you say passed from
5  the time that you got off the airplane when you
6  arrived to Miami and the time of the fall?
7  Approximately is fine.
8      A.  About five minutes.
9      Q.  Okay.  And how long --
10      A.  It was a full flight; so, I mean, I don't
11  know.  We were last on the flight, so, you know --
12  to get off, as I said, so it could be five minutes,
13  it could be ten minutes.  I am not sure.
14      Q.  And that's fine.  How long did it take you
15  to get from -- once you -- after you were -- got
16  into the wheelchair yourself after the fall, how
17  long did it take you to get to your connecting
18  flight or the gate?
19      A.  About ten minutes.
20      Q.  Okay.  And you don't recall the gate number
21  at all?
22      A.  I do not.
23      Q.  Do you know if the gate number was an E?
24  Do you recall having an E number?

| 51 |
| --- |

1      A.  I do not, I do not remember.
2      Q.  Are you familiar with the Miami airport at
3  all?  Do you know the concourses at all where
4  American's flights arrive and take off?
5      A.  Only when I am there and have to find my
6  gate.
7      Q.  You couldn't tell me which concourse it is
8  now?
9      A.  No.
10      Q.  All right.  How long a flight is it from
11  Miami to Toronto, approximately?
12      A.  Maybe -- I think it's about four hours.
13  I'm not sure.
14      Q.  Okay.
15      A.  I'm not sure.
16      Q.  That's fine.
17      A.  I think it's about.
18      Q.  Approximately is fine.
19      A.  Yes.
20      Q.  Once you were on board, other than asking
21  for ice for your knee, do you recall any other
22  discussions you had with anybody from American about
23  either your knee or the incident?
24      A.  One of the flight attendants asked me, you

| 52 |
| --- |

1  know.  I said I had an accident, I had an injury, I
2  had an accident.
3      Q.  Do you recall any other discussions you had
4  with anybody from American?
5      A.  No.
6      Q.  So you arrived in Toronto.  Do you know
7  what time you got into Toronto?
8      A.  I know it was night, it was late, and this
9  is why I'm saying I'm thinking the flight was
10  delayed or it was because of me, but it was in the
11  night when my husband picked me up.  And he was --
12  like, my husband was waiting outside for me to come
13  out, and he never liked to park; so then he came in
14  because he didn't know -- I'm sitting there, I
15  couldn't come out.  I'm sitting there in a
16  wheelchair.
17      Q.  Did your husband learn that your flight had
18  been delayed?
19      A.  Yes, I called.  I got a -- yes, I called.
20      Q.  When did you call him?
21      A.  I called from Miami.
22      Q.  And did you tell him what had happened?
23      A.  I did, but he still didn't understand that
24  I was coming out in a wheelchair, because I called

| 53 |
| --- |

1  right away.  He didn't realize that all this had
2  gone on, yes.
3      Q.  So you arrived at the airport and it was
4  late.  Do you know if it was after midnight or
5  before midnight?
6      A.  It was very late.  It could be just before
7  midnight, and it could be after midnight, yeah, it
8  was very light.
9      Q.  Did you go straight home, or did you go to
10  a hospital?
11      A.  I went home and dropped off my bags, and I
12  dropped off, you know, my mom; and then we went to
13  the hospital.
14      Q.  So you didn't go to bed that evening; you
15  just dropped things off and then went to the
16  hospital?
17      A.  Yes.
18      Q.  Okay.  When you left the hospital, were you
19  able to walk -- strike that.  When you left the
20  airport terminal to get into your husband's car,
21  were you able to walk?
22      A.  My husband lifted me into the car.
23      Q.  Okay.  Were you able to walk at all?
24      A.  Not then, not then.  I was hopping on one

14

**Eppley Court Reporting**
**(508) 478-9795**

54

1 leg, but not -- but he had to lift me from -- you
2 know, wheel me out and lift me into the car.
3     Q. So then you went from the airport to your
4 home. How far do you live from the airport?
5     A. About 45 minutes.
6     Q. Then you dropped your mother off, got her
7 settled?
8     A. Yes, got her settled.
9     Q. Then you turned around and went to the
10 hospital?
11    A. Got crutches from my house.
12    Q. And who had -- how did you have crutches at
13 your house?
14    A. I had crutches because I had bunion surgery
15 at Massachusetts General, and I kept my -- I have
16 two sets of crutches. Every time I go, they give me
17 a different one.
18    Q. Okay. And you went on to the hospital.
19 What was the name of the hospital?
20    A. Centenary Hospital. It's in Scarborough.
21    Q. How far away is the hospital?
22    A. The hospital is not very far away. It's
23 about -- driving, it's about three minutes, if that
24 much.

55

1     Q. Why don't you tell me what happened once
2 you got to the hospital.
3     A. Once I got to the hospital, I waited a
4 little bit, and then they sent me for an X-ray.
5     Q. And do you recall the name of the doctor
6 that you saw?
7     A. No, I do not.
8     Q. And you had X-rays done of your knee?
9     A. Yes.
10    Q. And what can you tell me about your knee at
11 that point? How was it feeling?
12    A. Very bad, very swollen.
13    Q. Okay. You could see the swelling with your
14 eyes?
15    A. Yes.
16    Q. And were you able to stand on it at all?
17    A. No.
18    Q. And you were using your crutches you had
19 brought from home?
20    A. Yes.
21    Q. And after your X-rays, what were you told
22 about your knee?
23    A. You know, I really do not remember what
24 they told me about my knee.

56

1     Q. Did they give you --
2     A. They -- say that again.
3     Q. I'm sorry. Did they give you any
4 instructions?
5     A. Yes.
6     Q. What did they tell you to do?
7     A. To rest, rest, do not walk on it, do not
8 stand on it, ice it down, pain medication.
9     Q. Did they give you any prescription for pain
10 medication?
11    A. I think they did.
12    Q. Okay.
13    A. I think they did. I'm not sure, but I
14 know -- yes, I think it was prescription medication.
15 I'm not sure.
16    Q. Did they tell you what the X-ray showed?
17    A. I do not recall if they told me what the
18 X-ray showed.
19    Q. And you then left the hospital and went
20 home?
21    A. Yes.
22    Q. Do you recall any other conversations or
23 discussions you had with anybody at the hospital
24 before you went home?

57

1     A. Well, they asked me what happened and I
2 told them.
3     Q. And other than that, do you recall anything
4 else?
5     A. No.
6     Q. Now, you went back home. And when was the
7 next time you sought any care for your knee?
8     A. I was coming back to Boston. When I came
9 to the Massachusetts General, I think it was a week
10 later.
11    Q. How soon after did you return to Boston
12 from Toronto?
13    A. I think it was about a week, I'm not sure
14 exactly.
15    Q. Was that already planned to do that?
16    A. Yes, yes.
17    Q. Did your knee improve at all during that
18 week before you came back to Boston?
19    A. Not really. It was still very painful, and
20 it was still swollen.
21    Q. Were you still using crutches?
22    A. No, I didn't use the crutches to come back.
23    Q. Did you have to have wheelchair assistance
24 at all when you came back to Boston?

Eileen M. Dick
April 10, 2006

(Pages 58 to 61)

58

1     A. No, I didn't have wheelchair assistance.
2     Q. You came back to Boston about a week later?
3     A. It's about -- I'm not -- yeah.
4     Q. That's fine. I know it's approximate.
5     A. Yes.
6     Q. And you then followed up at Massachusetts
7  General?
8     A. Yes, I went to my doctor at Massachusetts
9  General.
10    Q. Who is your doctor at Massachusetts
11 General?
12    A. Dr. Ellman.
13    Q. He's your primary care physician?
14    A. He's my primary care physician.
15    Q. How long has he been your doctor?
16    A. He's been my primary care physician for a
17 number of years.
18    Q. Is that Dr. Lawrence Ellman?
19    A. Leonard.
20    Q. And he's associated with Massachusetts
21 General?
22    A. Yes, he's at Massachusetts General.
23    Q. Prior to this time had you had any injury
24 or problem with either one of your knees?

59

1     A. None.
2     Q. Had you had any surgeries at all on your
3  legs or hips or anything --
4     A. I had bunion surgery.
5     Q. And who did that?
6     A. Dr. Scardina.
7     Q. And was that part of Massachusetts General?
8     A. Massachusetts General.
9     Q. And when did you have that surgery?
10    A. I had one in, I think, 2000 and one -- no,
11 not 2000. I had it in 19 -- before I retired I had
12 both done. I had one in 1999 and one a year later.
13 I'm not sure about the exact dates right now. They
14 were one after the other. I did one and then I did
15 the other one.
16    Q. And you saw Dr. Patel?
17    A. Dr. Ellman sent me to Dr. Patel.
18    Q. And why don't you tell me what Dr. Patel
19 told you?
20    A. He said I had a torn meniscus.
21    Q. Did he examine you?
22    A. He did.
23    Q. Did he take any MRI or an X-ray at that
24 point?

60

1     A. He did an X-ray.
2     Q. Did he tell you what the X-ray showed?
3     A. Yes, he told me.
4     Q. And what did he tell you?
5     A. I think he said it was a torn meniscus. On
6  examination, when he examined me, he told me that.
7     Q. And what kind of problems were you having
8  with your knee at the time that he examined you?
9     A. Pain, pain.
10    Q. Were you able to bend it?
11    A. Not at that time, not very much, no.
12    Q. But you were able to walk on it?
13    A. Yes, I was walking.
14    Q. And what was the plan of treatment?
15    A. To watch it and, you know, a bandage, a
16 knee brace, and ice, ice and rest, yes.
17    Q. Did he provide you a knee brace?
18    A. Yes.
19    Q. How long did you wear the knee brace?
20    A. Quite a while.
21    Q. When you say "quite a while" --
22    A. For about six weeks off and on, yeah.
23    Q. And other than ice and wearing a knee
24 brace, was there a discussion about surgery at all?

61

1     A. Well, not -- he said, later on down the
2  road, maybe we will have to do that, but not -- we
3  didn't have a discussion about surgery at that time.
4     Q. How many times did you see Dr. Patel about
5  your injury?
6     A. Twice.
7     Q. And the second time you saw him, do you
8  know roughly when that was?
9     A. It could be a month later. I'm not sure.
10    Q. And what did he tell you at that time?
11    A. We'll just watch it and see what happens.
12    Q. Did you seek or obtain any physical
13 therapy?
14    A. Yes, he sent me for physical therapy.
15    Q. And where did you have that?
16    A. Well, I had two sessions at Massachusetts
17 General, and then in the interim I went back to
18 Toronto, and I had -- I think it's quite a bit
19 continuous there.
20    Q. So you had two sessions of physical therapy
21 at Massachusetts General, and then you went back to
22 Toronto?
23    A. Yes.
24    Q. And you continued with your physical

16

**Eileen M. Dick**
**April 10, 2006**

62

1  therapy there?
2      A.  Yes.
3      Q.  What was the name of the entity or place
4  that you had the physical therapy?
5      A.  It's -- I do not remember.  It's not in a
6  hospital.  It's a physical therapy facility, a
7  physical therapist.  I do not remember the name of
8  the place.
9      Q.  LifeMark Health?
10     A.  That's right.
11     Q.  Does that sound right?
12     A.  Yes.
13     Q.  On Kingston Road in Scarborough?
14     A.  That's right, yeah.
15     Q.  And how often did you go for physical
16  therapy?
17     A.  Sometimes twice a week, sometimes, you
18  know, once a week.  Yes, sometimes twice a week.
19     Q.  And how long did you go -- strike that.  At
20  some point did you stop physical therapy?
21     A.  Yes.
22     Q.  Do you know when that was?
23     A.  I think I had physical therapy for quite a
24  while, a few weeks, six weeks or so, maybe, and then

63

1  I stopped.
2      Q.  I have a note here that looks like physical
3  therapy may have stopped in October of 2002.  Does
4  that sound right?
5      A.  Yes, that sounds right.
6      Q.  Since October of 2002 have you had any
7  treatment, physical therapy, or medical attention at
8  all with regard to your right knee?
9      A.  No, I have not.  I have not sought any.
10     Q.  And today how is your knee?
11     A.  Well, I have good days, and there's days
12  when it is painful, especially going downstairs.
13     Q.  Other than going downstairs, do you have
14  any other times when there's a problem with your
15  knee?
16     A.  Yes.  I can feel -- you know, it's painful
17  sometimes, uh-huh.  It doesn't stop me from walking
18  or anything, but yeah.
19     Q.  And are you unable to do anything now that
20  you were able to do before because of your knee?
21     A.  Well, I walked quite a bit.  I don't walk
22  as much now.  I still walk, but I don't walk as much
23  as I used to.
24     Q.  How much do you walk now?  Do you walk

64

1  every day?
2      A.  I do not walk every day.  I walk about
3  twice a week.
4      Q.  And how far do you walk?
5      A.  It depends on how much my husband wants to.
6           (Laughter.)
7      A.  I walk about a mile and a half.
8      Q.  And before the knee incident, how far did
9  you walk or how often did you walk?
10     A.  Every day or sometimes four times a week.
11     Q.  So now after the knee you go approximately
12  twice a week?
13     A.  Yes.
14     Q.  Is there anything else or any other
15  difficulties you have with your knee now that you
16  attribute to the incident?
17     A.  Well, I think all the difficulties -- any
18  difficulty I have with my knee now I attribute to
19  the incident.
20     Q.  The difficulty you stated is you don't walk
21  as much as anymore?
22     A.  Yes.
23     Q.  You have some pain on occasion?
24     A.  Yes.

65

1      Q.  And you have pain when you sometimes go
2  downstairs?
3      A.  Yes.
4      Q.  Any other times you have pain or you have
5  difficulty with your knee?
6      A.  When I get out of bed early in the morning,
7  it seems like it takes me a while to kind of get it
8  going, but then that's it, yeah.
9      Q.  Listening to you, I take it you travel
10  quite a bit?
11     A.  I do.
12     Q.  And you walk twice a week.  What other
13  activities do you do?
14     A.  Around the house, I cook, I -- you
15  know, that's about it.  I don't do, like, a lot of
16  physical stuff.  I have enough to keep me going,
17  yeah.
18     Q.  Do you recall an incident in June of 2002
19  where you stepped in a hole and aggravated your
20  knee?
21     A.  June of -- yes, I think I did, uh-huh.
22     Q.  Do you know when or how you stepped in a
23  hole?
24     A.  I don't know how but I did, walking.

**Eppley Court Reporting**
**(508) 478-9795**

Eileen M. Dick
April 10, 2006

(Pages 66 to 69)

66

1    Q. Oh, there's a note here in the physical
2 therapy notes that you fell in a hole in a driveway.
3    A. Uh-huh.
4    Q. Do you recall that?
5    A. Yes, uh-huh.
6    Q. And did that aggravate your knee?
7    A. It did, yes, it did.
8    Q. You stated that you had -- took some pain
9 medication for a while.  Do you recall what kind of
10 medication you took?
11    A. I think -- I cannot remember this, but I
12 think when I went to the hospital, I think they
13 called it -- it's Tylenol 3, because I remember
14 saying I cannot take Percocet, because I think they
15 had written Percocet before and changed it to
16 Tylenol 3.
17    Q. How long did you take the Tylenol for
18 before you stopped?
19    A. I took it for that first week, and then I
20 kind of slowed down, and then occasionally I will
21 take one.  But I do not do well on medications.  I
22 try not to take it too much.
23    Q. They are hard on your stomach?
24    A. Yes.

67

1    Q. Are you on -- do you need any pain
2 medications for your knee now?
3    A. No, I do not take any pain medication.  I
4 will not take pain medication just like that.
5    Q. Now, following the trip and after you
6 arrived back to Toronto, did you have any further
7 conversations or any contact with American Airlines
8 about your incident?
9    A. I don't think it was with American
10 Airlines, but I remember right after the incident, I
11 had a phone call from -- it must be with the Miami
12 Dade people, because after the incident report, they
13 were following up on that.  They did say someone
14 would call me, I recall.  And that's the only call,
15 but I'm not sure -- I don't think it was with
16 American Airlines.
17    Q. So other than this phone call that you
18 believe came from Miami Dade --
19    A. Yes, yes.
20    Q. -- you didn't have any contact with any
21 American Airlines personnel, as far as you know?
22    A. No.
23    Q. Did you receive this call in Toronto or
24 Boston, if you know?

68

1    A. I cannot remember, I really can't.
2    Q. But sometime after the incident you got a
3 call?
4    A. Yes, yes.
5    Q. Did you keep a note of that call?
6    A. No, I did not.
7    Q. Can you tell me what --
8    A. Well, basically, it said --
9    Q. Hold on a second.  I've got to get the
10 question out so the record is clear.
11    A. I'm sorry, I'm sorry.
12    Q. I knew this was going to happen.  It just
13 happened.  Why don't you tell me everything you
14 recall being said to you and what you said to the
15 person on the phone.
16    A. They called and said, "I understand there
17 was an" -- you know, "you had a fall in the airport
18 yesterday."  And she -- the person said -- it was a
19 woman, I know that -- "You were going through the
20 airport and fell."  And I said, "Correction.  I was
21 not going through the airport and fell."  And I gave
22 her basically what I just said, about how the
23 accident happened.
24    Q. You explained to her, "I wasn't going

69

1 through the airport; I was being brought to my
2 flight"?
3    A. Right.
4    Q. "And I fell on the escalator"?
5    A. That's right, that's right.  I went through
6 the whole thing about what happened, because when I
7 had the call, it would seem to me that the report
8 she had on her desk was that I was going through the
9 airport and fell, and then -- so when we were
10 finished and I explained, she said to me, "Oh, well,
11 this is not how I understood it," now she's got a
12 different picture.  I said, "That's exactly how it
13 happened, how I told you."  That's the only
14 conversation I can recall.
15    Q. And what you told her in that phone call is
16 the same as what you've told me --
17    A. Yes.
18    Q. -- as to what happened?
19    A. Yes.
20    Q. Other than that, do you recall her saying
21 anything else to you during that phone call?
22    A. I think she said something to the effect,
23 like, "Well, we'll get back to you," but that's
24 about it.

18

## 70

1    Q.  Did they ever get back to you?
2    A.  No.
3    Q.  Did you ever follow up or call the airport
4  to talk to anyone?
5    A.  No.
6    Q.  At some point did you seek an attorney's
7  help in this case?
8    A.  Yes.
9    Q.  Okay.  And when did you first do that,
10  approximately?
11    A.  It could be maybe a week or two later.  I'm
12  not sure.  I think it was sometime in March.  I'm
13  not sure what date it was.  It was not too long
14  after.
15    Q.  At the time of the incident, when you were
16  being brought to your connecting flight, did you
17  believe and understand that you were under the
18  direction and control of the attendants?
19    A.  Did I believe I was under their control?
20    Q.  Yes.
21    A.  "Control" is like what?  I mean, they are
22  directing me to where I'm supposed to go?
23    Q.  Yes.
24    A.  Yes.

## 71

1    Q.  And you understood you were in the area of
2  the terminal where only ticketed passengers could
3  be?
4    A.  That's what I understood, yes.
5    Q.  And this incident, again, was while you
6  were on your way to the connecting flight to Toronto
7  to finish the last leg of your trip; is that right?
8    A.  Yes.
9    Q.  Other than Dr. Patel and other than the
10  physical therapy group at Massachusetts General and
11  the physical therapy group in Toronto, have you
12  obtained or sought any other treatment for your knee
13  at any time?
14    A.  No.
15    Q.  Have you discussed your knee condition with
16  Dr. Ellman in any of your visits with him?
17    A.  Well, the first visit I discussed it with
18  him, and then he sent me to Dr. Patel.
19    Q.  Have you ever had any follow-up with him
20  about your knee of any type?
21    A.  No.
22        MR. WEIGAND:  All right.  I think I'm
23  done.  Geoff, do you want to follow up?
24

## 72

1        CROSS-EXAMINATION
2  BY MR. COAN:
3    Q.  Hi, Ms. Dick.  My name is Geoff Coan.  I
4  represent Worldwide Flight Services.  I introduced
5  myself to you before.  I know you have answered a
6  lot of questions today.  I only have a couple of
7  follow-up questions for you.  Okay?
8    A.  Uh-huh.
9    Q.  With respect to when you were on the
10  escalator and your mother fell back onto you, now, I
11  know your mom is extremely old, but how tall is your
12  mother?
13    A.  She's about 5,6, 5,5.
14    Q.  So is she a little taller than you or about
15  the same height?
16    A.  No, she is not taller.  I'm taller than my
17  mother.
18    Q.  How tall are you?
19    A.  I usually say I'm 5,8.
20    Q.  Shrinking a little?
21    A.  Yes.
22    Q.  And how about your mother's weight; is your
23  mom slight or is she heavyset?
24    A.  She is bigger than I am, yes, she is.

## 73

1    Q.  Do you have any idea --
2    A.  She's -- let's see.  She used to wear a
3  size 20 dress.  She wears a size 18 now.
4    Q.  Do you have any idea how much your mom
5  weighed back in February of 2002?
6    A.  I have no idea, but I know she weighed more
7  than I do.  She might be weighing about 185 pounds
8  or something like that, she might be.
9    Q.  Is that about the same as in February of
10  2002?
11    A.  Yes, uh-huh, yes.
12    Q.  And you look like you are in fairly good
13  shape.  You weighed less than 185 pounds back in
14  February of 2002; is that fair to say?
15    A.  All my life I have weighed 132 to 140
16  pounds, since I am an adult.
17    Q.  Never changed?  Wow, that's great.  Now,
18  your annual trip that you would take down to
19  Trinidad, I know that you talked about perhaps
20  taking more than one trip a year if there was an
21  emergency, or perhaps occasionally you would take
22  more than one trip.  But you said that you took an
23  annual trip to Trinidad every year; is that correct?
24    A.  Yes.

Eileen M. Dick
April 10, 2006

(Pages 74 to 77)

---

**74**

1    Q.  How many years have you been taking an
2    annual trip to Trinidad?
3    A.  Quite a bit.  Maybe about eight years.  We
4    have something in Trinidad we call Trinidad
5    carnival.
6    Q.  Sure, Trinidad and Tobago, right, the
7    carnival.  The whole country shuts down, right?
8    A.  Yes.
9    Q.  It sounds like a good time.
10   A.  Yes.
11   Q.  How many siblings do you have?
12   A.  None at the moment.
13   Q.  How many kids were in your family at one
14   point?
15   A.  Three.
16   Q.  Two have passed away?
17   A.  Yes.
18   Q.  Where were you in age out of the three
19   siblings?
20   A.  I'm the youngest.
21   Q.  Your father is no longer with you?
22   A.  No.
23   Q.  Now, when Mr. Weigand asked you about
24   conversations you had with American Airlines

---

**75**

1    personnel, you mentioned you had a conversation with
2    a representative from the Miami Dade airport.  Do
3    you know if you had any conversations with any
4    representatives of Worldwide Flight Services?
5    A.  I do not know, no.
6    Q.  You don't know?
7    A.  No.  I mean, not -- that's what I said, I
8    had a call, I had a phone call from a person, but I
9    don't know where that person was from.  I cannot
10   say, 'cause at the time I thought -- all through
11   that thing I probably thought I was dealing with
12   American Airlines.
13   Q.  Sure.  When you had mentioned the medical
14   care that you have received with respect to your
15   knee injury, it was Dr. Patel, Massachusetts General
16   Hospital physical therapy, Toronto physical therapy,
17   the first visit with Dr. Ellman, and then there was
18   also that emergency room visit up in Toronto,
19   correct?
20   A.  Right, yes.
21   Q.  Were there any other physicians that you
22   sought treatment for your right knee injury from in
23   Toronto prior to coming back to Boston?
24   A.  Just the treatment I had in the emergency

---

**76**

1    room.
2    Q.  Okay.
3        MR. COAN:  Thank you, Mrs. Dick.  I
4    don't have any further questions for you.  Do you
5    have any follow-up, Tory?
6        MR. WEIGAND:  I'm just looking here.
7    (Pause.) I think I'm good.
8        MS. KANE:  I just have a couple, if I
9    could.
10       CROSS-EXAMINATION
11   BY MS. KANE:
12   Q.  Mrs. Dick, when you got off the plane in
13   Miami and the personnel came with the wheelchair,
14   did you tell them what and where you were going at
15   that point?
16   A.  When I got off in Miami?
17   Q.  When you got off in Miami.
18   A.  Did I tell them my destination?
19   Q.  No.  Did you tell them where you were going
20   in the airport?
21   A.  Yes, I told them I was waiting for my
22   connecting flight, but I think they usually know
23   that, you know, where you were going.  But I said --
24   they are usually -- they usually ask you where you

---

**77**

1    are going, and you say you are going to such and
2    such a place.  They know what gate it is, or it's
3    posted so you can look up and say, "Yes, I'm going
4    there."
5    Q.  Okay.  And as you traveled to your next
6    gate, the attorney had asked you, did you feel you
7    were under the direction and control of the
8    personnel who was pushing your mother in the
9    wheelchair.  She was directing you because you had
10   told her where you had to go in the airport; is that
11   correct?
12   A.  Yes.
13   Q.  And in terms of being in control, if you
14   had decided to stop or to go someplace else in the
15   airport, you certainly could have; is that not the
16   case?
17   A.  I would say if I wanted to, I could say,
18   "Wait a minute, hold on a minute, I want to go to
19   the bathroom," "I want to buy a beer," or "I want to
20   buy something," yeah.
21   Q.  Okay.  Thank you.  That's all I have.
22   A.  Yes.
23
24

---

**78**

```
 1           REDIRECT EXAMINATION
 2  BY MR. WEIGAND:
 3     Q.  When you were traveling to the connecting
 4  flight, the attendant was directing the direction
 5  and route you were taking; is that correct?
 6     A.  Yes, because I think she knows the gate
 7  better than I do.
 8     Q.  Right.  So as far as telling you where to
 9  go and how to get to that connecting flight, you
10  were relying upon the attendant?
11     A.  I was.
12        MR. WEIGAND:  Okay.  I don't have
13  anything further.
14        MS. KANE:  I think we're all set.
15        MR. WEIGAND:  All right.
16        (Whereupon the deposition was concluded
17  at 11:36 a.m.)
18
19
20
21
22
23
24
```

**80**

```
 1             I N D E X
 2
 3          EXAMINATIONS
 4  Eileen M. Dick
 5     BY MR. WEIGAND            3
 6     BY MR. COAN             72
 7     BY MS. KANE             76
 8     BY MR. WEIGAND          78
 9
10        EXHIBITS MARKED
11  1, Documents produced by plaintiff in   14
12  response to record request
13  2, Printout of itinerary          16
14  1A, Incident report        46
15  3, Copy of witness's receipt for       47
16  ticket and travel in January and
17  February 2002
18
19  Original exhibits retained by Attorney Weigand
20
21
22
23
24
```

**79**

```
 1        CERTIFICATE OF COURT REPORTER
 2        I, Joan M. Cassidy, Registered
 3  Professional Reporter and Certified Realtime
 4  Reporter, do certify that the deposition of Eileen
 5  M. Dick, in the matter of E. Dick v. American
 6  Airlines & WFS, on April 10, 2006, was
 7  stenographically recorded by me; that the witness
 8  provided satisfactory evidence of identification, as
 9  prescribed by Executive Order 455 (03-13) issued by
10  the Governor of the Commonwealth of Massachusetts,
11  before being sworn by me, a Notary Public in and for
12  the Commonwealth of Massachusetts; that the
13  transcript produced by me is a true and accurate
14  record of the proceedings to the best of my ability;
15  that I am neither counsel for, related to, nor
16  employed by any of the parties to the above action;
17  and further that I am not a relative or employee of
18  any attorney or counsel employed by the parties
19  thereto, nor financially or otherwise interested in
20  the outcome of the action.
21
22
23        _____
24        Joan M. Cassidy, RPR, CRR
```

**81**

```
WITNESS: Eileen M. Dick
CASE: E. Dick v. American Airlines & WFS
        SIGNATURE PAGE/ERRATA SHEET
PAGE    LINE    CHANGE OR CORRECTION AND REASON
```

I have read the transcript of my deposition taken April 10,
2006.  Except for any corrections or changes noted above I
hereby subscribe to the transcript as an accurate record of the
statements made by me.
Signed under the pains and penalties of perjury.

_____DATE_____

Deponent, Eileen M. Dick

21

**Eileen M. Dick**
**April 10, 2006**

(Page 82)

82

Eileen M. Dick
SIGNATURE PAGE/ERRATA SHEET INFORMATION
For deposition taken on: April 10, 2006
E. Dick v. American Airlines & WFS

SIGNATURE INFORMATION FOR COUNSEL
The original signature page/errata sheet has been sent to
Kathleen Kane, Esq., to obtain signature from the deponent.
When complete, please send original to Tory Weigand, Esq. A
copy of any errata should be sent to each party of record
present at the deposition.

WITNESS INSTRUCTIONS
After reading the transcript of your deposition, please note any
change or correction and the reason on the errata/signature
page. DO NOT make any notations on the transcript itself. If
necessary, continue the format on a separate page.

PLEASE SIGN AND DATE the errata/signature page (before a notary
if requested) and return it to your counsel.

22

Eileen M. Dick
April 10, 2006

83

**A**

ability
79:14
able
18:17 19:1 37:23,24
53:19,21,23 55:16
60:10,12 63:20
accepted
12:13
accident
11:18 46:23 52:1,2
68:23
accurate
79:13 81:24
action
79:16,20
activities
65:13
address
4:17 5:1
adult
73:16
age
74:18
agency
17:6
ages
5:18
aggravate
66:6
aggravated
65:19
agree
14:24
ahead
4:6 18:9,10,12,13
38:8
Air
27:4
airline
27:1,6,8,10 40:6
Airlines
1:9 2:16 3:15 24:9
28:13 42:4,8,11
45:14 46:1 67:7,10
67:16,21 74:24
75:12 79:6 81:2
82:4
airplane
28:2,4 30:6 50:5
airport
3:18 18:22,24 20:9,14
23:11,14 24:13,16
24:17,23 25:19,23
30:21 31:3,20 46:5
48:7 49:4,7 51:2

53:3,20 54:3,4
68:17,20,21 69:1,9
70:3 75:2 76:20
77:10,15
alive
11:5,6
Alzheimer's
11:11
ambulance
40:12,13,15 47:13
American
1:9 2:16 3:15 12:23
12:24 21:17 24:7,8
24:9 26:2 27:2,8,12
28:13 40:6 42:3,8
42:10 44:17 45:14
46:1 51:22 52:4
67:7,9,16,21 74:24
75:12 79:2 79:5 81:2
82:4
American's
51:4
announced
28:15
announcement
27:22
annual
26:14,19,20 73:18,23
74:2
answer
4:6,9
answered
72:5
answers
4:4
anybody
21:16,22 24:3 27:12
28:13 45:14 51:22
52:4 56:23
anymore
64:21
Apart
31:11
APPEARANCES
2:1
approximate
13:21 58:4
approximately
9:9 12:19 50:7 51:11
51:18 64:11 70:10
April
1:15 79:6 81:22 82:3
area
30:22,23 31:3,20,21
31:23 32:15 34:7
40:8 43:2,6,7 45:3

47:12 71:1
arrange
13:13
arranged
30:16
arrangements
17:20 19:17,20
arrival
27:12
arrive
21:6 31:23 51:4
arrived
25:13,17 27:11 28:10
29:13,24 50:6 52:6
53:3 67:6
arrives
25:8
ascend
35:4
asked
27:16 40:22 41:1,8
42:15 45:17 51:24
57:1 74:23 77:6
asking
19:4 41:6 51:20
assistance
17:20,21 18:15,20
19:4,5,9,18 20:6,7
21:18,22 24:4 57:23
58:1
associated
58:20
attendant
30:20 32:1 35:15 36:5
38:17 39:16,22
40:12 43:13,18 48:8
48:20 78:4,10
attendants
40:6 41:24 42:1,9
43:10 44:6 45:4
47:13 51:24 70:18
attended
41:23 43:9
attending
42:16
attention
63:7
attorney
77:6 79:18 80:19
attorney's
70:6
attribute
64:16,18
audibly
4:10
average

26:9
a.m
1:15 78:17

**B**

back
5:6,8 14:23 15:7,9,19
17:17 21:5,18,20
23:5 26:19,21,23
35:6,12,19,24 36:1
36:19 37:4 45:22
48:3 57:6,8,18,22
57:24 58:2 61:17,21
67:6 69:23 70:1
72:10 73:5,13 75:23
background
6:1,23
backing
23:8
bad
19:12 55:12
bag
33:14 34:1,3,4,8
baggage
23:14,16,18
Baggin
11:1
bags
49:10,12 53:11
bandage
60:15
basically
68:8,22
bathroom
77:19
Bazzey
11:2,3
bed
53:14 65:6
beer
77:19
began
8:18 16:14
beginning
40:22 41:9
believe
10:14,24 12:1 47:20
67:18 70:17,19
bell
29:22
bend
37:8 60:10
bending
37:4
best
79:14

better
78:7
bigger
72:24
birth
5:10
bit
5:24 6:22 11:8,9 14:5
16:3 23:8 25:6,8
30:22 41:9,11 44:24
44:24 47:11 55:4
61:18 63:21 65:10
74:3
board
45:16,18 51:20
boarding
31:17 45:4
boards
9:1 10:4
book
17:6,13 18:11,13 22:2
booked
15:15,24,24 19:8,19
born
6:2
Boston
1:18 2:13,21 4:16 5:4
7:7 8:16,23 11:23
12:16,17 13:4 26:1
57:8,11,18,24 58:2
67:24 75:23
bottom
35:17 39:3,11 46:12
46:16
bought
18:5 23:2
Boulevard
5:2
Box
1:23
brace
60:16,17,19,24
break
3:21,23
bring
22:5 36:17 49:12
bringing
36:10,11
brought
24:15 38:17 40:7
55:19 69:1 70:16
BU
13:8,9
bunion
54:14 59:4
button

Eileen M. Dick
April 10, 2006
84

32:18
**buy**
77:19,20
**B-a-z-z-e-y**
11:2

_____ **C** _____
**C**
3:1
**call**
19:23 52:20 67:11,14
67:14,17,23 68:3,5
69:7,15,21 70:3
74:4 75:8,8
**called**
7:23 13:10 52:19,19
52:21,24 66:13
68:16
**Canada**
27:4
**cane**
18:19 19:2 33:13,17
34:11
**car**
19:1 53:20,22 54:2
**care**
12:10 42:20 43:23
57:7 58:13,14,16
75:14
**carnival**
74:5,7
**carried**
34:4
**carrying**
33:23,24
**carry-on**
34:1,3,8 49:11,11
**case**
70:7 77:16 81:2
**Cassidy**
1:21 79:2,24
**cause**
4:23 30:1 35:16 75:10
**causing**
38:5
**Centenary**
54:20
**certainly**
33:4 77:15
**CERTIFICATE**
79:1
**Certified**
79:3
**certify**
79:4
**chair**

33:3 34:10 35:16
**chair's**
36:2
**chance**
14:21
**change**
21:2 81:4 82:15
**changed**
66:15 73:17
**changes**
81:23
**check**
22:3 24:14
**checked**
23:13,18 24:9,23
49:10
**children**
5:16 9:2,13
**citizen**
12:24 13:1
**City**
13:7
**clean**
12:13
**clear**
32:4 33:15 46:23
68:10
**closer**
33:12
**Coan**
2:19 72:2,3 76:3 80:6
**colleague**
38:20 39:1
**come**
5:8 6:3 12:3,4,4,12
17:17 24:13 26:21
26:23 37:13 47:7
52:12,15 57:22
**comes**
35:19
**coming**
9:17 28:19 32:18
35:11,16 52:24 57:8
75:23
**Commonwealth**
79:10,12
**complete**
82:9
**concluded**
78:16
**concourse**
51:7
**concourses**
51:3
**condition**
71:15

**connect**
21:7
**connecting**
18:21 20:23 30:8,14
31:7,11,15 44:9
46:3 50:17 70:16
71:6 76:22 78:3,9
**connection**
10:8
**consequently**
19:12
**contact**
67:7,20
**continue**
8:12 42:22 82:17
**continued**
61:24
**continuous**
61:19
**control**
70:18,19,21 77:7,13
**conversation**
28:23 69:14 75:1
**conversations**
28:12 44:6 45:7 56:22
67:7 74:24 75:3
**cook**
65:14
**copies**
14:18
**copy**
20:12 46:23 47:16,21
80:15 82:10
**correct**
15:3 20:23 21:8,11
22:20 23:9 35:13
48:4 49:1,5,11
73:23 75:19 77:11
78:5
**corrected**
6:21
**correction**
68:20 81:4 82:15
**corrections**
81:23
**Council**
8:6
**counsel**
14:12,19,24 79:15,18
82:6,20
**country**
74:7
**couple**
26:11 72:6 76:8
**course**
32:1 42:24

**COURT**
1:3,22 79:1
**CROSS-EXAMIN...**
72:1 76:10
**CRR**
1:21 79:24
**crutches**
54:11,12,14,16 55:18
57:21,22
**current**
10:15,16
**currently**
4:15
**customs**
49:17,20,23,24

_____ **D** _____
**D**
3:1 80:1
**Dade**
3:17 67:12,18 75:2
**date**
5:10 70:13 81:28
82:19
**dates**
59:13
**day**
11:11 64:1,2,10
**days**
3:7 63:11,11
**dealing**
75:11
**death**
26:7
**decided**
77:14
**Defendant**
2:16,24
**Defendants**
1:11
**degree**
7:14,16,19 8:3
**delay**
25:15 44:16,17,20
**delayed**
44:11,13 52:10,18
**demonstrating**
35:11,22 36:4 37:6
**departing**
43:12
**depending**
26:11
**depends**
64:5
**deponent**
81:29 82:8

**deposed**
10:7
**deposition**
1:14 10:8 15:2 78:16
79:4 81:22 82:3,11
82:14
**desk**
69:8
**destination**
76:18
**Dick**
1:6,14 3:11,14 4:14
5:15 16:9 46:22
47:19 72:3 76:3,12
79:5,5 80:4 81:1,2
81:29 82:1,4
**Dicker**
2:18
**dietary**
13:11
**different**
27:6,8,10 34:21 54:17
69:12
**difficult**
40:24
**difficulties**
64:15,17
**difficulty**
64:18,20 65:5
**DIRECT**
3:12
**directing**
48:9,11,21 70:22 77:9
78:4
**direction**
70:18 77:7 78:4
**directions**
48:14
**discussed**
71:15,17
**discussion**
60:24 61:3
**discussions**
21:16 51:22 52:3
56:23
**DISTRICT**
1:3,4
**Docket**
1:8
**doctor**
55:5 58:8,10,15
**document**
16:9,12 46:9,11 47:24
**Documents**
14:16 80:11
**doing**

```
       10:8 11:7,8
Dorchester
  4:18 8:19,20
downstairs
  63:12,13 65:2
Dr
  58:12,18 59:6,16,17
    59:17,18 61:4 71:9
    71:16,18 75:15,17
dragging
  34:7
dress
  73:3
driveway
  66:2
driving
  54:23
dropped
  53:11,12,15 54:6
_____ E _____
E
  3:1,1 50:23,24 79:5
    80:1 81:2 82:4
earlier
  22:17
early
  65:6
Edelman
  2:18
Edgware
  7:4,22 8:2
educational
  6:23
effect
  69:22
eight
  74:3
Eileen
  1:6,14 3:11 4:14 79:4
    80:4 81:1,29 82:1
either
  45:7 51:23 58:24
elevator
  31:24 32:14,16,17,18
    32:20,23 33:9 37:1
    40:7
elevators
  30:23 32:2
Ellman
  58:12,18 59:17 71:16
    75:17
Elser
  2:18
emergency
  26:7 73:21 75:18,24
```

```
Emmanuel
  5:15
employed
  79:16,18
employee
  79:17
employees
  42:10
ended
  6:20
England
  6:18 7:3,5,11,20 8:6
    12:4
entity
  62:3
EPPLEY
  1:22
errata
  82:10
errata/signature
  82:15,19
escalator
  31:24 32:2,15 33:6
    34:16 35:13,14,21
    36:5,15,20 37:12,19
    37:23 39:12 47:10
    47:12 48:19 50:1
    69:4 72:10
escalators
  30:24 32:4 33:12
escalator/elevator
  34:7
escort
  24:18 27:13
escorting
  38:18
especially
  63:12
Esq
  2:3,11,19 82:8,9
evening
  53:14
evidence
  79:8
exact
  25:24 59:13
exactly
  22:14 57:14 69:12
examination
  3:12 60:6 78:1
EXAMINATIONS
  80:3
examine
  59:21
examined
  60:6,8
```

```
Excuse
  49:2
Executive
  79:9
exhibit
  14:15,16 16:6,7,10
    25:4 46:8,21 47:15
    47:16,20
exhibits
  1:2 80:10,19
expect
  3:22
explained
  68:24 69:10
extra
  14:18
extremely
  72:11
eyes
  55:14
_____ F _____
facility
  62:6
fact
  25:12 42:7
fair
  44:16 73:14
fairly
  17:11 73:12
fall
  13:24 35:23 36:24
    37:3 50:6,16 68:17
falling
  36:22
familiar
  51:2
family
  26:7 74:13
far
  31:10,14 54:4,21,22
    64:4,8 67:21 78:8
father
  74:21
Fax
  2:6,14,22
February
  13:16,19 14:7,7 15:19
    16:15 17:17 20:2
    22:19 25:23 26:14
    29:14 47:18,22 48:3
    73:5,9,14 80:17
Federal
  2:20
feel
  42:21 63:16 77:6
```

```
feeling
  55:11
fell
  36:19 48:19 66:2
    68:20,21 69:4,9
    72:10
female
  29:3,4 39:7,8
fifteen
  42:18
filing
  3:10
fill
  46:4
filling
  46:10,24
financially
  79:19
find
  51:5
fine
  50:7,14 51:16,18 58:4
finish
  71:7
finished
  7:1,24 27:17 69:10
first
  6:3,5,17 7:22 8:18
    10:18 14:15 27:5,7
    27:9 39:22 66:19
    70:9 71:17 75:17
five
  9:17 12:8 31:4 50:8
    50:12
flight
  1:10 2:24 3:16 15:24
    16:1 18:22 20:23
    25:1,5 27:15,17,21
    30:9,12,14 31:7,12
    31:15 43:3,4,5,8,12
    44:2,9,10,11,12,12
    44:18,20,23 46:3
    48:16 50:10,11,18
    51:10,24 52:9,17
    69:2 70:16 71:6
    72:4 75:4 76:22
    78:4,9
flights
  51:4
Floating
  9:2,12,22
flying
  36:3
follow
  70:3 71:23
followed
```

```
  58:6
following
  67:5,13
follow-up
  71:19 72:7 76:5
forget
  11:9
form
  3:5
format
  82:17
former
  7:6
forth
  5:6
four
  11:14 27:20 51:12
    64:10
frequently
  17:11,12
frightened
  14:2 41:3,5
front
  32:2,16
full
  4:12 50:10
full-time
  8:8 9:22,24 10:1
further
  67:6 76:4 78:13 79:17
_____ G _____
G
  3:1
gate
  29:13,20,23 30:2 31:7
    31:11 32:8 38:18
    43:11,24 45:3 48:16
    50:18,20,23 51:6
    77:2,6 78:6
General
  7:4,22 8:2 54:15 57:9
    58:7,9,11,21,22
    59:7,8 61:17,21
    71:10 75:15
Geoff
  71:23 72:3
Geoffrey
  2:19
geoffrey.coan@wils...
  2:23
getting
  12:12 28:14 36:7,8
give
  54:16 56:1,3,9
giving
```

45:19 48:14
go
4:6 5:6,7 11:21,24
12:3 13:12 18:21
20:9 21:3 23:5 26:2
26:6,9 32:5 33:6
36:3 37:7 38:7
40:23 41:10,12,20
42:21,21 43:2,7
45:22 47:5,6 48:9
48:11,21 49:7,17,24
53:9,9,14 54:16
62:15,19 64:11 65:1
70:22 77:10,14,18
78:9
going
10:21 14:20 16:9 30:8
30:22 31:9,14 32:3
32:7 33:4 35:13,14
35:23 43:24 45:16
46:7,8 47:19 48:13
48:16,17 63:12,13
65:8,16 68:12,19,21
68:24 69:8 76:14,19
76:23 77:1,1,3
good
11:7,8 29:1 33:7
63:11 73:12 74:9
76:7
Governor
79:10
grabbed
35:7 36:20,21
grabbing
35:8,12,19
graduated
7:4
grandchildren
5:20,23
great
73:17
Greenbrier
4:18
group
71:10,11
guy
47:3

H
half
64:7
Hancock
2:4
handbag
33:21,24 34:1,8,11,14
hanging

36:1
happen
68:12
happened
30:5,19 32:14,21
34:18 35:3 36:4
37:15,16 40:3,4
42:19 45:20 46:5
52:22 55:1 57:1
68:13,23 69:6,13,18
happening
40:11
happens
61:11
hard
66:23
head
4:9 37:3
heading
31:7
Health
62:9
heard
35:5
heavyset
72:23
height
72:15
help
16:3 28:20 37:13 70:7
helped
33:13 37:16,17,21
helping
24:19
helps
12:9
Hertfordshire
7:24
Hi
29:1 72:3
high
6:23 7:1,1
hips
59:3
hold
7:14 68:9 77:18
holding
35:8,20,20 36:21 37:2
37:5
hole
65:19,23 66:2
home
4:23 41:12 42:21,23
53:9,11 54:4 55:19
56:20,24 57:6
Hopedale

1:24
hopping
53:24
hospital
7:5,22,23,24 8:5 9:2
9:12,23 13:7 40:23
41:10,20 42:22
53:10,13,16,18
54:10,18,19,20,21
54:22 55:2,3 56:19
56:23 62:6 66:12
75:16
hospital-based
7:15
hours
51:12
house
54:11,13 65:14
hurt
41:4
husband
4:23 7:6 10:14,15,16
10:18 15:8 16:17,22
17:8,11 19:7,16
21:11 22:9,12,13,16
23:3 52:11,12,17
53:22 64:5
husband's
5:14 53:20

I
ice
41:13,16 45:17,19
51:21 56:8 60:16,16
60:23
icing
42:24
idea
32:10 33:7 43:6 73:1
73:4,6
identification
79:8
immediately
33:16 34:19
important
4:4
improve
57:17
incident
3:17 13:16 14:6 15:21
43:19 44:18 45:24
46:4,9,21 48:18
51:23 64:8,16,19
65:18 67:8,10,12
68:2 70:15 71:5
80:14

Index
1:2
indicated
42:20
indicates
25:4 48:1
indicating
30:2
Indies
7:2
individually
14:20
INFORMATION
82:2,6
injury
13:23 14:1,3 52:1
58:23 61:5 75:15,22
instructions
56:4 82:13
interested
79:19
interim
61:17
International
3:17
introduced
29:7 72:4
Iris
11:1,1,2
issued
79:9
itinerary
16:8,13 25:3 30:15
80:13

J
Jamaica
7:6,7 8:10,11,13 12:5
jammed
37:12
January
15:18 16:1,14 20:12
21:10 26:13 47:17
47:22 80:16
Joan
1:21 79:2,24
joined
9:12
Joseph
5:15
June
65:18,21

K
Kane
2:3 3:3,8 15:3 76:8,11

78:14 80:7 82:8
Kathleen
2:3 82:8
keep
65:16 68:5
kept
41:4 54:15
kids
74:13
kind
4:9 5:8 7:14 37:12
38:4 41:3,6 44:15
60:7 65:7 66:9,20
Kingston
62:13
kkane@spillanelaw...
2:7
knee
19:13 37:10 38:9,10
38:11,14 40:19
41:14 42:17,20
51:21,23 55:8,10,22
55:24 57:7,17 60:8
60:16,17,19,23 63:8
63:10,15,20 64:8,11
64:15,18 65:5,20
66:6 67:2 71:12,15
71:20 75:15,22
knees
19:12,14,15 37:4,7,9
58:24
knew
31:10 45:19 48:16
68:12
know
3:19,22,24 11:8,10,22
12:4 14:2 22:14
23:6 25:14 27:15,17
27:18,19 28:16,17
28:17 29:9,10,13,23
30:11 31:14 32:8,12
35:18 36:16,17 37:5
37:17 40:5 41:2
42:7 44:13,15,17,22
45:17,22 46:1 50:11
50:11,23 51:3 52:1
52:6,8,14 53:4,12
54:2 55:23 56:14
58:4 60:15 61:8
62:18,22 63:16
65:15,22,24 67:21
67:24 68:17,19 72:5
72:11 73:6,19 75:3
75:5,6,9 76:22,23
77:2
knows

78:6

**L**

**L**
2:3
**landed**
15:22 21:23
**late**
44:14 52:8 53:4,6
**Laughter**
64:6
**Law**
2:2
**Lawrence**
58:18
**lawsuit**
10:9,11
**leading**
48:22
**learn**
52:17
**leave**
16:1,20 21:2,6 25:5
29:12 45:5
**leaving**
20:11 26:1 44:2
**left**
12:18 15:9,18 16:18
16:21 17:16,19,23
17:24 18:6 22:14
23:7 25:5,12 30:12
30:20 44:23 45:6,8
45:11 46:2,3 48:24
49:4 53:18,19 56:19
**leg**
15:22 54:1 71:7
**legs**
35:20 59:3
**Leonard**
58:19
**lesson**
7:23
**let's**
73:2
**life**
73:15
**LifeMark**
62:9
**lift**
54:1,2
**lifted**
53:22
**light**
53:8
**liked**
52:13

**LINE**
81:4
**Listening**
65:9
**little**
5:24 6:22 11:9 16:3
23:8 25:5,8 41:9
47:11 55:4 72:14,20
**live**
8:18,21 11:16 12:9,11
54:4
**lived**
8:20 12:15
**living**
8:21
**LLP**
1:16 2:10,18
**London**
6:18 7:3,10 12:18
**long**
3:22 4:19 8:7 9:7,15
12:19 31:2 42:6,16
44:22 45:1 50:9,14
50:17 51:10 58:15
60:19 62:19 66:17
70:13
**longer**
74:21
**look**
14:21 23:5 40:9,19
73:12 77:3
**looked**
33:15 41:1,8
**looking**
10:20 15:10 25:3 41:3
76:6
**looks**
15:11 63:2
**lot**
4:22 11:23 12:1,22
27:8 65:15 72:6
**luggage**
49:12,14

**M**

**M**
1:14,21 2:19 3:11
79:2,5,24 80:4 81:1
81:29 82:1
**Maenola**
4:14
**Mahoney**
1:16 2:10
**making**
24:3
**male**

29:3 39:6
**March**
70:12
**mark**
14:20
**marked**
14:14,16 16:5,7,10
25:4 46:7,20,21,22
47:14,16,20 80:10
**marks**
46:16
**marriage**
6:12,13,19,20
**married**
5:12,13 6:9,10,15,17
6:18
**Mass**
4:18
**Massachusetts**
1:4,18,24 2:5,13,21
54:15 57:9 58:6,8
58:10,20,22 59:7,8
61:16,21 71:10
75:15 79:10,12
**matter**
3:15 42:7 79:5
**Meadow**
5:2
**mean**
20:5 40:14 49:6 50:10
70:21 75:7
**means**
30:2
**medical**
63:7 75:13
**medication**
41:19 56:8,10,14 66:9
66:10 67:3,4
**medications**
66:21 67:2
**meet**
13:13 16:24 18:21
28:5 30:8 44:8
**meniscus**
59:20 60:5
**mentioned**
8:15 75:1,13
**merged**
13:8
**met**
28:24 29:3 37:24 38:2
**Miami**
3:17 13:24 15:22
20:23 21:2,7 25:8
25:13,16,17,23 26:2
27:11 29:13,15

30:14 46:3 48:2,2,4
48:4,7,10,24 49:18
49:20 50:6 51:2,11
52:21 67:11,18 75:2
76:13,16,17
**midnight**
53:4,5,7,7
**migrated**
7:3
**mile**
64:7
**mind**
24:13 31:1
**minute**
10:21 15:11 77:18,18
**minutes**
31:2,4 40:14,18 42:18
50:4,8,12,13,19
54:5,23
**missed**
44:12,17
**mom**
53:12 72:11,23 73:4
**moment**
74:12
**Monday**
1:15 23:8
**month**
22:7 61:9
**months**
5:7
**morning**
3:23 29:1 65:6
**Morrison**
1:16 2:10
**Moskowitz**
2:18
**mother**
11:1 13:15,23 14:10
15:6 16:18,19,19
17:1,17 18:5,17,19
19:9 21:21 22:10,15
22:20,23 23:9,16,24
24:13,15 26:21
27:14 28:1,13,20
30:6,19 31:16 33:2
33:3,13,13,15,17
34:10 35:5,19,20,24
36:19,21 37:5,21
38:12 39:12,24
40:24 41:1 43:15
54:6 72:10,12,17
77:8
**mother's**
33:14,24 72:22
**motions**

3:6
**move**
38:2,5
**moved**
7:6,7,10 8:1,10 47:11
**moving**
35:21
**MRI**
59:23
**Musician**
10:19

**N**

**N**
3:1 80:1
**name**
3:14 4:13 5:14 7:21
27:19 29:5,6,7 39:9
39:10 54:19 55:5
62:3,7 72:3
**Napsbury**
7:23
**necessary**
82:17
**need**
3:10,21,23 21:17 22:4
27:13 38:7 67:1
**neither**
79:15
**never**
8:24 21:20 52:13
73:17
**night**
44:15 52:8,11
**nodding**
8:11
**nods**
4:8
**normal**
26:21
**normally**
17:13,15
**notary**
3:8,9 79:11 82:19
**notations**
82:16
**note**
63:2 66:1 68:5 82:14
**noted**
14:6 81:23
**notes**
66:2
**November**
9:18,19
**number**
13:21 25:24 50:20,23

Eileen M. Dick
April 10, 2006
88

50:24 58:17
nurse
8:4,8,12,24
nursing
7:4,12,14,15 8:6 10:4

_____ O _____

O
3:1
Oak
5:2
objections
3:4
obtain
7:19 61:12 82:8
obtained
71:12
occasion
19:6 20:2 64:23
occasionally
66:20 73:21
October
63:3,6
offer
41:18
office
19:23 47:4,5
Offices
2:2
oh
12:7 20:12 30:4 66:1
69:10
okay
4:6,12 5:10 6:13,19
6:22 11:5 13:15,18
14:12 15:4,14,17,21
16:24 17:3,19 19:3
20:5,11,21 22:6,9
22:16 23:1 25:3,17
26:17 27:1 29:17
31:6,9,19 32:13
33:10 34:18 35:2,10
36:14 38:12 41:22
42:19 43:17 44:19
46:15 48:1,23 49:21
50:9,20 51:14 53:18
53:23 54:18 55:13
56:12 70:9 72:7
76:2 77:5,21 78:12
old
72:11
once
8:22 18:24 24:2 26:5
26:9,10 45:3 50:15
51:20 55:1,3 62:18
ones

20:17
one's
5:19,19
Ontario
5:2
on-line
17:9,14 19:8,22 20:4
Order
79:9
original
80:19 82:7,9
originally
6:1 7:9
originated
15:11,16
outcome
79:20
outside
52:12
o'clock
25:6

_____ P _____

P
3:1
page
46:8 81:4 82:16,17,19
Pages
1:1
page/errata
81:3 82:2,7
pain
38:13 40:10 41:19
56:8,9 60:9,9 64:23
65:1,4 66:8 67:1,3,4
painful
38:9 57:19 63:12,16
pains
81:26
paramedics
40:16,17,18 41:23
42:16 43:9,23
park
52:13
part
7:23 14:9 15:2,5,17
26:14 30:15 49:4
59:7
participating
46:24 47:1
particular
5:3 19:5 20:2
parties
79:16,18
party
10:11 82:10

pass
45:4 48:23 49:3
passed
50:4 74:16
passengers
27:16,18,23 28:16
31:21 32:3 71:2
passes
31:17
Patel
59:16,17,18 61:4 71:9
71:18 75:15
Pause
76:7
pediatrics
9:3
penalties
81:26
people
28:8,19 35:15 37:13
37:17 40:5 67:12
Percocet
66:14,15
period
9:8 12:16 13:3
perjury
81:26
person
28:7,11,24 39:3,4,6
39:17,17,18,19
68:15,18 75:8,9
personnel
24:7,8 42:4,8 67:21
75:1 76:13 77:8
phone
19:22,23 67:11,17
68:15 69:15,21 75:8
physical
14:1 61:12,14,20,24
62:4,6,7,15,20,23
63:2,7 65:16 66:1
71:10,11 75:16,16
physically
14:4
physician
58:13,14,16
physicians
75:21
pick
18:11 20:12,13,16
23:23
picked
28:17 43:18 52:11
picture
24:12 69:12
place

5:4 14:6 15:21 49:18
62:3,8 77:2
plaintiff
1:7 2:8 14:17 80:11
plan
17:17 60:14
plane
18:21 28:20 34:6
45:13,17 48:19
49:15 76:12
planes
21:3
planned
57:15
Pleasantries
29:1
please
4:9,12 46:16 82:9,14
82:19
point
16:24 21:13,19 22:9
23:13,24 32:12
38:16,23 39:15
55:11 59:24 62:20
70:6 74:14 76:15
posted
77:3
pounds
73:7,13,16
practice
26:21
prescribed
79:9
prescription
56:9,14
present
27:3 82:11
prevented
36:22
previously
6:15
primary
58:13,14,16
principal
10:17
printout
16:7,13 80:13
prior
20:11 25:23 27:11
28:13 58:23 75:23
probably
16:2 18:4 75:11
problem
58:24 63:14
problems
38:4 60:7

proceedings
79:14
process
19:21
produced
14:13,16,19 79:13
80:11
Professional
79:3
property
8:21
provide
41:13,16 60:17
provided
24:10 79:8
psychiatry
8:1
Public
79:11
purchase
20:8
push
24:21,22
pushed
32:17 43:7
pushing
43:14,14 48:15 77:8
put
34:1
P.O
1:23

_____ Q _____

quarter
35:4
question
3:19 4:5 11:10,13
38:7 68:10
questions
3:16 4:4 72:6,7 76:4
Quincy
2:5
quite
14:5 32:4 44:24,24
60:20,21 61:18
62:23 63:21 65:10
74:3

_____ R _____

R
3:1
ran
37:2
reach
31:3
read

3:7 10:14 81:22
**reading**
82:14
**realize**
35:23 53:1
**really**
14:4,5,5 31:5 35:17
41:2 55:23 57:19
68:1
**Realtime**
79:3
**reason**
81:4 82:15
**recall**
17:7 25:11 27:22
28:12 29:5,6 30:4
30:13 39:6,15 41:23
42:3 43:23 44:5
45:10,15 46:10,24
47:2 50:20,24 51:21
52:3 55:5 56:17,22
57:3 65:18 66:4,9
67:14 68:14 69:14
69:20
**receipt**
47:17,21 80:15
**receive**
67:23
**received**
75:14
**recognize**
16:11
**record**
14:17 15:1 68:10
79:14 80:12 81:24
82:10
**recorded**
79:7
**records**
10:20 14:13,19 15:1
15:10
**REDIRECT**
78:1
**regard**
63:8
**registered**
8:4,5 79:2
**regular**
36:12
**Rehab**
9:1,5
**related**
79:15
**relative**
79:17
**relying**

78:10
**remain**
28:16
**remember**
19:4 20:1 22:14 24:6
38:19,20 39:9 44:19
45:1,24 50:2,3 51:1
55:23 62:5,7 66:11
66:13 67:10 68:1
**remind**
22:4
**rephrase**
3:19
**replaced**
19:14,15
**replacement**
19:13
**report**
45:24 46:4,9,21,23
67:12 69:7 80:14
**Reporter**
1:21 79:1,3,4
**REPORTING**
1:22
**represent**
3:15 72:4
**representative**
75:2
**representatives**
75:4
**request**
14:17 15:1 20:6 80:12
**requested**
18:14 82:20
**research**
13:10,10
**reserved**
3:5,6
**reside**
4:15,16 11:18
**resided**
4:19,20
**residences**
4:21
**resident**
12:23
**respect**
72:9 75:14
**response**
14:17 80:12
**responsive**
15:1
**rest**
56:7,7 60:16
**restricted**
31:20

**result**
13:24
**retained**
80:19
**retired**
9:3,16,17 10:16 11:24
59:11
**retirement**
10:2
**return**
15:23 17:4 20:17,18
22:13,16 23:20
57:11 82:20
**returned**
16:14 22:13
**returning**
15:19 22:10
**reviews**
16:12 46:11 47:24
**ride**
30:23
**right**
3:24 4:1,7,10,11 7:18
11:15,17 12:7,8,15
15:4 21:14 22:11,19
23:7,21 24:12 27:24
28:2 29:12 30:1,4
30:16,18 31:13,13
31:23 32:13 33:18
34:12,23,24 36:14
36:22 37:10 38:1,1
38:11,14 40:9 41:2
41:5,7,20 43:20
44:3 46:18 47:7,8
47:12,22 48:6 49:13
51:10 53:1 59:13
62:10,11,14 63:4,5
63:8 67:10 69:3,5,5
71:7,22 74:6,7
75:20,22 78:8,15
**rings**
29:22
**RN**
7:16,17
**road**
61:2 62:13
**room**
75:18 76:1
**roughly**
25:12 26:3 61:8
**round**
20:22
**round-trip**
30:15
**route**
78:5

**RPR**
1:21 79:24

**S**

**S**
3:1
**sat**
42:24
**satisfactory**
79:8
**saw**
42:8 55:6 59:16 61:7
**saying**
38:19,20,23,24 39:16
41:4 45:10 52:9
66:14 69:20
**says**
8:3
**Scarborough**
54:20 62:13
**Scardina**
59:6
**scared**
14:3 41:2
**scheduled**
25:5
**school**
6:24 7:1,2,4,12,21
10:15,16
**scream**
35:6,6
**screaming**
35:8,15
**seat**
30:3
**seats**
28:16
**second**
6:12,13 46:15 61:7
68:9
**section**
13:11
**security**
48:24 49:3,7
**see**
1:2 25:6,9 27:19
40:14 41:4 46:9,13
46:15 55:13 61:4,11
73:2
**seeing**
46:14
**seek**
61:12 70:6
**seen**
29:7 33:3
**send**

82:9
**sent**
55:4 59:17 61:14
71:18 82:7,10
**separate**
34:4,20 82:17
**Services**
1:10 2:24 72:4 75:4
**sessions**
61:16,20
**set**
78:14
**sets**
54:16
**settled**
54:7,8
**shape**
73:13
**sheet**
81:3 82:2,7
**she'll**
4:3 33:5
**shock**
41:5
**shocked**
14:2
**shook**
14:5
**show**
15:10 16:9 35:9 46:7
46:8 47:19
**showed**
56:16,18 60:2
**showing**
48:21
**Shrinking**
72:20
**shuts**
74:7
**siblings**
12:2,6 74:11,19
**side**
35:20 36:8,20 37:12
**sign**
3:7 46:13 82:19
**signature**
46:12,14 81:3 82:2,6
82:7,8
**Signed**
81:26
**sit**
10:4 28:19
**sits**
28:21
**sitting**
34:10 39:2 47:8,12

52:14,15
**six**
5:23 60:22 62:24
**size**
73:3,3
**slight**
72:23
**slowed**
66:20
**slowly**
37:18
**small**
34:1,5,8
**somebody**
12:9,11 28:5 35:17
40:6
**someplace**
77:14
**sons**
5:17
**soon**
57:11
**sorry**
56:3 68:11,11
**sort**
33:14 40:13
**sought**
57:7 63:9 71:12 75:22
**sound**
47:22 62:11 63:4
**sounds**
63:5 74:9
**Spaulding**
9:1,4
**speak**
47:5
**special**
17:21
**spend**
4:22 5:4,8
**spends**
11:22 12:22
**spent**
11:23
**Spillane**
2:2
**spoke**
24:6 47:2
**squiggly**
46:16
**SRN**
7:16
**stairs**
39:3
**stairway**
36:12

**stairwell**
37:9,11
**stand**
55:16 56:8
**standing**
32:16
**start**
35:5
**started**
35:4,6,22 40:9 45:19
**state**
4:12
**stated**
64:20 66:8
**statements**
81:25
**States**
1:3 6:4,5,6
**stay**
45:5
**stayed**
7:5
**stenographer**
4:2
**stenographically**
79:7
**step**
34:21,23
**stepped**
65:19,22
**steps**
34:20 36:9,9
**stipulations**
3:2
**stomach**
66:23
**stood**
34:13 38:1
**stop**
21:2 31:1 35:15 62:20
63:17 77:14
**stopped**
32:2 35:18,24,24 37:2
63:1,3 66:18
**straight**
53:9
**Street**
1:17 2:4,12,20 4:18
**stretched**
37:10
**stretching**
35:21 37:3,5
**strike**
3:6 20:13 29:12 30:7
48:7 53:19 62:19
**stuff**

12:13 65:16
**subscribe**
81:24
**suffer**
13:23
**suggest**
29:20
**Suite**
2:4
**suited**
47:3
**summer**
1:17 2:12 12:3
**supervisor**
40:8
**supposed**
43:2,7 70:22
**sure**
9:6 18:3 24:3 29:21
31:4,5 41:19 44:11
44:13 45:23 50:13
51:13,15 56:13,15
57:13 59:13 61:9
67:15 70:12,13 74:6
75:13
**surgeries**
59:2
**surgery**
19:13 54:14 59:4,9
60:24 61:3
**swear**
23:4
**swearing**
18:7
**swelling**
55:13
**swollen**
41:9 55:12 57:20
**sworn**
3:11 79:11

---

| T |
|---|

**take**
3:23 4:8 12:10 17:10
17:10 24:24 31:2
34:13 40:19 49:18
50:14,17 51:4 59:23
65:9 66:14,17,21,22
67:3,4 73:18,21
**taken**
43:22,23 81:22 82:3
**takes**
65:7
**talk**
10:21 21:21 24:2
27:12 38:16 45:14

70:4
**talked**
73:19
**tall**
72:11,18
**taller**
72:14,16,16
**teacher**
10:15
**tech**
8:24
**tell**
5:24 6:22 15:14 29:21
29:23 30:5,18 32:13
35:2 51:7 52:22
55:1,10 56:6,16
59:18 60:2,4 61:10
68:7,13 76:14,18,19
**telling**
78:8
**ten**
40:13,18 42:18 50:13
50:19
**terminal**
53:20 71:2
**terms**
77:13
**Thank**
76:3 77:21
**therapist**
62:7
**therapy**
61:13,14,20 62:1,4,6
62:16,20,23 63:3,7
66:2 71:10,11 75:16
75:16
**thereabouts**
9:9,20,21
**thereto**
79:19
**thing**
4:9 5:9 19:19 21:5
33:10 35:3 37:15,16
40:3,4,13 41:6
43:22 69:6 75:11
**things**
53:15
**think**
6:20 9:6,18,18 14:12
20:3 33:7 36:9,13
44:12 51:12,17
56:11,13,14 57:9,13
59:10 60:5 61:18
62:23 64:17 65:21
66:11,12,12,14 67:9
67:15 69:22 70:12

71:22 76:7,22 78:6
78:14
**thinking**
44:10 52:9
**Thorndike**
13:10
**thought**
41:11 75:10,11
**three**
5:7 8:2 11:10,14
13:22 54:23 74:15
74:18
**ticket**
18:5,9,10,11,13 20:8
20:17 22:3,22 23:2
23:3,20,24 29:18
47:17,21 48:1 80:16
**ticketed**
31:21 71:2
**tickets**
20:13,16,18,19
**till**
3:5 4:5
**time**
3:5,18,21 4:22 6:7 9:8
9:11 10:2 11:24
12:12,16,21,22 13:3
13:20 18:9,10,12,13
23:2 25:14 26:18
27:5,7,9,9 28:24
29:10,14 30:11 37:1
38:16,20,21 40:1
41:10,22 42:4,8,12
42:14 44:5,8 48:24
50:5,6 52:7 54:16
57:7 58:23 60:8,11
61:3,7,10 70:15
71:13 74:9 75:10
**times**
5:3 11:11,14 13:21,22
25:12,12,22,24 26:3
26:11 31:10 61:4
63:14 64:10 65:4
**Tobago**
74:6
**today**
3:16 14:21 63:10 72:6
**told**
23:1 33:11 38:21
39:21 40:10,15
55:21,24 56:17 57:2
59:19 60:3,6 69:13
69:15,16 76:21
77:10
**toppled**
35:6

toppling
35:19
torn
59:20 60:5
Toronto
4:22 5:1,2,5 15:12,18
15:19 16:21 17:24
18:6 20:22 21:2,7
22:10 25:16 30:9,15
44:14 46:4 48:2,4
49:19 51:11 52:6,7
57:12 61:18,22 67:6
67:23 71:6,11 75:16
75:18,23
Tory
2:11 3:14 76:5 82:9
touching
37:9
tough
12:12
training
6:24
transcript
79:13 81:22,24 82:14
82:16
travel
11:20,21 13:12 17:6
26:4 47:17,21 65:9
80:16
traveled
13:15,18,22 77:5
traveling
10:24 11:19 19:9 48:7
78:3
treatment
60:14 63:7 71:12
75:22,24
trial
3:5
tried
32:17
Trinidad
6:2 7:2,9 11:17 12:1
12:22 15:7,16 17:2
18:2 20:17,22 21:3
21:6,13 22:6,7 23:7
25:13 26:4 29:15
48:2,3 73:19,23
74:2,4,4,6
trip
10:22 14:9 15:5,6,8
15:11,15,16,17,22
15:23 16:14,18,20
17:4 20:21,22 21:10
21:18,20 26:13,14
26:19,20 27:2 29:14

42:22 48:2 49:13,14
67:5 71:7 73:18,20
73:22,23 74:2
trips
17:10,13
true
21:1 79:13
try
30:8 66:22
trying
18:4 32:8 49:22
turned
32:22 33:1 54:9
tweigand@morriso...
2:15
twelve
12:7
twice
11:10 26:5 61:6 62:17
62:18 64:3,12 65:12
two
5:8,17 8:1 9:7 43:10
43:11 54:16 61:16
61:20 70:11 74:16
Tylenol
66:13,16,17
type
71:20

___ U ___

uh-huh
12:18 63:17 65:21
66:3,5 72:8 73:11
unable
38:5 63:19
understand
3:18 31:6,19 32:5
42:9,13 52:23 68:16
70:17
understanding
19:16 30:7
understood
69:11 71:1,4
unit
13:10
United
1:3 6:3,5,6
use
27:8 57:22
Usual
3:2
usually
18:8 22:1,2,2,5 26:18
27:8,17 72:19 76:22
76:24,24

___ V ___

v
79:5 81:2 82:4
versus
5:4
visit
71:17 75:17,18
visits
71:16
Volume
1:1
vs
1:8

___ W ___

wait
4:5 27:16,23 40:12
77:18
waited
28:1 32:19,19 33:14
44:22,24 45:13 55:3
waiting
52:12 76:21
Waive
3:8,9
walk
18:17,19 19:1 28:20
33:2 37:23 53:19,21
53:23 56:7 60:12
63:21,22,22,24,24
64:2,2,4,7,9,9,20
65:12
walked
63:21
walking
33:3 34:6 60:13 63:17
65:24
walks
18:19 33:4
want
11:22 14:13 29:21
36:3 41:20 71:23
77:18,19,19
wanted
41:18 42:20,21,22
77:17
wants
11:21 13:12 64:5
wasn't
8:21 16:19 37:11
68:24
watch
60:15 61:11
way
15:7 21:1,5 22:1
30:21 35:5 48:22

71:6
wear
60:19 73:2
wearing
60:23
wears
73:3
week
57:9,13,18 58:2 62:17
62:18,18 64:3,10,12
65:12 66:19 70:11
weekend
5:8
weeks
5:8 60:22 62:24,24
Weigand
2:11 3:2,4,9,13,14
14:14,23 15:4 16:5
46:19 47:14 71:22
74:23 76:6 78:2,12
78:15 80:5,8,19
82:9
weighed
73:5,6,13,15
weighing
73:7
weight
72:22
went
6:23 7:1,3,12 9:2 15:5
20:14 23:11 35:7
47:3 49:20,23 53:11
53:12,15 54:3,9,18
56:19,24 57:6 58:8
61:17,21 66:12 69:5
weren't
48:14
West
7:2
we'll
5:6,7 61:11 69:23
we're
78:14
we've
18:7
WFS
79:6 81:2 82:4
wheel
54:2
wheelchair
17:20 18:14,18,20
19:3,5,9,17,20 20:5
20:7,10 21:18,22
22:3,4,5 24:3,10,14
24:14,19,24 27:13
27:16,18,23 28:5,10

28:11,14,15,18,19
28:21,24 30:19
32:23 36:10,10,11
36:17 37:20 38:1,3
38:13,17 39:2,4,12
39:13 42:1,10 43:10
43:13,18 44:6 47:9
48:8,15,20 50:16
52:16,24 57:23 58:1
76:13 77:9
wheelchairs
27:20
wheels
34:3,5 36:2
Wilson
2:18
witness
3:6 16:12 46:11 47:24
79:7 81:1 82:13
witness's
47:16 80:15
woman
39:1 68:19
work
8:7,12,22 9:4,22 13:3
13:6,9
worked
8:24 9:1,3,24,24
11:23 13:7,8,9,11
29:9,10
working
32:24 33:8
Worldwide
1:10 2:24 72:4 75:4
Wow
73:17
written
66:15

___ X ___

X
80:1
X-ray
55:4 56:16,18 59:23
60:1,2
X-rays
55:8,21

___ Y ___

yeah
18:11 26:8 38:9 53:7
58:3 60:22 62:14
63:18 65:8,17 77:20
year
5:3 6:9 7:7 12:14,18
26:3,5,23 27:3

**Eileen M. Dick**
**April 10, 2006**
92

| | | | |
|---|---|---|---|
| 59:12 73:20,23 | **16** | **3** | 25:6 |
| **years** | 80:13 | 47:16,20 66:13,16 | **80s** |
| 8:2,2 9:4,7,18 19:10 | **18** | 80:5,15 | 19:11 |
| 19:10 58:17 74:1,3 | 7:3,10 73:3 | **30** | **82** |
| **yesterday** | **185** | 3:7 | 12:2 |
| 68:18 | 73:7,13 | **37** | **87** |
| **youngest** | **19** | 5:19 | 6:21 |
| 12:2 74:20 | 6:20 59:11 | **382** | |

**0**

**9**

| | | | |
|---|---|---|---|
| **01747** | **1938** | 1:23 | **9** |
| 1:24 | 5:11 | **39** | 25:6 |
| **02110** | **1961** | 5:19 | **90** |
| 2:21 | 6:18 | | 19:15 |
| **02169-4300** | **1972** | **4** | **97** |
| 2:5 | 7:5 12:17 | **45** | 11:9,14 12:20 19:11 |
| **02210** | **1975** | 54:5 | |
| 2:13 | 6:5 7:8 8:15 9:9 | **455** | |
| **03-13** | **1977** | 79:9 | |
| 79:9 | 9:9,23 | **46** | |
| **05-10446-GAO** | **1984** | 80:14 | |
| 1:8 | 4:20 | **47** | |
| | **1996** | 80:15 | |

**1**

| | | | |
|---|---|---|---|
| | 6:10,11,13 | **5** | |
| **1** | **1999** | **5,5** | |
| 5:11 14:16 46:8 80:11 | 59:12 | 72:13 | |
| **1A** | | **5,6** | |
| 46:20,21,22 80:14 | **2** | 72:13 | |
| **1-81** | **2** | **5,8** | |
| 1:1 | 16:7,10 25:4 80:13 | 72:19 | |
| **10** | **20** | | |
| 1:15 79:6 81:22 82:3 | 73:3 | **6** | |
| **10:00** | **200** | 617-328-8373 | |
| 1:15 | 2:4 | 2:6 | |
| **106** | **2000** | 617-328-9100 | |
| 4:18 | 9:18,18,19,23 59:10 | 2:6 | |
| **11** | 59:11 | 617-422-5300 | |
| 29:21,23 | **2002** | 2:22 | |
| **11E** | 10:22 13:16,19,20 | 617-423-6917 | |
| 30:2 | 14:7 16:15 20:2 | 2:22 | |
| **11:36** | 25:23 26:14 47:18 | 617-439-7500 | |
| 78:17 | 47:22 63:3,6 65:18 | 2:14 | |
| **11:55** | 73:5,10,14 80:17 | 617-439-7590 | |
| 25:9 | **2006** | 2:14 | |
| **12:00** | 1:15 79:6 81:23 82:3 | **66** | |
| 25:9 | **25** | 5:2 | |
| **1212** | 14:7 15:19 16:15 | | |
| 2:4 | 22:19 29:14 | **7** | |
| **132** | **25th** | **72** | |
| 73:15 | 21:6 23:8 48:3 | 80:6 | |
| **14** | **250** | **76** | |
| 80:11 | 1:17 2:12 | 80:7 | |
| **140** | **27** | **78** | |
| 73:15 | 15:18 16:14 20:12 | 80:8 | |
| **155** | **27th** | | |
| 2:20 | 16:22 17:16,19 | **8** | |
| | | 8:53 | |

**3**

AMRS SERVICES / AA
Airline Services Contract

RESTATED AMENDMENT OF AIRLINE SERVICES CONTRACTS
BETWEEN
AMR SERVICES CORPORATION AND AMERICAN AIRLINES, INC.

This RESTATED AMENDMENT OF AIRLINE SERVICES CONTRACT is made and entered into by and between American Airlines, Inc., a corporation organized and existing under the laws of the State of Delaware ("American"), and AMR Services Corporation, a corporation organized and existing under the laws of the State of Delaware ("AMRS"), as of this _24_ day of _March_, 1999 (the "Amendment").

RECITALS:

WHEREAS, American and AMRS (and its subsidiaries) are parties to various contracts (the "Contracts") pursuant to which AMRS (or its subsidiaries) provide various airline support services to American, including without limitation deicing, aircraft maintenance, trituration, cargo services, cargo agency services, janitorial services, baggage handling, GSE maintenance, skycap services, passenger services, airport handling services, preboarding services, ground handling and warehousing; and

WHEREAS, MR Services Acquisition Corporation, AMR Services Holding Corporation and AMR Corporation have entered into that Stock Purchase Agreement (the "Stock Purchase Agreement") dated as of December 23, 1998 providing for the sale of all of the stock of AMRS and which is closing on the date hereof (the "Closing"); and

WHEREAS, American and AMRS intend to extend the terms of (a) each of the Station Exhibits to the Core Agreement for Services dated as of January 16, 1995, (b) each of the Station Exhibits to the Core Agreement for Services (Selected Functions) dated as of March 20, 1995 (the "1995 Selected Functions Agreement"), (c) each of the Station Exhibits to the letter agreement between American and AMRS dated September 23, 1987 (the "1987 Core Services Agreement"), (d) the Standard Ground Handling Agreement (Simplified Procedure) between American and Societe de Fret et de Services, a wholly-owned subsidiary of AMRS ("SFS"), for Cargo Services for ORY effective January 1, 1996, as amended by the Amendment to the IATA Annex B1.1 between American and SFS effective January 1, 1999 and (e) the Standard Ground Handling Agreement (Simplified Procedure) for Cargo Services for BRU between American and AMRS effective August 1, 1992, as amended by the Amendment to the IATA Annex B1.1 between American and AMRS effective January 1, 1999 (the Contracts set forth in (a) through (e) are the "Extended Contracts") (The parties agree and acknowledge that the Extended Contracts only apply to those services provided as of the date hereof and do not apply to services previously cancelled by the parties.); and

d-598321.7NISW
d

1

WHEREAS, American and AMRS desire to amend the Contracts to make certain modifications to the terms of those Contracts.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth and other good and valuable consideration, the parties hereby agree as follows:

The Amendment of Airline Services Contracts between AMRS and American dated as of October 27, 1998 (the "Prior Version") is hereby amended and restated. The Contracts are hereby amended to contain all the provisions set forth herein. To the extent the provisions contained herein are not included in any particular Contract, the provisions set forth in this Amendment are deemed to be part of that Contract. To the extent the provisions contained herein contradict or are inconsistent with the provisions of any particular Contract, unless excepted for herein, the contradictory or inconsistent provisions of that Contract are deemed to be amended to reflect the provisions set forth in this Amendment. Where a provision contained herein covers material of a general subject matter that is dealt with in a particular Contract, the provisions contained in that Contract shall remain in full force and effect unless they are contradictory to the provision contained herein, in which case the contradictory provisions contained in the particular Contract shall be deemed to be amended, but the non-contradictory provisions covering the subject matter shall continue in full force and effect. To the extent applicable, the terms of this Amendment shall be governed by the terms set forth in the following provisions:

1.    Review of Services. American may maintain, at its own cost, its own representative (e.g. a regional general manager) who shall be entitled to review (from time to time and at any time) the services furnished to American by AMRS pursuant to the applicable Contract (the "Services") and AMRS's related operations and facilities, and provide feedback and advice to AMRS in connection with the performance of its obligations under that Contract.

2.    Equipment. In the event AMRS purchases any equipment from American pursuant to a Contract, unless otherwise specifically provided in the relevant Contract or Section 27 below, the purchased items shall be delivered to AMRS "where is" and "as is" without representation or warranty of any kind, express or implied (including warranties of merchantability or fitness for intended use or for a particular purpose).

3.    Supplies. Except as otherwise specifically provided in the relevant Contract, AMRS and American shall provide the supplies required to furnish the Services in accordance with the specifications set forth in the relevant Contract (the "Specifications") according to the allocation of the responsibility for the supplies that is in effect as of the date hereof. AMRS shall provide or arrange for security and weather protection for all supplies furnished by American for the performance of the Services (the "Supplies") while in AMRS's custody. AMRS will segregate all Supplies in areas separate and apart from all other supplies and shall, at all times, maintain records and

6-598231.3MSW
d

2

other procedures necessary to clearly identify such Supplies as being owned by American. AMRS represents and warrants to American that the Supplies shall be located at the station (a "Station") for which such Supplies are to be used and AMRS shall not create, assume or permit to exist any lien, pledge, charge, security interest or other encumbrance in or to the Supplies. The Supplies shall be used by AMRS exclusively to furnish the Services to American and the use of Supplies for any other purpose is prohibited. AMRS will comply with American's inventory control and reporting procedures with respect to Supplies, as specified in the specification documents set forth in the relevant Contract (the "Specification Documents") and shall take routine inventory of Supplies as often as specified in the Specification Documents, or more frequently if American reasonably so requests. If any inventory, audit or inspection of Supplies (whether conducted by or on behalf of American or AMRS) reveals that any waste, loss, theft, damage or spoilage of Supplies has occurred, AMRS shall, upon American's request, immediately reimburse American for the replacement cost of such Supplies including, without limitation, freight charges.

4.    Pricing.

(a)    At the end of the Existing Term (as defined in Section 10) of an Extended Contract, and annually thereafter, AMRS's charges for each service in that Extended Contract for the following year shall be increased by fifty percent (50%) of the increase in the United States Consumer Price Index during the preceding 12 month period (the "CPI Adjustment"). AMRS's charges in an Extended Contract until it expires shall remain as currently determined in such Extended Contract until it expires (prior to taking into account the extension in Section 10 hereof), at which time the CPI Adjustment shall commence to apply. For those Extended Contracts which are currently expired (prior to taking into account the extension in Section 10 hereof), the CPI Adjustment shall commence to apply as of the date hereof. AMRS's charges in the expired (prior to taking into account the extension in Section 10 hereof), the CPI Adjustment shall commence to apply as of the date hereof. The CPI Adjustment shall not apply to (i) any charge set-forth as a Extended Contracts shall otherwise be adjusted only as set forth in subsection (b) below. or in the Extended Contract, including the cost portion of cost pricing terms, (ii) any charge set-forth as a charges, including the cost portion of cost pricing terms, (ii) any charge set-forth as a percentage and (iii) any amount determined by reference to a standard industry rate that is adjusted in accordance with changes in that rate (e.g. NAGSA). The price adjustment mechanism set forth in Section 10 of Exhibit YYZ to the 1987 Core Services Agreement effective January 1, 1998 shall no longer apply, and the CPI Adjustment shall apply to the price as of December 30, 1998 effective as of the Closing Date. AMRS's charges in the Contracts other than the Extended Contracts shall not be affected by this subsection (a). Notwithstanding any other provision of this Amendment or any Extended Contract, the provisions of Section 11.10 of the standard IATA contract and any similar provision providing that AMRS may change prices at any time at its sole discretion, other than in accordance with a prescribed formula, shall no longer apply with regard to an Extended Contract.

(b)    With regard to each of the Extended Contracts, except as provided below, in subsection (a) above or in the Extended Contract, AMRS's charges shall be

d-598321-71\SW

d

3

adjusted only with the prior written consent of the parties, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, if any of the following events occurs and is reasonably projected to materially increase AMRS's costs of performing the services at a station under an Extended Contract, then, upon advance written notice from AMRS to American within thirty (30) days of such event detailing the impact thereof, the components of AMRS's charges directly affected by such event will become subject to renegotiation by the parties in good faith to take into account such increased costs at such station:

(i)     There is enacted any law, regulation or ruling of any governmental authority having jurisdiction over the provision of the Services that materially alters the hours of service, rates of pay or working conditions associated with the performance of the Services;

(ii)    American changes the Specifications (which American reserves the right, in its sole discretion, from time to time, to amend, modify and supplement) in a manner that materially alters the working conditions, procedures, levels of training or operational aspects of or with respect to performing the Services or the type of equipment used in rendering the Services.

(iii)   American changes the number or frequency of flights to and from the Station, the times between arrivals and the departures or the type of aircraft serviced at the Station; or

(iv)    There occurs any other event or circumstance over which AMRS has no reasonable control that materially adversely affects AMRS's costs in performing or rendering the Services.

If, despite such good faith negotiation, the parties fail to reach agreement on such adjustments to AMRS's charges at such station within sixty (60) days of American's receipt of such notice, AMRS may terminate the relevant Extended Contract with respect to such station upon sixty (60) days' advance written notice to American.

Notwithstanding any provision in an Extended Contract, the provisions explicitly set forth above, without cross reference to any provision contained in any Extended Contract, constitute both parties' sole rights to call for a renegotiation of pricing.

5.      Specifications.

(a)     AMRS shall, at all times, perform the Services with due care and diligence in a professional and businesslike manner that is consistent with the relevant Specifications. AMRS shall take all possible steps to ensure that, with regard to Services rendered hereunder, American's aircraft, crews, passengers and loads receive treatment not less favorable than that given by AMRS to other carriers to whom it provides Services at the relevant Stations. Except as otherwise specifically provided in the

d-398321:7MSW
d

relevant Contract. AMRS assumes all responsibility for the development and implementation of methods and procedures to accomplish each of the tasks comprising the Services.

(b)  To the extent that any provisions of the Specification Documents conflict with or are modified by the specific terms of the relevant Contract, then the specific terms of the relevant Contract shall govern. Nothing contained in the relevant Contract or herein shall require or permit either party to take any action contrary to any law, order or regulation of any governmental body or regulatory authority having jurisdiction over the provision of Services hereunder, or contrary to any permit or authorization granted to AMRS or American by any governmental body or regulatory authority.

(c)  "Exhibit C – Functional Outsource Performances Reporting" the Core Agreement for Services (Selected Functions) between AMRS and American dated as of February 15, 1995 is hereby deleted and the parties agree that it shall be treated as if it was never in effect.

(d)  AMRS will support American's Supplier Excellent 2000 ("SE-2000") process, and the level at which AMRS will participate (i.e. which step in the "ladder" of SE2001, 2002, etc.) will be based on mutual agreement.

6.  Training.  Except as otherwise specifically provided in the relevant Contract:

(a)  AMRS shall, at its sole cost and expense, employ and train all personnel required for the performance of Services under this Agreement. AMRS shall be responsible for the compensation of its personnel while they are in training. There shall be no charge to American for time spent in training by AMRS personnel. AMRS shall be responsible, at its sole cost and expense, for any further training necessitated by employee turnover or course failures.

(b)  All employees of AMRS that are trained by a party other than American with regard to Services must pass a test on the specific Services on which they received third party training similar to the test given to persons trained by American (including both American employees and employees of third parties) with regard to those specific Services before they perform those specific Services (or continue performing such Services, as applicable).

(c)  AMRS shall be required, at its sole cost and expense, to provide or arrange for ongoing and recurrent training of its personnel to ensure that all Services are provided in accordance with the Specifications  In addition, American may, at its discretion and its own expense, monitor or test AMRS's employees training levels. If American determines the training level of one or more of AMRS's employees is insufficient, then AMRS will institute such additional training at its own expense as may

be necessary to bring AMRS's employees to the level of training required in order to provide the Services in accordance with the Specifications.

(d)     Training above and beyond that which is normally required (the training set forth in subsections (a) and (c) shall be considered normally required) to provide, the Services that drives additional costs to AMRS will be negotiated by the parties in good faith. Except as specifically provided for in a Contract, reimbursement for employee time in training that is beyond the training that is normally required will be dealt with according to the party's present practices as of the date hereof for compensating for such employee time. In addition to other types of training that are beyond normally required training, training resulting from any significant event that would be the basis for AMRS to request a pricing renegotiation pursuant to Section 4 shall be considered above and beyond normally required training.

7.     Collections and Disbursements.    To the extent the Services to be provided by AMRS comprise in part the collection, disbursement or other handling of funds for or on behalf of American:

(a)     AMRS shall cause, and at all times shall require that, all receipts, revenues and proceeds of any nature received or collected by AMRS in connection with the provision of Services shall be deposited in, or paid directly to, a collection account or accounts established by American for each Station.

(b)     AMRS shall report to American in accordance with the Specifications, and American may monitor, all collections and disbursements for American in connection with the Services and any and all usage of the collection and operations accounts. but American shall have no responsibility for any usage by AMRS or its employees and agents, and AMRS shall be accountable and liable to American for the handling of all receipts, revenues, proceeds, costs and expenses.

(c)     All funds in any operations accounts provided by American and collection accounts for American (the "American Funds") shall be and remain the property of American, and AMRS shall have no title or ownership interest therein and will not create, assume or permit to exist any lien, pledge, charge, security interest or other encumbrance in or to such funds or accounts.

8.     Invoicing and Payments.    Except as otherwise specifically provided in the relevant Contract, AMRS shall submit, in accordance with the Specifications and the requirements of American's information systems and databases, monthly bills to American for Services performed pursuant to the Contracts, and American shall pay all amounts due AMRS within thirty (30) days of receipt of such bills. Billings shall be communicated to American by AMRS in an electronic or hardcopy format as required by American from time to time. Upon its receipt from AMRS of any bill, American may review such bill in order to determine its compliance with this Agreement and the Specifications. If a discrepancy exists between the amount claimed to be due to AMRS

6

d-598211-7MSW
d

on such bill and the amount calculated by American to be due to AMRS. American shall, promptly after American's discovery thereof, notify AMRS thereof. It will be AMRS's responsibility to reconcile any such discrepancy and AMRS shall submit to American appropriate corresponding documentation (by hard copy or electronic media) supporting the amount in dispute within thirty (30) days of receipt of notification from American regarding such disputed amount. Amounts due and payable by American pursuant to the Contracts may be offset by American against amounts owed to American by AMRS pursuant to the Contracts or any other contract or agreement between the parties.

9. **Port Fees and Sales and Use Taxes.** Except as otherwise provided in the relevant Contract, the parties will allocate the responsibility for all taxes, federal, state or otherwise (including any income taxes and sales, use and value added taxes), and all port fees or concession fees, however designated, which are levied or imposed by an airport or other governmental entity or agency with respect to the Services or otherwise imposed by reason of the transactions contemplated by the Contract according to the parties' allocation of responsibility for such taxes as of the date hereof, regardless of whether the tax is the direct responsibility of a party or whether that party reimburses the other party for the tax.

10. **Term.**

(a) Any Contract other than the Extended Contracts that has by its terms expired, but under which services continue to be provided, shall be deemed to have continued in effect and may be terminated (or any Service therein may be terminated) by either party on ninety (90) days' written notice. Except as otherwise specifically provided in the Contract, upon the expiration of the term of any Contract other than an Extended Contract, such Contract shall continue in effect and may be terminated (or any Service therein may be terminated) by either party on ninety (90) days' written notice.

(b) The term of the Extended Contracts (including all Services provided thereunder and including any Extended Contract that by its terms has expired but pursuant to which Services continue to be rendered) is hereby extended to the fifth (5th) anniversary of the date hereof. The remaining term of the Extended Contracts prior to taking into account such extension is the "Existing Term". The period running from the end of the Existing Term to the end of the term of each Extended Contract as extended by this subsection (b) is the "Extended Term". At the end of the Extended Term, the Extended Contracts will automatically renew for five one year extension periods. Either party may terminate an Extended Contract effective at the end of the Extended Term or at the end of any renewal term by giving written notice to the other party of its desire to terminate at least six months prior to the start of the following renewal term.

11. **Termination and Remedies.** The provisions set forth in this Amendment shall apply to all Contracts and, without cross-reference to the provisions contained in the

7

d-598321.7vMW
d

Extended Contracts, shall constitute the exclusive termination rights of the parties in the Extended Contracts.

(a)    In the event that American discontinues or significantly reduces its flight schedule at a Station, American may for its convenience, at any time during the term of the applicable Contract after providing at least thirty (30) days' written notice, terminate the applicable Contract or any of the Services thereunder with respect to such Station.

(b)    If AMRS defaults in its performance of any of its obligations under any Contract (including without limitation AMRS's failure to perform the Services in accordance with the Specifications), and has refused or failed to cure such default within thirty (30) days after receipt of written notice from American specifying the nature of the default, American may, upon written notice to AMRS immediately terminate that Contract with respect to any Station to which such default relates.

(c)    (i)    If any of the following events occurs, the other party may, upon written notice to the affected party, immediately terminate the Contracts with respect to any or all Stations:

(A)    A party shall (1) apply for or consent to the appointment of a receiver, trustee, custodian, intervenor or liquidator of such party of all or a substantial part of such party's assets, (2) file a voluntary petition in bankruptcy, admit in writing that such party is unable to pay its debts as they become due or generally not pay its debts as they become due, (3) make a general assignment for the benefit of creditors, (4) file a petition or answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, insolvency, reorganization, conservatorship or similar laws affecting the rights of creditors generally, (5) file an answer admitting the material allegations of, or consent to, or default in answering, a petition filed against such party in any bankruptcy, reorganization or insolvency proceeding or (6) take corporate action for the purpose of effecting any of the foregoing;

(B)    An involuntary petition or complaint shall be filed against a party seeking bankruptcy or reorganization of such party or the appointment of a receiver, custodian, trustee, intervenor or liquidator of such party, or of all or substantially all of such party's assets, and such petition or complaint shall not have been dismissed within sixty (60) days of the filing thereof, or an order, order for relief, judgment or decree shall be entered by any court of competent jurisdiction or other competent authority approving a petition or complaint seeking reorganization of a party or appointing a receiver, custodian, trustee, intervenor or liquidator of such party, or of all or substantially all of such party's assets;

(C)    A party shall be or become insolvent or unable to pay its debts as they become due or its liabilities shall exceed its assets; or

d-59832l.7:MSW
d

(d)    American may upon written notice to AMRS immediately terminate this Agreement with respect to any or all Stations if (i) Castle Harlan Partners III, L.P. or affiliated entities under common control (or any successor permitted by this subsection (d)) ceases to own (directly or indirectly) at least 50% of the Voting Securities or (ii) more than 20% of the Voting Securities are owned (directly or indirectly) by a Disallowed Person, in either case, unless American has consented in writing. American's consent shall not be unreasonably withheld in subsection (i), but may be withheld in American's sole discretion in subsection (ii). A Disallowed Person is a person who is, or any of its Affiliates are, engaged in (i) the operation of a passenger or cargo airline or (ii) the operation of ground handling, cargo handling or passenger services which generate annual revenues in excess of $50,000,000 from such services. For the purposes of this subsection (d), the term "Voting Securities" means securities or other interests having the right to vote (appropriate adjustments shall be made to account for disparate voting power of different classes) for the Board of Directors or similar governing body of AMRS or of an entity that is the parent of AMRS (other than securities or interests having the power only upon the happening of a contingency that has not occurred and is not likely to occur), and the ownership of securities includes having a contractual or other right to vote or direct the vote of such securities or interests. An initial public offering of AMRS or an entity that is the parent of AMRS shall not, be deemed to violate the provisions of subsection (i) of the first sentence of this subsection (d).

(e)    AMRS may terminate a Contract if (i) American defaults in its payment of AMRS's charges provided for in that Contract and fails to cure such payment default within twenty (20) business days of AMRS's written notice thereof to American or (ii) American defaults with respect to any other material obligation in that Contract and fails to cure the same within thirty (30) days of AMRS's written notice thereof to American.

(f)    The right of American to terminate a Contract for its convenience, at any time during the term of a Contract, including such right set forth in Section 10(a) of the 1995 Selected Functions Agreement, is hereby deleted from the Contracts. This provision shall not be deemed to delete or modify American's right terminate any Contract, other than an Extended Contract, containing an undefined expiration date (or which is of undefined duration) or upon notice to terminate any renewing Contract, other than an Extended Contract, at the end of a term prior to renewal

(g)    Without limiting any other remedies hereunder, in the event of termination of a Contract by American pursuant to a breach by AMRS, AMRS will exert reasonable efforts to assist American in making arrangements for and transitioning to alternative services (including, without limitation, AMRS providing services on an interim basis).

(h)    In the event of American's breach of a Contract, AMRS's sole and exclusive remedy will be recovery of damages directly related to such breach. AMRS will not have any right to terminate the Contract other than as set forth in subsection (e)

above or in Section 4(b). In any event, American will not be liable to AMRS in any way for any incidental, consequential or special damages.

12.    Compliance with Legal Requirements.

(a)    In furnishing the Services, AMRS shall comply with all applicable federal, state and local (including airport) laws, executive orders, ordinances, rules, and regulations issued pursuant thereto, and such provisions of American's Approved Security Program Manual (as amended from time to time) as are pertinent to AMRS's operation and supplied by American to AMRS.

(b)    AMRS shall ensure and be able to demonstrate that it has conducted adequate background investigations (including without limitation any background investigation required by law, rule or regulation of any governmental entity) of all its employees hired after the Closing Date who have unescorted access to any airport area controlled for security reasons (including those employed in the passenger screening process). If AMRS becomes aware that any employee hired after November 1, 1985 has not passed required background checks, it will not permit that employee to have unescorted access to any airport area controlled for security reasons. Adequate background checks on such employees will include, at a minimum and to the extent permitted by law, references and prior employment histories (to the extent necessary to verify representations made by the employee/applicant) relating to employment in the preceding five (5) years (or such other period required by law). Such background investigation will specifically include, and be subject to, the United States Postal Service Procedures set forth in Appendix A for covered employees. AMRS shall also conduct any drug testing on its employees required by any governmental entity, including without limitation the FAA.

(c)    In furnishing the Services, AMRS shall comply with all applicable federal, state and local (including airport) laws, executive orders, ordinances, rules, and regulations issued pursuant thereto, including without limitation, and to the extent applicable to this Agreement, the provisions contained within Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.; Americans With Disabilities Act of 1990, 42 U.S.C. § 12101, et seq.; Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634, Equal Pay Act of 1963, 29 U.S.C. § 206 (d); Civil Rights Act of 1866 and 1871, 42 U.S.C. §§1981 and 1983; Civil Rights Act of 1991, Pub. L. 102-166, amending Title VII, section 1981, Rehabilitation Act, ADA and ADEA; Executive Order No. 11246, as amended, Section 503 and 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§793, 794, Veterans' Reemployment Rights Act, 38 U.S.C. § 4301, et seq., as amended; Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, et seq.; Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq.; Immigration Reform and Control Act of 1986, 8 U.S.C. § 1324 (a), (b) and (c); Occupational Safety and Health Act of 1970, 29 U.S.C. § 553, et seq.; Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 301, et seq.; Drug-Free Workplace Act of 1988, 41 U.S.C. § 701, et seq.; Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, et seq.;

d-598321:NSW
d

workers' compensation statutes, Airport and Airway Improvement Act of 1982, 49 U.S.C. § 2201, et seq.; Clean Air Act, as amended, 42 U.S.C. § 7401, et seq.; Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), as amended, 42 U.S.C. § 9601, et seq., Federal Water Pollution Control Act (commonly referred to as Clean Water Act), as amended, 33 U.S.C. § 1251, et seq.; Noise Control Act of 1972, as amended, 42 U.S.C. § 4901, et seq.; Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901, et seq.; Hazardous Materials Transportation Act, as amended, 49 U.S.C. § 1801, et seq.; rules and regulations of the Federal Aviation Administration ("FAA"), U.S.C. § 106, 49 U.S.C. § 1301, et seq.; Air Carrier Access Act of 1986, 49 U.S.C. § 1374 and regulations 14 C.F.R. § 382, et seq.; the Procedures for Transportation Workplace Drug Testing Programs and Alcohol Misuse Prevention Programs (49 C.F.R. § 40; 14 C.F.R. § 61, 63, 65, 121 and 135.

(d)    In the event AMRS requires access to any airport security identification display area to perform the Services, or in the event AMRS otherwise performs any security-related function for American, AMRS shall be required to comply with (i) all applicable provisions of 14 CFR 107 and 108, (ii) all applicable written airport policy statements regarding security, (iii) all applicable security directive and information circulars promulgated pursuant to 14 CFR 108.29 and (iv) those provisions of American's Security Program Manual (i.e., the manual approved by the FAA pursuant to 14 CFR 108.25, as such manual may be amended from time to time) of which American notifies AMRS from time to time during the term of this Agreement. AMRS shall ensure and be able to demonstrate that it has conducted expanded background investigations of all employees hired on or after the Closing Date under current FAA regulations found at 14 CFR 107.31 and 108.33, who have unescorted access to any airport area controlled for security reasons (including those employed in the passenger screening process or other security-related function) and that all employees performing screening functions meet the educational and other requirements of 14 CFR 108.31. If AMRS becomes aware that any employee hired prior to the Closing Date has not passed required background checks, it will not permit that employee to have unescorted access to any airport area controlled for security reasons

(e)    In the event the Services to be performed by AMRS hereunder include aircraft maintenance or preventative maintenance duties, ground security coordinator duties, aviation screening duties or other safety-sensitive functions described in 14 CFR 121 (Appendices I and J), AMRS represents, warrants and covenants that it will at all times during the term of the relevant Contract after the Closing Date maintain compliance with (i) drug testing and alcohol misuse prevention programs pursuant to 14 CFR 65, 121 and 135 and 49 CFR 40, as applicable and (ii) the standards and required components set forth in 14 CFT 121, Appendices I and J, including, without limitation, all applicable record-keeping requirements. AMRS shall not use or contract with any drug testing laboratory that is not certified by the Department of Health and Human Services ("DHHS") pursuant to the DHSS " Mandatory Guidelines for Federal Workplace Drug Testing Programs" (53 Federal Register 11970, April 11, 1988 as amended by 59 Federal [9908; June 9, 1994). AMRS shall provide to American a copy

of AMRS's FAA-certified drug testing and alcohol misuse prevention programs, together with evidence in form reasonably satisfactory to American that such programs have been approved by the FAA. American shall have the right at any time, upon not less than 24 hours prior oral or written notice to AMRS, to review, inspect and audit AMRS's testing, training and other records required to be kept under American's and AMRS's drug testing and alcohol misuse prevention programs.

(f)    American shall have the right, but not the duty, to conduct such audits of AMRS's employment records, but not in violation of any legal duty of confidentiality owed by AMRS to any employee, to ensure AMRS's compliance with applicable FAA Regulations or any law, rule or regulation of any other governmental entity. American reserves the right to require removal from American's facilities at any Station by AMRS of any AMRS employees unacceptable to American, provided, however, that American will not exercise this right on unlawful grounds.

(g)    AMRS shall obtain all necessary governmental and airport authorizations, consents and approvals and make and give all governmental or airport filings and notices with respect to the transactions contemplated hereby and maintain at all times during the term of the relevant Contract all governmental, airport or other licenses, permits and other authorizations required to provide the Services at each Station in accordance with the terms of the relevant Contract.

(h)    Throughout the term of this Agreement, AMRS and its employees and other personnel engaged in activities performed on behalf of American shall not discriminate on the basis of handicap, consistent with the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101 et seq, and Title 14 of the United States Code of Federal Regulations, Section 382.9, and shall comply with directives issued by American Regulations officials under Title 14 of the United States Code of Federal Regulations. Section 382.67, which are binding on AMRS by virtue to the type of services performed hereunder by AMRS.

13.    Liability and Indemnity. Except as otherwise provided in a contract, the parties shall have the following rights and obligations with regard to liability and indemnification:

(a)    In this Article, all references to:

(i)    "American" or "AMRS" shall include their employees, servants, agents and subcontractors;

(ii)    "ground support equipment" shall mean all equipment used in the performance of Services under the applicable Contract, whether fixed or mobile; and

(iii)    "act or omission" shall include negligence.

(b)    Except as stated in Subsection (i), American shall not make any claim against AMRS and shall indemnify it (subject as hereinafter provided) against any legal liability for claims or suits, including costs and expenses incidental thereto, in respect of:

(i)    delay, injury or death of persons carried or to be carried by American;

(ii)    injury or death of employees of American;

(iii)    damage to or delay or loss of baggage, cargo or mail carried or to be carried by American; and

(iv)    damage to or loss of property owned or operated by, or on behalf of, American and any consequential loss or damage;

arising from an act or omission of AMRS in the performance of the relevant Contract unless done with intent to cause damage, death, delay, injury or loss or recklessly and with the knowledge that damage, death, delay, injury or loss would probably result.

PROVIDED THAT all claims or suits arising hereunder, shall be dealt with by American, and

PROVIDED ALSO THAT AMRS shall notify American of any claims or suits without undue delay and shall furnish such assistance as American may reasonably require.

PROVIDED ALSO THAT where any of the services performed by AMRS hereunder relate to the carriage by American of passengers, baggage or cargo direct to or from a place in the United States of America then if the limitations of liability imposed by Article 22 of the Warsaw Convention would have applied if any such act or omission had been committed by American but are held by a Court not to be applicable to such act or omission committed by AMRS in performing this Agreement then upon such decision of the Court the indemnity of American to AMRS hereunder shall be limited to an amount not exceeding the amount for which American would have been liable if it had committed such act or omission

(c)    American shall not make any claim against AMRS in respect of damage, death, delay, injury or loss to third parties caused by the operation of American's aircraft arising from an act or omission of AMRS in the performance of this Agreement unless done with intent to cause damage, death, delay, injury or loss or recklessly and with knowledge that damage, death, delay, injury or loss would probably result.

(d)    (i)    Notwithstanding the provisions of Subsection (b), in the case of claims arising out of surface transportation which is provided on behalf of American and is part of the operation of loading/embarking or unloading/disembarking and/or is covered by American's contract of carriage the indemnity shall not exceed the limits specified in the said contract of carriage.

(ii)    In the case of claims arising out of surface transportation which is not provided on behalf of American and/or is not part of the operation of loading/embarking or unloading/disembarking and/or is not covered by American's contract of carriage the waiver and indemnity herein contained shall not apply.

(e)    AMRS shall not make any claim against American and shall indemnify it (subject as hereinafter provided) against any legal liability for claims or suits, including costs and expenses incidental thereto, in respect of:

(i)    injury or death of any employees of AMRS, its servants, agents or subcontractors; and

(ii)    damage to or loss of property owned or operated by, or on behalf of, AMRS and any consequential loss or damage;

arising from an act or omission of American in the performance of the relevant Contract unless done with intent to cause damage, death, delay, injury or loss or recklessly and with knowledge that damage, death, delay, injury or loss would probably result.

(f)    Notwithstanding Subsection (b)(iv), AMRS shall indemnify American against any physical loss of or damage to American's aircraft caused by AMRS's negligent operation of ground support equipment PROVIDED ALWAYS THAT AMRS's liability shall be limited to any such loss of or damage to American's aircraft not exceeding $1,500,000 except that loss or damage in respect of any incident below $3,000 shall not be indemnified.

For the avoidance of doubt, save as expressly stated, this Subsection (f) does not affect or prejudice the generality of the provisions of Subsection (b) including the principle that American shall not make any claim against AMRS and shall indemnify it against any liability in respect of any and all consequential loss or damage howsoever arising.

(g)    It is the specific intent of the parties that the parties be released from, and indemnified for, their own negligence as set forth in the provisions of this Article 13.

14.    **Insurance.**

(a)    Contractor, at its sole cost and expense, at such time when it ceases to be a wholly-owned subsidiary of AMR Corporation ("AMR"), shall procure and

maintain during the remainder of the term of the relevant Contract, with insurers of recognized financial responsibility, the following insurance:

(i) Aviation liability insurance, including, airport liability, comprehensive general liability (including premises, products and completed operations, contractual liability and personal injury coverage) and automobile liability covering all Services performed by Contractor under the Contract, including the ownership, operation or use of all licensed and unlicensed vehicles used at a Station. Such coverage shall be in an amount of not less than the amount set forth in Appendix B based on the Services provided under the relevant Contract.

(ii) Workers Compensation Statutory Limits
Employers liability $1,000,000

(iii) a fidelity bond with a minimum limit of not less than $1,000,000 specifically covering the Services performed by the Contractor under the Contract.

(b) AMRS shall provide American with certificates of insurance evidencing the above coverages within five (5) business days of the date upon which AMRS ceases to be a wholly-owned subsidiary of AMR and thereafter annually upon renewal of such policies. Such certificates shall, as respects the aviation and automobile liability coverage:

(i) Name American and its affiliates, successors, assigns and agents and each of the foregoing's respective directors, officers and employees (the "American Indemnified Parties") as additional insureds.

(ii) Provide that the indemnification and other liabilities assumed by AMRS under the Amendment and the applicable Contract are specifically insured under the contractual liability section of such policies.

(iii) Be primary without any right of contribution from any insurance carried by American.

(iv) Waive any and all rights of subrogation the insurer may or could have against American.

(v) Include the insurer's agreement that AMRS's breach of any representation set forth in its policy will not invalidate the insurance as to the American Indemnified Parties.

(vi) Include the insurer's agreement that the coverage shall extend to loss or damage to aircraft.

(c)    All of the insurance policies required herein shall provide that American shall be given prior written notice of any cancellation or adverse material change in such policy and that such cancellation or adverse material change shall not be effective as to American for at least thirty (30) days after receipt of such written notice by American.

15.    Right to Audit.    AMRS will at all times keep complete and accurate books, records, documents and records of accounts in accordance with sound business practices from which may be determined (a) the accuracy of cost plus pricing, cost pass throughs, the basis for any cost adjustments set forth under Section 4(b)(iv), the basis for any other calculations and computations required pursuant to the relevant Contract and AMRS's compliance with its obligations pursuant to the relevant Contract with American and (b) AMRS's compliance with all statutes, regulations, orders, ordinances and security programs (collectively, the "Required Records").    The right to audit any Required Records shall be limited to those circumstances where the pricing or other structure of the relevant Contract gives rise to a bona fide need by American to audit such records to verify AMRS's compliance with the terms of the Contract.  In any case, an audit shall be limited to such materials as are relevant to the relevant Contract.  Such books, records, documents and records of accounts, together with all properties and facilities of or used by AMRS in connection with rendering the Services under the relevant Contract, will be open for inspection, examination, copying and audit by American and its authorized representatives during regular business hours of the applicable location, upon American's reasonable advance request, including after the termination (regardless of cause) of the relevant Contract for a period of one (1) year in the case of (a) and five (5) years in the case of (b).  Such books and records of accounts will be maintained by AMRS at its chief executive office or the applicable Station for a period of five (5) years from the date of their creation. AMRS agrees that at all times when a facility is subject to audit, AMRS will have an employee on site capable of locating and gaining access to all documents subject to audit. Where AMRS no longer services a particular airport or location AMRS will cooperate with American in providing such access. American will have the right to have its auditors, agents of the FAA or other governmental agencies, or other business related personnel accompany its agents for such audits. AMRS will cooperate with those conducting the audit. In the event of termination of the relevant Contract for any cause, AMRS will provide to American such documentation of regulatory compliance as American reasonably requests. American shall be responsible for its own expenses in any such audit.

16.    Confidentiality.    Except as otherwise specifically provided in the relevant Contract, American and AMRS each agree that all information communicated to one by the other or the other's affiliates or representatives, whether before or after the date of this Amendment or the relevant Contract, including, without limitation, all terms and conditions of this Amendment and the relevant Contract, will be received in strict confidence, will be used only for purposes of this Amendment and the relevant Contract and will not be disclosed by the recipient party, its officers, directors, agents, representatives,

16

d-598321.7\NSW

d

subcontractors or employees, without the prior written consent of the other party. In addition, each party shall limit access to such information to its officers, directors, agents, representatives, subcontractors or employees with a need to know such information. Each party agrees to take all reasonable precautions to prevent the disclosure to outside parties of such information, except as required by legal, accounting or regulatory requirements beyond the reasonable control of the recipient party. This Section shall not be violated by disclosure of information which no act or omission of a party having a degree of care as the Disclosing Party (the "Disclosing Party"), (b) is disclosed under an obligation of confidentiality, (c) is independently acquired by the Disclosing Party as a result of work carried out by an employee of the Disclosing Party to whom no disclosure of such information has been made, (d) is disclosed despite the exercise of the same information is given to the other party prior to the termination proceeding to enforce a party's rights under this Amendment under a confidentiality obligation under this Section (the "Disclosing Party"), (b) is disclosed under an the Disclosing Party by a third party which did not acquire the information under a available or becomes available through no act or omission of a party having a notice of the requirement for such disclosure is given to the other party prior to the termination of this Amendment and the Contracts for any reason. disclosed as required by court order or as otherwise required by law, on condition that any disclosure. The rights and obligations under this Section will survive the termination information is given to the other party prior to the termination

17.    **Independent Contractor.**    The relationship between American and AMRS shall be that of independent contractors for all purposes, and in no event shall persons employed by either party be held or construed to be employees of the other. AMRS shall be solely Except as specifically set forth in the relevant Contract, AMRS shall be solely responsible for the supervision, daily direction and control of its employees and payment of their salaries (including withholding of appropriate payroll taxes), workers compensation, disability benefits and the like.

18.    **Governing Law.**    THIS AMENDMENT AND THE CONTRACTS WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CHOICE OF LAW PRINCIPLES. ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AMENDMENT OR ANY CONTRACT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK. BOROUGH OF MANHATTAN, OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AS THE PARTY BRINGING THE SUIT IN ITS SOLE DISCRETION MAY ELECT, AND SUCH COURTS SHALL HAVE NON-EXCLUSIVE JURISDICTION OF ANY SUIT, ACTION OR PROCEEDING. THE PARTIES HEREBY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION WITH NOTHING CONTAINED HEREIN OR IN THE STOCK PURCHASE AGREEMENT SHALL BE DEEMED TO PROVIDE FOR EXCLUSIVITY OF JURISDICTION WITH REGARD TO THIS AMENDMENT AND THE CONTRACTS OR THE SUBJECT MATTER COVERED THEREIN OR HEREIN. THE PARTIES HEREBY AGREE THAT SERVICE OF ALL WRITS, PROCESS AND SUMMONS IN ANY SUIT, ACTION OR PROCEEDING MAY BE MADE UPON IT AT THE ADDRESS SET

17

d

d-598324.7MSW

FORTH IN SECTION 20 HEREOF IN THE MANNER PROVIDED IN SUCH SECTION.

19. **Construction.** The parties acknowledge that this Amendment and the Contracts are the result of mutual negotiation. Accordingly, neither this Amendment nor any of the Contracts will not be construed against the party preparing and drafting it, but will be construed as if both parties jointly prepared and drafted it. Any uncertainty or ambiguity will not be interpreted against either party by virtue of such party's actual role in the preparation and drafting hereof.

20. **Notices.** Unless otherwise provided herein, all notices or other communications hereunder shall be in writing and will be deemed to have been given and received: (a) when delivered personally by hand to the recipient or when transmitted by facsimile to the recipient (with telephonic confirmation by the sender to the recipient), (b) one (1) business day after delivery by an overnight courier or (c) when received after mailing by United States registered or certified first class mail (postage prepaid), properly addressed to the parties at the following addresses (or at such other addresses as shall be specified by notice in accordance with this section):

If to AMRS:

    AMR Services Corporation
    P.O. Box 619622, MD 5223
    DFW Airport, TX 76155
    Facsimile: .(817) 931-4818
    Attention: President

If to American:

    American Airlines, Inc.
    P.O. Box 619616, MD 5223
    DFW Airport, TX 75261-9616
    Facsimile: (817) 963-2033
    Attention: Vice President, Purchasing

With a copy to:

    Corporate Secretary
    Facsimile: (817) 967-2937

21. **Successors and Assigns.** The provisions of this Amendment and the Contracts will be binding upon and will inure to the benefit of the parties and to their respective successors and assigns. Neither any Contract nor any part thereof as applied to any Station, nor any right or obligation under any Contract may be assigned or subcontracted out by either party without the prior written consent of the other, except that (a) American may assign it to, and delegate or subcontract out American's liabilities, obligations or duties thereunder to, AMR or to any direct or indirect majority-owned subsidiary of AMR, without obtaining the prior consent of AMRS and (b) subcontracting arrangements in place on the date hereof may remain in effect.

d-598321.7\1SW

d

22.    **Amendment.** Amendment and any Contract are deemed incorporated herein or therein, as applicable, for all intents and purposes. All attachments, exhibits and schedules to this Amendment and any Contract are deemed incorporated herein or therein, as applicable, for all intents and purposes.

23.    **Prior Agreement and Amendment.** This Amendment and the Contracts as hereby amended supersede all prior agreements and understandings, whether oral or written, between the parties with respect to the Services. This Amendment and the Contracts as hereby amended contains the complete, final and exclusive agreements between the parties with respect to the subject matter hereof. No modification, termination or waiver of any provision of this Amendment or any Contract shall be given effect against either party unless made in writing, and signed by each of the parties hereto.

24.    **Force Majeure.** Each party shall be excused from performance hereunder to the extent that it is prevented from performing as a result of acts of God, war, civil disturbance, embargo or any law, court order or requirement of any governmental entity (so long as such party provides the other party with prompt written notice thereof and uses all commercially reasonable efforts to avoid or remove such causes of nonperformance and immediately continues performance whenever and to the extent such causes are removed). If any such nonperformance continues for more than sixty (60) days, the other party may, upon written notice to the nonperforming party, immediately terminate the relevant Contract with respect to any Station to which such nonperformance relates.

25.    **Further Assurances.** Each party hereto shall do and perform such further acts and execute and deliver such further instruments at such party's expense as may be required by law or reasonably requested by the other party to carry out and effectuate the purposes of this Agreement and the Contracts. Without limiting the generality of the foregoing, AMRS shall cooperate with American to take all steps necessary to preserve American's ownership rights and title in and to the Supplies and American Funds including, upon American's request, causing a financing statement under Section 9.408 of the Uniform Commercial Code as enacted in Texas (or under the equivalent provisions of the laws of any other jurisdiction) to be filed with respect thereto in all relevant jurisdictions.

26.    **Minority Business Enterprise Opportunities.** If it is commercially feasible for AMRS to subcontract out a portion of the Services to be provided to American under a Contract, AMRS shall, at American's request, subcontract up to ten percent (10%), or such greater percentage as required under governmental contracts as applicable to American (and as notified in writing by American to AMRS), of American's requirements for Services to a small business concern owned or controlled by one or more minorities or women and qualifying as a Minority Business Enterprise (as defined in 49 CFS §23.5). American shall have the right to approve the use of such Minority Business Enterprise and such approval shall not be unreasonably withheld. In all cases where AMRS uses a Minority Business Enterprise (whether or not at the request

d-598331:7:MSW
d

19

of or approved by American) as a subcontractor of the Services provided under a Contract, AMRS shall provide American, quarterly, within ten (10) calendar days following the end of the quarter, or more frequently as reasonably requested by American, a statement of the monetary value of any subcontracting from such Minority Business Enterprise(s) in connection with a Contract

27.    Warranty Pass Through.    AMRS will use its commercially reasonable efforts to pass through, or otherwise pass on to American, the benefit of any warranty to which it is entitled on any part or other item that it sells to American or installs on any of American's aircraft.    American will use its commercially reasonable efforts to pass through, or otherwise pass on to AMRS, the benefit of any warranty to which it is entitled on any part or other item that it sells to AMRS for AMRS's own use or for which AMRS assumes the risk of defect or other damage.

28.    Year 2000 Compliance.    AMRS shall assume the responsibility for confirming that all purchased products and services (including EDI and any other applicable interfaces) that are purchased, materially modified or acquired by AMRS after the Closing Date are Year 2000 compliant.    AMRS will implement the plan referred to in the Stock Purchase Agreement for achieving Year 2000 compliance of AMRS's products and services for use by American and will absorb the costs thereof provided that the cost of implementing such plan does not exceed the amount referred to in the Stock Purchase Agreement.

29.    Other Services.    In the event AMRS performs airline services for American other than the Services, those other services will be subject to the provisions of this Amendment unless they are subject to a written agreement specifically covering the matters contemplated herein.    As applicable to such services, this Agreement shall be deemed a "Contract".

30.    Equitable Relief.    To the extent that monetary relief is not a sufficient remedy for any breach of this Amendment or any Contract, or upon any breach or impending breach of this Amendment or any Contract, the non-breaching party shall be entitled to injunctive relief as a remedy for that breach or impending breach by the other party, in addition to any other remedies granted to the non-breaching party in this Amendment or the Contract, as applicable.

31.    Time.    Time is of the essence with respect to the performance of the provisions of this Amendment and the Contracts.

32.    Miscellaneous.    Except as otherwise provided herein, all rights, powers and remedies provided under this Amendment or any Contract or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise or beginning of the exercise of any right, power or remedy by AMRS or American will not preclude the simultaneous or later exercise of any other such right, power or remedy. The waiver by either party hereto of any requirement or obligation arising hereunder will

20

not operate or be construed as a subsequent waiver of such requirement or obligation. The headings in this Amendment and the Contracts are for purposes of reference only and will not limit or define the meaning hereof or thereof. This Amendment and any Contract may be executed in one or more counterparts, each of which will be an original but all of which will constitute one instrument. If any provision contained in this Amendment or any Contract is for any reason held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not invalidate this entire Amendment or any entire Contract. Such provision will be construed as if not containing such provision. Notwithstanding anything to the contrary in this Amendment or any Contract, the provisions of this Amendment and any Contract which by their nature shall survive the termination of this Amendment or any Contract (including, without limitation, provisions of this Amendment or any Contract which expressly provide for their survival) shall survive the termination of this Amendment or any Contract for any reason.

33.    Extension of Leases and Modifications of Non-Competition
        Covenants.

    (a)    American hereby agrees to extend the term of any sublease entered into pursuant to or in connection with an Extended Contract, if such sublease is used for services provided to American. Such extension shall be to a period ending on the date of the termination of the relevant Extended Contract. The extension of the sublease shall in any case continue to be subject to the same terms and conditions, including without limitation that the sublease will, notwithstanding the extension contemplated by the preceding sentence, end upon the termination of American's right to use the subleased space. In any event, the subleased space shall be subject to all terms and conditions of the lease under which American leases the space. AMRS may only use the space in a manner consistent with its usage of the space prior to the date hereof. In the event American's cost for the space increases during the extension of the term provided hereby, AMRS's rent for the space shall increase by the same percentage as American's rent under the main lease for the subleased space increases.

    (b)    American hereby releases AMRS from its obligations to do work only for American pursuant to the Agreement of Sublease dated January 5, 1995 between American and AMRS for Harrisburg, PA, the Agreement of Sublease dated May 22, 1995 between American and AMRS for Louisville, KY, the Agreement of Sublease dated January 23, 1995 between American and AMRS for Stewart, NY, the Agreement of Sublease dated June 6, 1995 between American and AMRS for Jackson, WY. However, if AMRS performs services for a customer (an "Other Airline") other than American or any other airline that is wholly-owned by AMR Corporation (an "AMR Airline") at any such location, AMRS will pay to American rent for the space subleased by AMRS (the "Subleased Space") equal to a percentage of the rent that American pays on the Subleased Space to the party from whom American leases the Subleased Space. The percentage shall be equal to the percentage that the revenues received by AMRS from the services performed for Other Airlines at that subleased space constitute when compared to the

total revenues received by AMRS for services performed for both AMR Airlines and Other Airlines at that subleased space.

(c)     The General Sales Agency Agreement between American and AMRS dated April 1, 1998 for Belgium and the General Sales Agency Agreement between American and AMRS dated November 1, 1997 for Spain are hereby amended to clarify that the provision prohibiting AMRS from acting as a general sales agent for any other carrier operating the same routes is intended by the parties only to cover those employees of AMRS acting as the general sales agents for American on those routes and not to other employees of AMRS or AMRS as a whole.

(d)     The most favored nation clause in the Exhibit for YYZ Station in the 1987 Core Services Agreement is hereby deleted.

(e)     In the event American solicits bids for work of the type covered by the Contracts, American will use reasonable efforts to offer AMRS the opportunity to bid on such work at the same time as such solicitations are first made to other service providers.  American shall not be liable for any violation of this subsection (e), and the parties agree and understand that such solicitation of an offer by AMRS is only extended as a courtesy and not a contractual right.

[Remainder of Page Left Intentionally Blank]

d-598321:7.NSW
d

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed in their name and on their behalf.

AMERICAN AIRLINES, INC.

By: _____

Name: _____

Its: _____

AMR SERVICES CORPORATION

By: _____

Name: _____

Its: _____

d-598321.7MSW

d

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed in their name and on their behalf.

AMERICAN AIRLINES, INC.

By: _____
Name: JEFFREY C. CAMPBELL
Its: VP CORPORATE DEVELOPMENT
      AND TREASURER

AMR SERVICES CORPORATION

By: _____
Name: _____
Its: _____

d-598321.7MSW
p

## Appendix A

US Postal Service Personnel Screening

Effective September 12, 1998, the United States Postal Service (USPS) expanded screening requirements for newly hired people who have access to the U. S. mail to include fingerprinting. Access to mail as used in this contract refers to individuals who transport, sort, load and unload mail to and from ground equipment and to and from aircraft. This includes individuals who have direct supervisory duties in directing the transport, sortation, loading and unloading of mail to and from ground equipment and aircraft. The details of the required screening of personnel hired as of September 12, 1998 as it affects your contract with American are:

A.    Requirements: AMRS employing individuals to perform duties under this contract where those duties will entail access to the mail, must provide the following documentation. The items listed in (1) through (4) below must be completed prior to the employee being granted access to the mail. For purposes of this clause, the term "completed" means that all tasks have been done, and the required submissions to the Postal Service have been made by posting in the US Mails. AMRS is required to maintain all certifications required in Sections A.(1) through A.(4), below.

(1)    Drug Screening: AMRS must certify that individuals providing service under this contract have passed a screening test for those substances identified by the Substance Abuse and Mental Health Services Administration (SAMHSA) as the five most abused substances which are cocaine, marijuana, amphetamine/methamphetamine, opiates and phencyclidine (PCP). The tests must be performed by a SAMHSA approved certified laboratory. The drug test must meet the cut-off levels established by SAMHSA. All drug screening tests must be completed within 90 days prior to having access to the mails since drug tests older than 90 days are invalid and must be redone. AMRS must maintain the name of the institution conducting the test and a document indicating if the employee passed or tested positive.

(2)    Criminal History. Certification, based upon a criminal records check (a state records check is preferred) of each employee through local agencies (state, county or city) where the applicant has resided and/or worked for the past five years (this may require multiple checks for applicants who live in one location and work in another, or for applicants who have moved), that each individual:

(a)    is not on parole, probation, or under suspended sentence for commission of an felony;

(b)  has not been convicted of a felony criminal violation in the past 5 years;

(c)  has not engaged in the illegal use, possession, sale or transfer of narcotics or other illicit drugs during the past 5 years;

(d)  does not have pending serious criminal charges (e.g., murder, rape, robbery, burglary, physical assaults, sale and distribution of drugs, or weapons violations). If criminal charges are pending, the individual will not be authorized access to the mails until the charges have been satisfactorily resolved.

(3)  Citizenship: Certification of U.S. citizenship or legal work status authorizing the individual to work in the United States is required.

(4)  Fingerprinting: AMRS must provide two copies of completed FD-258, Applicant Fingerprint Charts for each individual. The fingerprint cards must be signed and dated by someone experienced in taking fingerprints.

B.  Processing:

(1)  AMRS will submit, for individuals employed by AMRS and any subcontractors, a completed Certification and Transmittal Cover Sheet, a completed PS Form 2181-C and two completed FD-258 applicant fingerprint charts to:

Aviation Screening Coordinator
National Mail Transportation Purchasing
475 L'Enfant Plaza SW, Room 4900
Washington, DC, 20260-6210

The Purchasing Department listed above will forward the documentation to the Security Clearance Unit, U.S. Postal Inspection Service. Upon receipt of the required documentation, the Security Clearance Unit will submit the fingerprint cards to the Federal Investigations Processing Center, Office of Personnel Management and perform a search of the National Crime Information Center (NCIC) Wants and Warrants and Inspection Service databases.

(2)  A copy of the completed Certification and Transmittal Cover Sheet shall also be sent to American at the address listed in Paragraph H.

(3)  AMRS shall maintain supporting documentation for the drug screening, criminal history inquiries, and citizenship verifications subject to review

d-598321.7M5W
d

by the Postal Service, for the life of this contract in accordance with their internal procedures, advising American on the Certification form. At the employee's local station AMRS is only required to maintain a copy of the Certification form.

C.    Access: AMRS will be responsible to ensure only cleared individuals have access to the mails and for maintaining an accurate listing of individuals at the facilities for Postal review. AMRS must maintain all certifications required in compliance with the clause.

D.    Denial: Persons who meet the following criteria are not permitted to have access to the mail under this contract:

    (1)    A contractor, sub-contractor, or employee of a contractor or sub-contractor who has not received a security screening in accordance with the criteria as listed above under Personnel Screening.

    (2)    A contractor, sub-contractor, or employee of a contractor or sub-contractor who tested positive for a prohibited drug without authorization by a legal prescription or other exemption under Federal, state, or local law.

    (3)    A contractor, sub-contractor, or employee of a contractor or sub-contractor who has been convicted of illegal use, possession, sale, or transfer of controlled substances during the past five years.

    (4)    A contractor, sub-contractor or sub-contractor or employee of a contractor or sub-contractor who has been convicted of any criminal felony violation during the past five years, who is on parole, probation or suspended sentence for commission of a criminal felony during the past five years or has pending felony criminal charges.

    (5)    A contractor, sub-contractor, or employee of a contractor or sub-contractor who has ever been convicted of, or is under current investigation or indictment for theft of mail or other Postal Law.

E.    Disqualified Personnel. It is agreed that in the event an employee is disqualified under the above criterion, the responsibility for placement of that employee into a function not having access to the mail rests solely with AMRS.

F.    Required Postal Service Forms:
    (1)    PS Form 2181-C, Authorization and Release-Background Investigations (USPS Suppliers and Employees of Suppliers).

(2) FD-258, Applicant Fingerprint Chart (two copies). The Postal Inspection Service at Memphis, TN will provide original copies for supplier use. These forms may be obtained by calling the Memphis office at (901) 747-7712.

(3) Certification and Transmittal Cover Sheet.

G. **Self-assessments:** At a minimum, AMRS will conduct an annual security self-assessment of their operations and the operations of their sub-contractors to ensure that appropriate security procedures are in place to protect the mail. This self-assessment may be accomplished at any time between February 1 and April 30. A report must be submitted to the address listed in Paragraph H stating that the assessment was accomplished, and that appropriate corrective actions were taken or are underway to address any problems uncovered. Reports must also state that AMRS is adhering to the personnel screening requirement of this contract.

H. **Reimbursement Policy.** American will reimburse AMRS for any additional personnel screening costs incurred up to $100.00 per employee due to the USPS contract requirements at the local station. These costs should be included separately in the regular monthly ground handling invoice. The additional costs should be identified to our General Manager as line code 7503947 and include a description of the charges. In addition, a separate statement for the additional charges incurred is required to be sent by the third workday of each month to:

American Airlines, Inc.
Postal Sales & Service
P. O. Box 619616 - MD 4449
Dallas/Ft. Worth Airport, Texas 75261-9616
Attn: Personnel Screening

Appendix B

| TYPE OF SERVICE | MINIMUM INSURANCE LIMIT |
|---|---|
| Admirals Club (Bartenders) | $ 1,000,000[1] |
| Air Conditioning Maintenance | $ 1,000,000 |
| Air Freight | $ 1,500,000 |
| Armored Car | $ 10,000,000 |
| Bag Handler | $ 1,000,000 |
| Baggage Delivery | $ 5,000,000/Any one bag |
| Cabin Cleaning | $ 50,000,000/Any one bag |
| Carpet Cleaning-in aircraft | $200,000,000 |
| Carpet Cleaning-in terminal | $200,000,000 |
| Catering - Wide Body Aircraft | $ 1,000,000 |
| - Narrow Body Aircraft | $200,000,000 |
| Courtesy Chair | $200,000,000 |
| Courtesy Car | $ 5,000,000 |
| Deicing | $ 10,000,000 |
| Electric Sign Maintenance | $200,000,000 |
| Elevator/Escalator Maintenance | $ 1,000,000 |
| Employee Transportation | $ 10,000,000 |
| Escort Services (People w/o VISAs) | $ 10,000,000 |
| Electrical Maintenance | $ 5,000,000 |
| Ground Equipment Maintenance | $ 1,000,000 |
| Ground Handling | $ 50,000,000 |
| Guard - Unamed | $200,000,000 |
| - Armed | $ 1,000,000 |
| Inter Bag Transportation | $ 10,000,000 |
| Into-Plane Fueling | $ 5,000,000 |
| Janitorial (other than aircraft) | $200,000,000 |
| Jetway Maintenance | $ 1,000,000 |
| On Call Maintenance | $ 25,000,000 |
| Pest Control | $ 50,000,000 |
| Positive Bag Claim | $ 10,000,000 |
| Pre-board Screening | $ 1,000,000 |
| Rubbish Removal | $ 25,000,000 |
| SkyCap | $ 5,000,000 |
| Snow Removal | $ 1,000,000 |
| Temperature Control Maintenance | $ 50,000,000 |
| Traffic Control | $ 1,000,000 |
| Triturator | $ 5,000,000 |
| Truck Lease (Propane) | $ 5,000,000 |
| Uniform Agreement | $ 10,000,000 |
| Window Washing | $ 1,000,000 |
| | $ 1,000,000 |

d-598321.7MSW
d

28

d-59821.7MSW
p

29

Comprehensive Automobile Liability - Always $1,000,000

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                      SUPERIOR COURT DEPT.
                                                  CIVIL ACTION NO.:

                                                        05-0466

|                              |   |                              |
|------------------------------|---|------------------------------|
| EILEEN DICK                  | : |                              |
|   Plaintiff                  | : |                              |
|                              | : |                              |
| v.                           | : |                              |
|                              | : |        RECEIVED              |
| AMERICAN AIRLINES, INC.      | : |        FEB 07 2005           |
|                              | : |   SUPERIOR COURT - CIVIL     |
|   Defendant.                 | : |   MICHAEL JOSEPH DONOVAN     |
|                              | : |   CLERK / MAGISTRATE         |
| WORLDWIDE FLIGHT SERVICES, INC. | : |                           |
|                              | : |                              |
|   Defendant.                 | : |                              |

## PARTIES

1.  Plaintiff, Eileen Dick, is a natural person residing at 106 Greenbriar Street, Dorchester, Suffolk County, Massachusetts.

2.  Defendant, American Airlines, Inc. is a foreign corporation with its principal place of business at P.O. Box 619616 MD 5675, 4333 Amon Carter Blvd, Fort Worth, Texas.

3.  Defendant, Worldwide Flight Services, Inc is a foreign corporation with its principle place of business at 1925 W. John Carpenter Fwy., Ste. 450 Irving, Texas.

## FACTS

4.  At all relevant times herein, Defendant, American Airlines was a

SPILLANE LAW OFFICES
• • • • •
1212 HANCOCK ST
QUINCY, MA 02169-4300
TEL: (617) 328-9100
FAX: (617) 328-8373

1130 WASHINGTON ST
HANOVER, MA 02339
TEL: (781) 829-9993
FAX: (781) 829-9924

www.spillanelawoffices.com

tenant of Miami Dade Airport.

5.   At all relevant times, herein, Defendant Worldwide Flight Services, Inc. operated in Miami Dade Airport, including American Airlines terminals.

6.   Eileen Dick was a lawful invitee on the premises of Defendant American Airlines.

7.   Iris Baggy, the Plaintiff's mother, was a lawful invitee on American Airlines premises and placed in the care of an employee of co-Defendant, Worldwide Flight Services, Inc.

8.   While on Defendant's, American Airlines' premises, and under the care of co-Defendant, Worldwide Flight Services, Inc., the Plaintiff was injured when her mom fell on her while riding down an escalator, sustaining substantial personal injuries.

## COUNT 1: NEGLIGENCE
## AMERICAN AIRLINES

9.   The Plaintiff repeats, realleges, and incorporates fully paragraph 1 through 8 as if each were set forth in their entirety.

10.  The Defendant, American Airlines owed a duty to the Plaintiff to make reasonable efforts to ensure that the companies they allow to operate on their premises do so with reasonable care.

11.  The Defendant, American Airlines, was negligent when they breached their duty to ensure that Worldwide Flights, Inc. operated on their premises with due care.

12.  As a direct and proximate cause of the Defendant's breach of its duty

SPILLANE LAW OFFICES
• • • •
1212 HANCOCK ST
QUINCY, MA 02169-4300
TEL: (617) 328-9100
FAX: (617) 328-8373

1130 WASHINGTON ST
HANOVER, MA 02339
TEL: (781) 829-9993
FAX: (781) 829-9924
www.spillanelawoffices.com

to exercise due care, the Plaintiff sustained personal injuries, incurred medical

expenses, and experienced suffering to her mind and body

WHEREFORE, the Plaintiff demands judgment against the

Defendant, American Airlines Inc., for monetary damages, interest, costs, and such

additional relief as the court deems just and reasonable.

## COUNT 2; NEGLIGENCE
## WORLDWIDE FLIGHT SERVICES, INC.

13.  The Plaintiff repeats, realleges, and incorporates fully paragraph 1

through 8 as if each were set forth in their entirety.

14.  The Defendant, Worldwide Flight Services, Inc. owed the Plaintiff a duty

to exercise reasonable care while operating in its capacity of transporting the

Plaintiff's mother through the airport.

15.  The Defendant, Worldwide Flight Services, Inc. was negligent in that

they breached their duty to exercise reasonable care when their employee had the

Plaintiff's mother, Iris Baggey attempt to stand on a moving escalator.

16.  As a direct and proximate cause of the Defendant's negligence, Iris fell on

the Plaintiff who sustained personal injuries to her mind and body and incurred

substantial medical expenses.

WHEREFORE, the Plaintiff demands judgment against the Defendant,

Worldwide Flight Services. Inc. for monetary damages, interest, costs and such

additional relief, as the Court deems just and reasonable.

## DEMAND FOR JURY TRIAL

The Plaintiff demands a Trial by Jury on all issues so triable

SPILLANE LAW OFFICES
* * * * *
1212 HANCOCK ST
QUINCY, MA 02169-4300
TEL: (617) 328-9100
FAX: (617) 328-8373
———
1130 WASHINGTON ST
HANOVER, MA 02339
TEL: (781) 829-9993
FAX: (781) 829-9924
www.spillanelawoffices.com

By Plaintiff's Attorney

Kathleen Kane, BBO No. 660175
Spillane Law Offices
1212 Hancock Street-Suite 200
Quincy, MA  02169-4300
(617) 328-9100

DATED: February 1, 2005

SPILLANE LAW OFFICES
♦ ♦ ♦ ♦ ♦
1212 HANCOCK ST
QUINCY, MA 02169-4300
TEL: (617) 328-9100
FAX: (617) 328-8373

1130 WASHINGTON ST
HANOVER, MA 02339
TEL: (781) 829-9923
FAX: (781) 829-9924

www.spillanelawoffices.com