UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

EILEEN DICK, )
    Plaintiff, )
  )
  )
v. )     DOCKET NO: 05-10446-GAO
  )
AMERICAN AIRLINES, INC. and )
WORLDWIDE FLIGHT SERVICES, INC. )
    Defendants. )
  )

## DEFENDANT, AMERICAN AIRLINES, INC.'S
## MOTION FOR SUMMARY JUDGMENT

NOW COMES the defendant American Airlines, Inc. ("American") and hereby moves for the entry of summary judgment on all claims contained in plaintiff's complaint. As more fully set forth in the accompanying memorandum of law and undisputed statement of facts, plaintiff's claims are governed by the Convention for the Unification of Certain Rules Relating to International Transportation by Air ("Warsaw Convention" or "Convention") and otherwise fail as a matter of law. Plaintiff did not initiate her claim within the two year period required by the Convention and has otherwise failed to state any claim against American.

WHEREFORE, defendant, American Airlines, Inc., respectfully request that it's motion for summary judgment be **Allowed**.

/s/ Tory A. Weigand

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on **May 16, 2006**

/s/ Tory A. Weigand
_____

Tory A. Weigand, BBO #548553
250 Summer Street
MORRISON MAHONEY LLP
Boston, MA 02210-1181
(617) 439-7500 (main no.)
(617) 737-8827 (direct dial)
*For the defendant, American Airlines, Inc.*

1001884v1

# EXHIBIT "A"

1

Volume I, Pages 1-81

Exhibits: See Index

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------

EILEEN DICK

                    Plaintiff

vs.                             Docket No. 05-10446-GAO

AMERICAN AIRLINES, INC., and

WORLDWIDE FLIGHT SERVICES, INC.

                    Defendants

----------------------------

DEPOSITION OF EILEEN M. DICK

Monday, April 10, 2006, 10:00 a.m.

Morrison Mahoney LLP

250 Summer Street

Boston, Massachusetts

-------Reporter:  Joan M. Cassidy, RPR, CRR-------

EPPLEY COURT REPORTING

P.O. Box 382

Hopedale, Massachusetts 01747

**Eileen M. Dick**
**April 10, 2006**

A.  All right.

Q.  Also, since we have a stenographer, she's taking down everything we say, so she'll be taking down my questions and your answers.  It's important for you to wait till I get my question out and then go ahead and answer.  Okay?

A.  All right.

Q.  And also, she can't take down nods of the head and that kind of thing, so please answer audibly.  All right?

A.  All right.

Q.  Okay.  Could you please state your full name.

A.  Eileen Maenola Dick.

Q.  And where do you currently reside?

A.  I reside in Boston.

Q.  And what's the address there?

A.  106 Greenbrier Street, Dorchester, Mass.

Q.  And how long have you resided there?

A.  I've resided there since 1984.

Q.  Do you have any other residences?

A.  I sometimes spend a lot of time in Toronto 'cause my husband still has got a home there.  He's from there.

**Eileen M. Dick**
**April 10, 2006**

1     Q.  And what's the address in Toronto?

2     A.  66 Oak Meadow Boulevard, Toronto, Ontario.

3     Q.  Is there any particular times of year that

4 you spend in one place versus the other, Boston or

5 Toronto?

6     A.  No.  We just go back and forth.  We'll be

7 here for three months, we'll just go up for a

8 weekend, spend two weeks, come back, that kind of

9 thing.

10    Q.  Okay.  And what is your date of birth?

11    A.  May 1, 1938.

12    Q.  And you're married?

13    A.  I am married.

14    Q.  And what's your husband's name?

15    A.  Joseph Emmanuel Dick.

16    Q.  And do you have any children?

17    A.  I do have two sons.

18    Q.  And their ages?

19    A.  One's 39 and one's 37.

20    Q.  Do you have any grandchildren?

21    A.  Yes, I do.

22    Q.  How many do you have?

23    A.  I have six grandchildren.

24    Q.  Why don't you tell me a little bit about

Eileen M. Dick
April 10, 2006

15

```
 1   records were responsive to the record request that

 2   was a part of the deposition?

 3                MS. KANE:  Correct.

 4                MR. WEIGAND:  Okay, all right.

 5        Q.  Now, as part of the trip, who else went on

 6   this trip besides yourself and your mother?

 7        A.  We were on our way back from Trinidad, and

 8   my husband had gone on the trip with us, but he had

 9   left before we did, he came back before.

10        Q.  Looking at some records, which I will show

11   you in a minute, it looks like the trip originated

12   from Toronto?

13        A.  No.

14        Q.  No, okay.  Why don't you tell me about the

15   trip.

16        A.  The trip originated from Trinidad.

17        Q.  Okay.  But was this part of a trip where

18   you left Toronto on January 27, and you were

19   returning back to Toronto on February 25?

20        A.  Yes.

21        Q.  Okay.  So the incident took place on the

22   leg of the trip when you landed in Miami?

23        A.  On the return trip.

24        Q.  But when you booked the flight, you booked
```

Eileen M. Dick
April 10, 2006

16

```
 1   the flight in -- to leave in January, did you not?

 2        A.  I probably did, yes.

 3        Q.  Maybe we can help you a little bit with

 4   this.

 5             MR. WEIGAND:  Let me have this marked as

 6   the next exhibit.

 7             (Marked, Exhibit 2, Printout of

 8   itinerary.)

 9        Q.  Ms. Dick, I'm going to show you a document

10   that's been marked as Exhibit 2 and just ask you if

11   you recognize that.

12        A.  (Witness reviews document.) Yes.

13        Q.  And is that a printout of your itinerary

14   for the trip that began on January 27 and returned

15   on February 25, 2002?

16        A.  Yes.

17        Q.  Now, again, it was you, your husband, and

18   your mother that left together on the trip?

19        A.  My mother -- no, my mother wasn't on -- did

20   not leave on this trip.

21        Q.  So when you left Toronto, was it just you

22   and your husband on the 27th?

23        A.  Yes.

24        Q.  Okay.  And at some point did you meet up
```

Eileen M. Dick
April 10, 2006

17

```
 1  with your mother?

 2      A.   In Trinidad.

 3      Q.   Okay.  And then she came with you on the

 4  return trip?

 5      A.   Yes.

 6      Q.   Did you book this through a travel agency;

 7  do you recall?

 8      A.   I didn't.  My husband did, and he might

 9  have done it on-line.

10      Q.   I take it you take some trips with your

11  husband fairly frequently?

12      A.   Very frequently.

13      Q.   And does he normally book the trips

14  on-line?

15      A.   Normally, yes.

16      Q.   Before you left on the 27th, was it your

17  plan to come back in February with your mother?

18      A.   Yes.

19      Q.   Okay.  Before you left on the 27th, did you

20  make any arrangements for wheelchair assistance or

21  other special assistance?

22      A.   I always do.

23      Q.   Did you do that before you left?

24      A.   Before I left Toronto?
```

Eileen M. Dick
April 10, 2006

18

```
 1      Q.  Yes.  Or did you do it when you got to
 2   Trinidad?
 3      A.  That I'm not sure about.  I'm not -- I'm
 4   trying to -- I'm -- more than likely we probably
 5   bought this ticket for my mother here, like in
 6   Toronto, before we left, more than likely.  I'm not
 7   swearing to that, but we've done this often that
 8   I'm -- that's what I usually do.
 9      Q.  Get the ticket ahead of time?
10      A.  Get the ticket ahead of time, and then we
11   pick it up down there or -- yeah, book the ticket
12   ahead of time, yes.
13      Q.  And when you book the ticket ahead of time,
14   that's when you would have requested some wheelchair
15   assistance?
16      A.  I always do.
17      Q.  Your mother, was she able to walk at all on
18   her own, or was she always in a wheelchair?
19      A.  My mother can walk.  She walks with a cane.
20      Q.  So the wheelchair assistance would be just
21   to meet her from the plane and to go to a connecting
22   flight or to get out of the airport?
23      A.  Yes.
24      Q.  But once she's out of the airport, she's
```

Eileen M. Dick
April 10, 2006

19

1    able to walk and get into her car?

2        A.    With a cane, yes.

3        Q.    Okay.  When you would ask for wheelchair

4    assistance, what is the -- do you remember asking

5    for wheelchair assistance on this particular

6    occasion?

7        A.    Well, it would not be me, my husband would

8    do it.  He booked on-line, but we always do -- my

9    mother has been traveling with wheelchair assistance

10   now for many years, because over the years -- as I

11   said, she's 97, and since she was in her 80s, she's

12   had bad knees.  She has consequently, since then,

13   had knee replacement surgery.

14       Q.    She had both knees replaced?

15       A.    She had both knees replaced at 90.

16       Q.    So it's your understanding your husband

17   would have made the arrangements for the wheelchair

18   assistance?

19       A.    If I booked the thing, I would make the

20   arrangements for the wheelchair.

21       Q.    If you did it, what would be your process?

22   Do you do it on the phone, or do you do it on-line?

23       A.    I would do it on the phone, call the office

24   and do it.

Eileen M. Dick
April 10, 2006

20

1     Q.   Do you remember who and how it was done on

2   this particular occasion in February of 2002?

3     A.   As I said before, I think it was done

4   on-line.

5     Q.   Okay.  And by that you mean the wheelchair

6   request for assistance?

7     A.   The wheelchair assistance is always done

8   when we purchase the ticket.  It's not something we

9   go to the airport and say, "Could I have a

10   wheelchair."

11     Q.   Okay.  So you -- prior to leaving on

12   January 27, did you get a copy -- oh, did you pick

13   up -- strike that.  Did you pick up your tickets

14   when you went to the airport?

15     A.   Yes.

16     Q.   Did you pick up all of your tickets, your

17   return ticket, or just the ones to Trinidad?

18     A.   No, return tickets.

19     Q.   So you got the whole -- all tickets?

20     A.   Yes.

21     Q.   For the whole trip, okay.  And again, that

22   was a round trip between Toronto and Trinidad with a

23   connecting flight in Miami; is that correct?

24     A.   Yes.

Eileen M. Dick
April 10, 2006

21

1    Q.  And that was true on the way there, that

2  is, you'd leave from Toronto, stop in Miami, change

3  planes, and go to Trinidad?

4    A.  Yes.

5    Q.  And the same thing on the way back, which

6  was on the 25th:  You would leave Trinidad, arrive

7  in Miami, and connect on to Toronto; is that

8  correct?

9    A.  Yes.

10    Q.  On your trip there in January, you were

11  with your husband; is that correct?

12    A.  Yes.

13    Q.  And you got to Trinidad at some point; is

14  that right?

15    A.  Yes.

16    Q.  Did you have any discussions with anybody

17  from American or anyone about the need for

18  wheelchair assistance for your trip back at that

19  point?

20    A.  Not for my trip back, no.  I never --

21    Q.  How about for your mother; did you talk

22  with anybody about wheelchair assistance?

23    A.  When I landed?

24    Q.  Yes.

1    but even when I am leaving from Boston, I'm using

2    American.   We always go to Miami.

3        Q.   So roughly how many times a year do you

4    travel to Trinidad?

5        A.   Many once a year, but sometimes twice, and

6    sometimes if there's something I have to go for,

7    like an emergency, a death in the family or

8    something, that's -- yeah.

9        Q.   But on average, you'd go at least once?

10        A.   At least once.

11        Q.   Maybe a couple more times, depending?

12        A.   Maybe.

13        Q.   And was this trip here, which was January

14    to February of 2002, part of your annual trip that

15    you would do?

16        A.   Yes.

17        Q.   Okay.

18        A.   That's usually the time when I would do the

19    one annual trip.   I just got back.

20        Q.   When you do this annual trip, is it your

21    normal practice to have your mother come back with

22    you?

23        A.   Sometimes.   She did not come back this year

24    with me.

Eileen M. Dick
April 10, 2006

1     Q.  So you and your mother waited to get off

2  the airplane, right?

3     A.  Yes.

4     Q.  And when you got off the airplane, was

5  there somebody there to meet you with a wheelchair?

6     A.  Yes.

7     Q.  Was there more than one person?

8     A.  For us or for other people?

9     Q.  For you.

10    A.  No, the wheelchair arrived and the

11 wheelchair person.

12    Q.  Do you recall any conversations with

13 anybody from American Airlines prior to your mother

14 getting into the wheelchair?

15    A.  Just when they announced the wheelchair

16 passengers, you know, to remain in your seats and

17 you will be picked up, you know, and just, you know,

18 they might say to you, as one of the wheelchair

19 people, "The wheelchair is coming, just sit there."

20    Q.  So you help your mother walk off the plane,

21 and then she sits in the wheelchair?

22    A.  Yes.

23    Q.  Did you have any conversation with the

24 person who met you with the wheelchair at that time?

Eileen M. Dick
April 10, 2006

30

1    A.   I do not -- well, you might be right 'cause

2    Gate 11E -- is that what that means (indicating)?

3    Q.   No, that might be your seat, actually.

4    A.   Oh, all right.  No, I cannot recall.

5    Q.   Why don't you tell me what happened after

6    you got off the airplane and your mother was --

7    well, strike that.  Was it your understanding that

8    you were now going to try to meet your connecting

9    flight to Toronto?

10   A.   Yes.

11   Q.   And do you know how much time you had

12   before your flight left?

13   A.   I cannot recall.

14   Q.   And this connecting flight from Miami to

15   Toronto was part of your round-trip itinerary that

16   you had arranged; is that right?

17   A.   Yes.

18   Q.   All right.  So why don't you tell me what

19   happened after your mother got in the wheelchair and

20   you left with the attendant.

21   A.   We were on our way through the airport and

22   going, and we came to an area -- after a bit of a

23   ride, we came to an area where there were elevators

24   and escalators and --

**Eileen M. Dick**
**April 10, 2006**

31

        Q.  Let me stop you there, if you don't mind.
How long -- how many minutes did it take you to
reach that area of the airport?

        A.  Maybe about five minutes.  I'm not sure.
I'm really not sure.

        Q.  Okay.  Did you understand that you were
heading toward the gate for your connecting flight?

        A.  Yes.

        Q.  Okay.  Were you going anywhere else at that
times, as far as you knew?

        A.  Apart from the gate for the connecting
flight?

        Q.  Right, right.

        A.  Not as far as I know.  We were going for my
connecting flight.

        Q.  And did you and your mother have your
boarding passes with you?

        A.  Yes.

        Q.  Okay.  And did you understand that to be a
restricted area of the airport, that is, only
ticketed passengers could be in that area?

        A.  Yes.

        Q.  All right.  So you arrive at the area where
there's an elevator and an escalator, you said?

Eileen M. Dick
April 10, 2006

32

1    A.  Yes -- well, of course, I -- the attendant

2  stopped in front of the elevators and the escalator.

3  There were other passengers going up and down the

4  escalators, so that's why it was quite clear.

5    Q.  Did you understand you had to go up or

6  down?

7    A.  We were going up.

8    Q.  And do you know what gate you were trying

9  to get to?

10    A.  I have no idea.

11    Q.  Why don't you --

12    A.  I did at that point, but I don't know now.

13    Q.  All right, okay.  Why don't you tell me

14  what happened after you got to the elevator and the

15  escalator area.

16    A.  We were standing in front of the elevator,

17  and she tried to get the elevator, pushed the

18  button, and the elevator was not coming.  She

19  waited -- we waited for a while, and there was no

20  elevator.

21    Q.  What happened next?

22    A.  So she said to me -- she turned around, got

23  the wheelchair, and said to me, "The elevator is not

24  working."  And I had said, "What do we do now?"  And

Eileen M. Dick
April 10, 2006

33

1    she said to me -- she said to me -- she turned to my

2    mother and said, "You can walk," because she had

3    seen my mother walking to the chair.  And I said,

4    "She certainly walks, but what are we going to do

5    now?"  And she said, "Well, she'll have to get up

6    and go up on the escalator."  And I said, "I do not

7    think that's a good idea."  And she said to me,

8    "Well, it's not working."  And I said to her, "Is

9    there not another elevator?"  And she said no.

10       Q.  Okay.  And what was the next thing that was

11   done or said after she told you that?

12       A.  Well, we got closer to the escalators.  She

13   helped my mother out.  My mother got her cane.  I

14   took my mother's bag, and we sort of waited until it

15   looked clear.  And then my mother got on, and I got

16   on immediately behind her.

17       Q.  Now, your mother had a cane with her,

18   right?

19       A.  Yes.

20       Q.  And she had one of -- did she have a

21   handbag?

22       A.  I took it away from her.

23       Q.  And what were you carrying, if anything?

24       A.  I was carrying my handbag and my mother's

Eileen M. Dick
April 10, 2006

34

1    handbag, and I had a small carry-on bag which I put

2    next to me.

3         Q.   The carry-on bag, did it have wheels on it,

4    or was it a separate bag you carried?

5         A.   Wheels, a small one.

6         Q.   So when you were walking from the plane to

7    the escalator/elevator area, you were dragging the

8    small carry-on bag and you had your own handbag?

9         A.   Yes.

10        Q.   And your mother was sitting in the chair

11   with her cane and her own handbag?

12        A.   That's right.

13        Q.   So when she stood up, you had to take her

14   handbag?

15        A.   Yes.

16        Q.   And you both got on the escalator?

17        A.   Yes.

18        Q.   Okay.  What happened after that?

19        A.   I got on immediately behind her.

20        Q.   Now, there are separate steps.  Were you on

21   a different step?

22        A.   Yes.

23        Q.   But the step right behind her; is that

24   right?

Eileen M. Dick
April 10, 2006

35

```
 1      A.  Yes.

 2      Q.  Okay.  Why don't you tell me what was the

 3   next thing that happened?

 4      A.  We started to ascend, and about a quarter

 5   of the way up, I just heard my mother start to

 6   scream.  She toppled back.  She started to scream,

 7   and I grabbed her and we both went -- I'm

 8   grabbing -- I'm holding onto her, she's screaming,

 9   so -- I will show you.

10      Q.  Okay.

11      A.  (Demonstrating) Because I'm -- she's coming

12   back.  I'm grabbing her --

13      Q.  And the escalator is going up, correct?

14      A.  The escalator is going up.  And there are

15   people screaming, "Stop."  And the attendant,

16   she's -- 'cause she was coming up with the chair, so

17   she and somebody else at the bottom -- I really

18   don't know how it stopped; but in the meantime, my

19   mother comes toppling back.  I'm grabbing her,

20   holding one side, holding my mother, and my legs --

21   because the escalator is moving, so I'm stretching

22   like this (demonstrating).  And I started -- I

23   realize I'm going to fall.  And this is how we

24   stopped when it stopped.  My mother is back.  I'm
```

Eileen M. Dick
April 10, 2006

36

1   hanging back and --

2       Q.  That chair's got wheels on it.  I don't

3   want you to go flying.

4       A.  This is what happened (demonstrating).

5       Q.  Did the attendant get on the escalator

6   behind you?

7       A.  She was getting on with the -- on the other

8   side, on -- she was getting up with the -- on the

9   steps with -- I think it's steps -- with the

10  wheelchair.  She was bringing the wheelchair.

11      Q.  So she was bringing the wheelchair up the

12  regular stairway?

13      A.  I think so.

14      Q.  Okay.  And was that right next to the

15  escalator?

16      A.  She was behind me, so I don't know where --

17  but I know she said she will bring the wheelchair

18  up.

19      Q.  When your mother fell back into you, you

20  said you grabbed onto the side of the escalator?

21      A.  Well, I am holding and I grabbed my mother.

22      Q.  Right.  What prevented you from falling?

23      A.  Well, I was the one who -- I did.

24      Q.  Did you actually fall down?

Eileen M. Dick
April 10, 2006

37

```
1      A.   I -- by this time the elevator -- someone
2   ran and stopped it.  So I'm holding here, and I'm
3   stretching, so I didn't, like, fall with my head
4   back or anything, but my knees are bending and, you
5   know, I'm stretching this one and holding my mother
6   (demonstrating).
7      Q.   Did you actually go down to your knees?
8      A.   Bend over, yes.
9      Q.   Your knees were touching the stairwell?
10     A.   My right knee was stretched out because
11  there wasn't another stairwell, and this one was
12  kind of jammed against the side of the escalator.
13     Q.   Did some people come to your help?
14     A.   Yes.
15     Q.   And what was the next thing that happened?
16     A.   The next thing that happened is they helped
17  us up, you know, people came and helped us up
18  slowly.
19     Q.   How did you get off the escalator?
20     A.   They had to get me a wheelchair.
21     Q.   So they helped your mother off?
22     A.   Yes.
23     Q.   Was she able to walk off the escalator?
24     A.   She was able to -- they met her with a
```

1  wheelchair right there.  We stood right there, and

2  they met her; and I couldn't move, so they came --

3  they got me a wheelchair as well.

4      Q.  What kind of problems were you having

5  causing you unable to move --

6      A.  I --

7      Q.  I just need to get my question out.  Go

8  ahead.

9      A.  Yeah.  I was on my -- my knee was painful.

10      Q.  Which knee?

11      A.  My right knee.

12      Q.  Okay.  And so now your mother and you are

13  in a wheelchair, and you have some pain in your

14  right knee?

15      A.  Yes.

16      Q.  At this point in time, did you talk with

17  the attendant that had brought you the wheelchair

18  and was escorting you to the gate?

19      A.  I do not remember saying anything to her at

20  that time, but I remember her colleague saying to

21  her something at that time:  "I told you not to do

22  that."

23      Q.  Now, at some point are you saying that

24  there was another -- you were saying there was a

Eileen M. Dick
April 10, 2006

40

```
1    time?

2        A.   No.

3        Q.   What was the next thing that happened?

4        A.   Well, the next thing that happened -- I

5    don't know who all those people were, like, maybe

6    American Airline attendants.  Somebody for the

7    elevator came along, and they brought me along to an

8    area; and they got a supervisor or something and

9    started to look at me and ask me if I was all right.

10   And I told them what -- I was in pain and what was

11   happening.  And then they got -- they said, well,

12   wait, they will get an ambulance, an attendant, and

13   that sort of thing.  So the ambulance came about ten

14   minutes later with -- I mean, I didn't see the

15   ambulance, but they told me that.

16       Q.   So paramedics came?

17       A.   Paramedics came, yes.

18       Q.   So in about ten minutes some paramedics

19   came to take a look at you and your knee?

20       A.   Yes, yes.

21       Q.   And what did they do for you?

22       A.   Well, it was beginning to -- they asked me

23   would I like to go to the hospital; and I said,

24   "Well, it's difficult because I have my mother."
```

Eileen M. Dick
April 10, 2006

41

1   They looked at my mother, asked if she was all

2   right.  She was really scared and, you know,

3   frightened.  She was kind of looking at herself to

4   see if she was hurt.  And she kept saying no, she's

5   all right and she was just frightened and in shock

6   kind of thing.  And she was asking me if I was all

7   right.

8              And so they asked me -- when I looked at

9   it, it was beginning to get swollen a little bit at

10  this time -- if I would like to go to the hospital.

11  I thought about it for a bit; and I said no, I would

12  rather go home.

13       Q.  And did they provide you some ice for your

14  knee?

15       A.  Yes, they did.

16       Q.  Other than ice, did they provide you

17  anything else?

18       A.  No.  They did offer me if I wanted any,

19  like, pain medication and if I was sure I didn't

20  want to go to the hospital; and I said, "Not right

21  now."

22       Q.  Okay.  Now, during this time when you were

23  being attended to by the paramedics, do you recall

24  anything that any of the attendants said, the

Eileen M. Dick
April 10, 2006

```
 1    it down; and then we got to the -- they took me
 2    along to the other area where I was supposed to go
 3    for the flight.
 4        Q.   For the flight?
 5        A.   For the flight.  And do not ask me what
 6    area or what was -- I have no idea.  I was just
 7    pushed along to the area where I was supposed to go
 8    to for the flight.
 9        Q.   So after the paramedics attended to you,
10    did -- were the same two wheelchair attendants with
11    you that took you two onto the gate for your
12    departing flight?
13        A.   The same wheelchair attendant, yes.
14        Q.   You had one pushing you and one pushing
15    your mother?
16        A.   Yes.
17        Q.   Okay.
18        A.   I only picked up a wheelchair attendant
19    after the incident.
20        Q.   That's right.
21        A.   Yes.
22        Q.   So you were taken -- so the next thing you
23    recall after being taken care of by the paramedics
24    was going on to the gate --
```

Eileen M. Dick
April 10, 2006

44

```
 1      A.   Yes.

 2      Q.   -- where your flight was leaving; is that

 3  right?

 4      A.   Yes.

 5      Q.   During that time do you recall any

 6  conversations with the wheelchair attendants?

 7      A.   No.

 8      Q.   Did you make it in time to meet your

 9  connecting flight?

10      A.   No.  I'm thinking that I -- the flight --

11  I'm not sure if the flight was delayed or if we

12  missed the flight.  I have -- I think the flight was

13  delayed, but I'm not sure, but I know we got on,

14  because we did not get to Toronto until very late

15  that night.  And I know there was some kind of

16  delay, but whether it was -- to be fair, I do not

17  know if it was an American delay or if we missed the

18  flight because of the incident.

19      Q.   Okay.  You just remember that there may

20  have been some delay in the flight?

21      A.   Yes.

22      Q.   Do you know how long you waited for the

23  flight before you left?

24      A.   I waited for quite a bit, quite a bit.
```

48

1      Q.  Okay.  And again, the ticket indicates a

2  trip from Toronto to Miami, Miami to Trinidad, and

3  then back on the 25th of February from Trinidad to

4  Miami, and Miami on to Toronto, correct?

5      A.  Yes.

6      Q.  All right.  When you -- while you were at

7  the Miami airport and you were traveling -- strike

8  that.  When you were with the wheelchair attendant,

9  were they directing you where to go while you were

10  in Miami?

11     A.  Were they directing me where to go?

12     Q.  Yes.

13     A.  They were taking me to where I was going.

14  They weren't giving me directions because I was in

15  the wheelchair, so they were pushing me to where --

16  they knew what flight I was going to and what gate I

17  was going to.

18     Q.  How about before the incident, when you got

19  off the plane and before you fell on the escalator,

20  you were with a wheelchair attendant; was she

21  directing you and showing you where to go?

22     A.  She was leading the way, yes.

23     Q.  Okay.  You did not pass out through

24  security at any time before you left Miami; is that

Eileen M. Dick
April 10, 2006

49

1    correct?

2        A.   Excuse me?  Say that again.

3        Q.   You didn't pass out through the security

4    part of the airport before you left; is that

5    correct?

6        A.   No, I did not.  You mean, did I get out of

7    the airport to go through security?

8        Q.   Right.

9        A.   No, I didn't.

10       Q.   And your bags were already checked,

11   correct, your carry-on -- other than your carry-on

12   bags, did you bring other luggage with you on the

13   trip?

14       A.   Yes, I had other luggage on the trip.

15       Q.   And they were already on the plane?

16       A.   Yes.

17       Q.   Did you go through customs at all while you

18   were in Miami, or did that take place when you got

19   to Toronto?

20       A.    I went through customs when I was in Miami.

21       Q.   Okay.

22       A.   Yes, that's what I was trying -- yes, we

23   went through customs.

24       Q.   Did you go through customs before you got

Eileen M. Dick
April 10, 2006

70

```
 1        Q.   Did they ever get back to you?

 2        A.   No.

 3        Q.   Did you ever follow up or call the airport

 4   to talk to anyone?

 5        A.   No.

 6        Q.   At some point did you seek an attorney's

 7   help in this case?

 8        A.   Yes.

 9        Q.   Okay.  And when did you first do that,

10   approximately?

11        A.   It could be maybe a week or two later.  I'm

12   not sure.  I think it was sometime in March.  I'm

13   not sure what date it was.  It was not too long

14   after.

15        Q.   At the time of the incident, when you were

16   being brought to your connecting flight, did you

17   believe and understand that you were under the

18   direction and control of the attendants?

19        A.   Did I believe I was under their control?

20        Q.   Yes.

21        A.   "Control" is like what?  I mean, they are

22   directing me to where I'm supposed to go?

23        Q.   Yes.

24        A.   Yes.
```

71

```
 1      Q.  And you understood you were in the area of

 2   the terminal where only ticketed passengers could

 3   be?

 4      A.  That's what I understood, yes.

 5      Q.  And this incident, again, was while you

 6   were on your way to the connecting flight to Toronto

 7   to finish the last leg of your trip; is that right?

 8      A.  Yes.

 9      Q.  Other than Dr. Patel and other than the

10   physical therapy group at Massachusetts General and

11   the physical therapy group in Toronto, have you

12   obtained or sought any other treatment for your knee

13   at any time?

14      A.  No.

15      Q.  Have you discussed your knee condition with

16   Dr. Ellman in any of your visits with him?

17      A.  Well, the first visit I discussed it with

18   him, and then he sent me to Dr. Patel.

19      Q.  Have you ever had any follow-up with him

20   about your knee of any type?

21      A.  No.

22          MR. WEIGAND:  All right.  I think I'm

23   done.  Geoff, do you want to follow up?

24
```

Eileen M. Dick
April 10, 2006

75

1   personnel, you mentioned you had a conversation with

2   a representative from the Miami Dade airport.  Do

3   you know if you had any conversations with any

4   representatives of Worldwide Flight Services?

5       A.  I do not know, no.

6       Q.  You don't know?

7       A.  No.  I mean, not -- that's what I said, I

8   had a call, I had a phone call from a person, but I

9   don't know where that person was from.  I cannot

10  say, 'cause at the time I thought -- all through

11  that thing I probably thought I was dealing with

12  American Airlines.

13      Q.  Sure.  When you had mentioned the medical

14  care that you have received with respect to your

15  knee injury, it was Dr. Patel, Massachusetts General

16  Hospital physical therapy, Toronto physical therapy,

17  the first visit with Dr. Ellman, and then there was

18  also that emergency room visit up in Toronto,

19  correct?

20      A.  Right, yes.

21      Q.  Were there any other physicians that you

22  sought treatment for your right knee injury from in

23  Toronto prior to coming back to Boston?

24      A.  Just the treatment I had in the emergency

Eileen M. Dick
April 10, 2006

78

```
1                    REDIRECT EXAMINATION

2    BY MR. WEIGAND:

3       Q.  When you were traveling to the connecting

4    flight, the attendant was directing the direction

5    and route you were taking; is that correct?

6       A.  Yes, because I think she knows the gate

7    better than I do.

8       Q.  Right.  So as far as telling you where to

9    go and how to get to that connecting flight, you

10   were relying upon the attendant?

11      A.  I was.

12          MR. WEIGAND:  Okay.  I don't have

13   anything further.

14          MS. KANE:  I think we're all set.

15          MR. WEIGAND:  All right.

16          (Whereupon the deposition was concluded

17   at 11:36 a.m.)

18

19

20

21

22

23

24
```

# EXHIBIT "B"

********** IMPORTANT NOTICE **********

IF YOU PURCHASED A **SPECIAL FARE** CERTAIN RESTRICTIONS MAY APPLY.  SOME FARES ARE NON-REFUNDABLE.

IF THE FARE ALLOWS CHANGES, A FEE MAY BE ASSIGNED FOR THE CHANGE.

ITINERARY FOR- EILEEN DICK                        DATE 22 DEC 01

27JAN - SUNDAY
        LV    TORONTO ON          1159A    FLT1561    AMERICAN AIRLINES
        AR    MIAMI INTERNTNL      319P               ECONOMY


        LV    MIAMI INTERNTNL      450P    FLT1819    AMERICAN AIRLINES
        AR    PORT OF SPAIN        927P               ECONOMY

25FEB - MONDAY
        LV    PORT OF SPAIN        853A    FLT1818    AMERICAN AIRLINES
        AR    MIAMI INTERNTNL     1155A               ECONOMY


        LV    MIAMI INTERNTNL      115P    FLT1562    AMERICAN AIRLINES
        AR    TORONTO ON           435P               ECONOMY

# EXHIBIT "C"

# SPILLANE LAW OFFICES

◆  ◆  ◆  ◆  ◆

1212 HANCOCK STREET, SUITE 200
QUINCY, MASSACHUSETTS 02169-4300
(617) 328-9100
FACSIMILE: (617) 328-8373

DAVID M. SPILLANE
KATERI M. BOUSALEH
ROBERT S. BERGER
CHRISTOPHER J. FEIN

1130 WASHINGTON STREET
HANOVER, MASSACHUSETTS 02339
(781) 829-9993

Reply to Quincy Office

September 10, 2003

Gary Gardner, Esquire
Wilson, Elser, Moskowitz, Edelman & Dicker
160 East 42 nd Street
New York, New York 10017-5639

RE:   Name:              Eileen Dick v. Worldwide Flight Services, Inc.
      Date of Injury:    February 25, 2002
      Our File No.:      317-6000

Dear Mr. Gardner:

I have been told that you are now the attorney assigned to this claim.  AS you know, I represent Eileen Dick concerning personal injuries sustained on February 25, 2002, at Miami-Dade International Airport and caused by the negligence of an employee of Worldwide Flight Services, Inc. in the course of her employment.  The following is a statement of facts, a summarization of my client's injuries, and a formal demand for settlement.

Eileen Dick is currently 65 years old old, married and the mother of two adult children.  She was a registered nurse while she lived in London many years ago and when she moved to Boston she was employed at the New England Medical Center as a nurse technician for many years as well.  Her husband is a retired school principal.

Page 2
September 10, 2003

## FACTS

On February 25, 2002 Eileen was traveling back from Trinidad with her 92-year-old mother, Iris Bazzey.  Mother and daughter's flight plan required transfer at Miami Dade for the last leg of the trip back to Toronto.  Ms. Bazzey needed wheelchair assistance on and off the airplanes as well as for traveling throughout the airport and arrangements were made with airline personnel for her to have such assistance.

After disembarking from their flight into Miami, they were met by attendant Elda Alvarez, an employee of World Wide Flight Services.  Ms. Bassey was placed in a wheelchair and Ms. Alvarez began to push the wheelchair through the terminal toward their anticipated destination which was the gate of their next flight.  The gate was on another level of the airport and Ms. Alvarez directed Eileen and her mother to an elevator.  Ms. Alvarez, after waiting a short period of time, decided that the elevator must have been broken.  She did nothing to verify whether the elevators were, in fact, broken but instead pushed the wheelchair to an escalator. She told them to take the escalator and that she, Ms. Alvarez, would take the wheelchair down the stairs and meet them at the other end.  Eileen immediately questioned the decision of using the escalator, making it clear that she did not think it a good idea to put a 92-year-old woman like her mother on an escalator.  She also indicated that she, Eileen, was of an age that she wouldn't be able to assist her mother on the escalator should something happen.

Page 3
September 10, 2003

Rather than trying to find another means of accomplishing the task, Ms. Alvarez insisted there was no other way and the ill-fated journey on the escalator was begun. The two elderly women got on the escalator and, at some point, as the stairs began to move Ms. Bazzey lost her balance, falling backwards onto her daughter. Eileen herself then fell over, striking her right knee on the hard metal of the escalator's stairs. After the incident Eileen overheard the other wheelchair attendant tell Ms. Alvarez that she had warned her against putting Ms. Bazzey on the escalator unattended.

## INJURIES AND TREAMTMENT

After she fell and hit her knee, Eileen was in immediate and significant pain. She received preliminary triage and treatment at the airport before boarding the flight back to Toronto. The EMT's applied ice to her knee which Eileen continued to do for the entire flight home. Upon her arrival in Toronto, Eileen went to the emergency room of Centenary Health Centre. She arrived on crutches and by then Eileen's not only was her knee in pain bur her leg was swollen and cool to the touch. X-Rays came back as normal and she was discharged from the ER with a prescription for Motrin. As the weeks went on Eileen continued to experience significant symptoms in her knee making walking painful and difficult. Activites like climbing stairs were all but impossible. She continued to use crutches during this time.

Page 4
September 10, 2003

On March 20, 2002 Eileen was in Boston, where they maintain an second residence, and still suffering pain and symptoms in her knee. She presented to Dinish Patel, a board certified orthopedic surgeon at Massachusetts General Hospital. After history and examination, it was Dr. Patel's impression that Eileen had suffered a right knee-ACL tear, medial meniscus tear, and patella chondromalacia. Taking a conservative approach, he recommended physical therapy, rehabilitation, and bracing before deciding on surgery. Her initial physical therapy evaluation was at Massachusetts General Hospital on April 5, 2002.

Eileen returned to Toronto and on April 16, 2002, began a regimen of physical therapy at Lifemark Health and continued with it until October. On October 30, 2002, she saw Dr. Patel at Massachusetts General Hospital again. After an examination and history, Dr. Patel felt that surgery was unnecessary at that time. His notes suggest that there is a possibility of further problems and, should that happen, he would revisit the issue of surgery.

At this time, Eileen continues to experience discomfort in her knee although much improved from the date of the incident. She was given home exercise programs which she does on a regular basis. The knee injury has prevented her from what used to be regular, if not daily, walking which she did for health and exercise.

With respect to her treatment, I have attached medical bills and records in substantiation of these medical expenditures. As I mentioned to Khane, the medical bills were unavailable from Lifemark Health, the Toronto facility where Ms. Dick attended physical therapy. Because of the nature of Canada's national healthcare

Page 5
September 10, 2003

system, the facility does not bill patients as is customary in the United States. As such, we have approximated the costs of Ms. Dick's therapy utilizing $100 as the reasonable fee for a physical therapy session as is customarily the case in the Boston area.

## MEDICAL EXPENSES

| | | |
|---|---|---|
| 1. Centenary Health Center (ER) | $ | 220.00 |
| 2. Dr. Dinish Patel Massachusetts General Hospital | $ | 250.00 |
| 3. Massachusetts General Hospital Physical Therapy evaluation | $ | 348.00 |
| 4. Lifemark Health (PT) | $ 3,400.00 | (estimated) |
| **TOTAL** | **$ 4,218.00** | |

## DEMAND

Liability in this case is quite clear. Elda Alvarez, an employee and agent of World Wide Flight Services, knew or should have known that sending a 92-year-old- woman in need of wheelchair assistance down an escalator essentially unattended was a dangerous and risky venture. Earlier, when confronted with what in her mind was a slow elevator, she did not seek to verify whether it was out of service, something she should have done because it was a very safe way, if not the safest way, to transport Ms. Bazzey. Rather, she immediately sent my client and her mother over to an escalator, a much more dangerous and risky mode of transportation given the

Page 6
September 10, 2003

situation. Then, instead of trying to try to find a safer resolution to her "dilemma" she

put both elderly women in harm's way while she gave herself safe transit. Her

declaration that there was "no other choice" rings hollow when you consider that, at

the very least, she easily could have assisted Ms. Bazzy herself down the escalator

and returned afterward for the wheelchair. Instead, as I said, she negligently left the

task of protecting Ms. Bazzy to my client.

As a result, Eileen is still experiencing the effects of the injury she sustained

on the escalator on February 25, 2002 and she is entitled to be compensated by

Worldwide for her injuries which were significant, the medical expenses incurred as

well as the pain and suffering she endured. Demand is therefore made to settle this

case for in the amount of One Hundred Twenty Five Thousand Dollars

($125,000.00).

I look forward to hearing from you. Please contact me after you have

reviewed this demand letter with the enclosed medical records (Exhibit A) and

medical bills (Exhibit B).

Thank you for your anticipated cooperation in this matter.

Very truly yours,

SPILLANE LAW OFFICES

DATED: September 10, 2003

Robert S. Berger
1212 Hancock Street
Quincy, MA  02169
(617) 328-9100

# EXHIBIT "D"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| EILEEN DICK,<br>Plaintiff, | ) ) ) ) | |
| v. | ) ) | DOCKET NO: 05-10446-GAO |
| AMERICAN AIRLINES, INC. and<br>WORLDWIDE FLIGHT SERVICES, INC.<br>Defendants. | ) ) ) ) ) | |

## AFFIDAVIT OF RIC ARNER

I, Ric Arner, hereby depose and swear as follows:

1.    I am an employee and Manager for American Airlines, Inc. ("American") and have been employed by American for 20 years.

2.    I have been the Manager of Airport Services-International Operations for American at the Miami International Airport for 17 years.

3.    I am very familiar and knowledgeable of the Miami International Airport, its layout, gates, escalators, concourses and particularly those portions of the Miami International Airport used by American.

4.    In February, 2002 (as well as today) concourses C, D and E at the Miami International Airport are used by American.

5.    In February, 2002, Gates E9 and E11 and connected terminal area was used exclusively by American flights and American ticketed passengers and the E escalator/elevator located near Gates E9 and E11 is within the area used exclusively by American ticketed passengers and is within the restricted/security protected area of the terminal. Both Gate E9 and

1

E11 are approximately 25 feet from the escalator and this entire area is and was used exclusively by American ticketed passengers.

6.    Worldwide Flight Services, Inc. was an independent contractor for American providing certain airline passengers support services including passenger embarking and disembarking services such as escorts and wheelchair assistance and served in that capacity in February, 2002.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS ___ DAY OF MAY, 2006.

Ric Arper, Manager Airport Services
International Operations-Miami
International Airport
American Airlines, Inc.

2

# EXHIBIT "E"

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT DEPT.
CIVIL ACTION NO.:

05-0466

EILEEN DICK
    Plaintiff

v.

AMERICAN AIRLINES, INC.

    Defendant.

WORLDWIDE FLIGHT SERVICES, INC,

    Defendant.

**RECEIVED**

FEB 07 2005

SUPERIOR COURT - CIVIL
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

## PARTIES

1.  Plaintiff, Eileen Dick, is a natural person residing at 106 Greenbriar Street, Dorchester, Suffolk County, Massachusetts.

2.  Defendant, American Airlines, Inc. is a foreign corporation with its principal place of business at P.O. Box 619616 MD 5675, 4333 Amon Carter Blvd, Fort Worth, Texas.

3.  Defendant, Worldwide Flight Services, Inc is a foreign corporation with its principle place of business at 1925 W. John Carpenter Fwy., Ste. 450 Irving, Texas.

## FACTS

4.  At all relevant times herein, Defendant, American Airlines was a

SPILLANE LAW OFFICES

1212 HANCOCK ST
QUINCY, MA 02169-4300
TEL: (617) 328-9100
FAX: (617) 328-8373

1130 WASHINGTON ST
HANOVER, MA 02339
TEL: (781) 829-9993
FAX: (781) 829-9924
www.spillanelawoffices.com

tenant of Miami Dade Airport.

5. At all relevant times, herein, Defendant Worldwide Flight Services, Inc. operated in Miami Dade Airport, including American Airlines terminals.

6. Eileen Dick was a lawful invitee on the premises of Defendant American Airlines.

7. Iris Baggy, the Plaintiff's mother, was a lawful invitee on American Airlines premises and placed in the care of an employee of co-Defendant, Worldwide Flight Services, Inc.

8. While on Defendant's, American Airlines' premises, and under the care of co-Defendant, Worldwide Flight Services, Inc., the Plaintiff was injured when her mom fell on her while riding down an escalator, sustaining substantial personal injuries.

## COUNT 1: NEGLIGENCE
## AMERICAN AIRLINES

9. The Plaintiff repeats, realleges, and incorporates fully paragraph 1 through 8 as if each were set forth in their entirety.

10. The Defendant, American Airlines owed a duty to the Plaintiff to make reasonable efforts to ensure that the companies they allow to operate on their premises do so with reasonable care.

11. The Defendant, American Airlines, was negligent when they breached their duty to ensure that Worldwide Flights, Inc. operated on their premises with due care.

12. As a direct and proximate cause of the Defendant's breach of its duty

SPILLANE LAW OFFICES
♦ ♦ ♦ ♦ ♦
1212 HANCOCK ST
QUINCY, MA 02169-4300
TEL: (617) 328-9100
FAX: (617) 328-8373

1130 WASHINGTON ST
HANOVER, MA 02339
TEL: (781) 829-9993
FAX: (781) 829-9924
www.spillanelawoffices.com

to exercise due care, the Plaintiff sustained personal injuries, incurred medical expenses, and experienced suffering to her mind and body

WHEREFORE, the Plaintiff demands judgment against the Defendant, American Airlines Inc., for monetary damages, interest, costs, and such additional relief as the court deems just and reasonable.

## COUNT 2; NEGLIGENCE
## WORLDWIDE FLIGHT SERVICES, INC.

13. The Plaintiff repeats, realleges, and incorporates fully paragraph 1 through 8 as if each were set forth in their entirety.

14. The Defendant, Worldwide Flight Services, Inc. owed the Plaintiff a duty to exercise reasonable care while operating in its capacity of transporting the Plaintiff's mother through the airport.

15. The Defendant, Worldwide Flight Services, Inc. was negligent in that they breached their duty to exercise reasonable care when their employee had the Plaintiff's mother, Iris Baggey attempt to stand on a moving escalator.

16. As a direct and proximate cause of the Defendant's negligence, Iris fell on the Plaintiff who sustained personal injuries to her mind and body and incurred substantial medical expenses.

WHEREFORE, the Plaintiff demands judgment against the Defendant, Worldwide Flight Services. Inc. for monetary damages, interest, costs and such additional relief, as the Court deems just and reasonable.

## DEMAND FOR JURY TRIAL

The Plaintiff demands a Trial by Jury on all issues so triable

SPILLANE LAW OFFICES
♦ ♦ ♦ ♦ ♦
1212 HANCOCK ST
QUINCY, MA 02169-4300
TEL: (617) 328-9100
FAX: (617) 328-8373

1130 WASHINGTON ST
HANOVER, MA 02339
TEL: (781) 829-9993
FAX: (781) 829-9924
www.spillanelawoffices.com

By Plaintiff's Attorney

*Kathleen Kane*

Kathleen Kane, BBO No. 660175
Spillane Law Offices
1212 Hancock Street-Suite 200
Quincy, MA  02169-4300
(617) 328-9100

DATED: February 1, 2005

SPILLANE LAW OFFICES
• • • •
1212 HANCOCK ST
QUINCY, MA 02169-4300
TEL: (617) 328-9100
FAX: (617) 328-8373

1130 WASHINGTON ST
HANOVER, MA 02339
TEL: (781) 829-9993
FAX: (781) 829-9924

www.spillanelawoffices.com

# EXHIBIT "F"

**AA 1818 Departing Port Of Spain (POS) on 25feb2002**

| | | | |
|---|---|---|---|
| Status: | Normal | | |
| From: | POS | To: | MIA |
| Sked Depart: | 08:56 | Sked Arrival: | 11:54 |
| Actl Depart: | 10:13 | Actl Arrival: | 12:58 |
| Departure Gate: | 6 | Arrival Gate: | E11    BagClaim:    CSTM |
| Departure Gate Change Time: | 18:17 | Arrival Gate Change Time: | 04:38 |
| Taxi Out: | 11 | Taxi In: | 7 |
| Aircraft: | 5EK | Aircraft Type: | B75W |

Delay Information
FL1818/25/1013 POS DM ACFT 5EK

25 1418 323D02 POS-3SJ
DM POSOOAA MIAKKAA MIAGGAA POSKKAA
F 1818/25 POS 77/73C
CREW ARRIVED LATE INTO POS ON 24FEB.AS A RESULT CREW REQUIRED ADDITIONAL RESTING TIME BEFORE DEPTR ..

END HISTORY


**AA 652 Departing Miami (MIA) on 25feb2002**

| | | | |
|---|---|---|---|
| Status: | Normal | | |
| From: | MIA | To: | YYZ |
| Sked Depart: | 19:15 | Sked Arrival: | 22:33 |
| Actl Depart: | 19:11 | Actl Arrival: | 22:05 |
| Departure Gate: | E25 | Arrival Gate: | B12    BagClaim: |
| Departure Gate Change Time: | | Arrival Gate Change Time: | 14:48 |
| Taxi Out: | 13 | Taxi In: | 9 |
| Aircraft: | 3BL | Aircraft Type: | 738W |


**AA 1562 Departing Miami (MIA) on 25feb2002**

| | | | |
|---|---|---|---|
| Status: | Normal | | |
| From: | MIA | To: | YYZ |
| Sked Depart: | 13:15 | Sked Arrival: | 16:35 |
| Actl Depart: | 13:58 | Actl Arrival: | 17:07 |
| Departure Gate: | E9 | Arrival Gate: | B11    BagClaim: |
| Departure Gate Change Time: | 11:17 | Arrival Gate Change Time: | |
| Taxi Out: | 15 | Taxi In: | 11 |
| Aircraft: | 445 | Aircraft Type: | SP80 |

Delay Information
FL1562/25/1358 MIA DM ACFT 445

25 1859 9C08AF MIA-7X2
DM1562/25 MIA 43/46M
MOVEUP DUE N545 OTS

# EXHIBIT "G"

Source: Legal > Cases - U.S. > Federal & State Cases, Combined ⓘ
Terms: **warsaw /25 embarking and date geq (03/02/2004)** (Edit Search)

☛Select for FOCUS™ or Delivery
☐

*2004 U.S. Dist. LEXIS 8423, \**

ELIZABETH FAZIO, a/k/a LISA FAZIO, Plaintiff, v. NORTHWEST AIRLINES, INC., Defendant.

File No. 1:03-CV-808

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

2004 U.S. Dist. LEXIS 8423

**March** 15, 2004, Decided

**DISPOSITION: [\*1]** Defendant Northwest Airlines, Inc.'s motion to dismiss GRANTED. JUDGMENT entered in favor of Defendant and Plaintiff's complaint DISMISSED in its entirety.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff passenger sued defendant airline in state court alleging breach of contract and negligence. Following removal, the airline, pursuant to Fed. R. Civ. P. 12(b)(6), moved to dismiss asserting that the complaint was preempted by the Convention for the Unification of Certain Rules Relating to International Transportation by Air (Convention), Oct. 29, 1934, 49 Stat. 3000, T.S. No. 876 (reprinted at 49 U.S.C.S. § 40105 note).

**OVERVIEW:** The airline's argued that the Convention was the exclusive remedy for the passenger's claims and that the passenger's claims were time-barred under the Convention. The passenger did not deny that if the action was governed by the Convention, the Convention was the exclusive remedy, and the action was time-barred. However, she contended that her case did not fall within the scope of the Convention because her allegations did not allege injuries that arose during the operations of embarking or disembarking. She contended that since she asserted a claim of negligence which occurred in the pre-boarding process, she had asserted a clam for injuries occurring before any of the operations of embarking or disembarking had taken place. The passenger's theory of liability against the airlines was premised on her contention that the airlines owed her and her husband a duty to assist in embarkation and disembarkation by providing wheelchair assistance through the airport to the airplane at each point on their itinerary. The allegations indisputably pertained to the operations of embarking and disembarking. The Convention applied, and the claims were time-barred.

**OUTCOME:** The airline's motion to dismiss was granted.

**CORE TERMS:** embarking, disembarking, airline, passenger, airport, wheelchair, injuries occurring, motion to dismiss, pre-boarding, boarding, aircraft, terminal, transportation, preboarding, airplane, personal injuries, exclusive remedy, time-barred, escalator, local law, indisputably, destination, favorable, premised, arrival, theory of liability, failing to provide, breach of contract, air travel, negligently

**LexisNexis(R) Headnotes** ◆ Hide Headnotes

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action
HN1⊥In evaluating a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a court treats as true all of the well-pleaded allegations of the complaint, and construes all allegations in the light most favorable to plaintiff.  More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action
HN2⊥In evaluating a Fed. R. Civ. P. 12(b)(6) motion, a court need not accept as true legal conclusions or unwarranted factual inferences.  More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action
HN3⊥In order for a Fed. R. Civ. P. 12(b)(6) dismissal to be proper, it must appear beyond doubt that plaintiff would not be able to recover under any set of facts that could be presented consistent with the allegations of the complaint.  More Like This Headnote

Transportation Law > Air Transportation > Personal Injury & Property Damage
Torts > Transportation Torts > Aviation
HN4⊥It is undisputed that the Convention for the Unification of Certain Rules Relating to International Transportation by Air (Convention), Oct. 29, 1934, art. 17, 49 Stat. 3000, T.S. No. 876 (reprinted at 49 U.S.C.S. § 40105 note), provides the exclusive remedy for personal injuries suffered on-board aircraft, or in the course of any of the operations of embarking or disembarking. The United States Supreme Court has held that recovery for a personal injury suffered on board an aircraft or in the course of any of the operations of embarking or disembarking, if not allowed under the Convention, is not available at all.  More Like This Headnote

Governments > Legislation > Statutes of Limitations > Time Limitations
Transportation Law > Air Transportation > Personal Injury & Property Damage
Torts > Transportation Torts > Aviation
HN5⊥The Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 29, 1934, art. 29, 49 Stat. 3000, T.S. No. 876 (reprinted at 49 U.S.C.S. § 40105 note), provides that the right to damages shall be extinguished if an action is not brought within two years from the date of arrival at the destination.  More Like This Headnote

Transportation Law > Air Transportation > Personal Injury & Property Damage
Torts > Transportation Torts > Aviation
HN6⊥The Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 29, 1934, 49 Stat. 3000, T.S. No. 876 (reprinted at 49 U.S.C.S. § 40105 note), addresses and concerns, only and exclusively, an airline's liability for passenger injuries occurring on board the aircraft or in the course of any of the operations of embarking or disembarking.  More Like This Headnote

Transportation Law > Air Transportation > Personal Injury & Property Damage
Torts > Transportation Torts > Aviation
HN7⊥The Convention for the Unification of Certain Rules Relating to International Transportation by Air (Convention), Oct. 29, 1934, art. 17, 49 Stat. 3000, T.S. No. 876 (reprinted at 49 U.S.C.S. § 40105 note), does not define the period of time before passengers enter the interior of the airplane when the operations of embarking commence. The fact that an accident occurs in an airport terminal is not sufficient to either include or exclude the accident from the scope of the Convention. Instead, courts apply a flexible approach, considering factors such as

the activity of the passenger at the time of the accident, the extent to which the airline was exercising control over the passenger at the time of injury, the imminence of actual boarding, and the physical proximity of the passenger to the gate.  More Like This Headnote

Transportation Law > Air Transportation > Personal Injury & Property Damage 🔍
Torts > Transportation Torts > Aviation 🔍
HN8⊕ In the context of the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 29, 1934, art, 17, 49 Stat. 3000, T.S. No. 876 (reprinted at 49 U.S.C.S. § 40105 note), preboarding searches are part of the operations of embarking.  More Like This Headnote

**COUNSEL:** For Elizabeth Fazio, a/k/a Lisa Fazio, plaintiff: Michael W. Betz, LEAD ATTORNEY, Betz & Bloss, PC, Grand Rapids, MI.

For Northwest Airlines, Inc., defendant: David R. Baxter, LEAD ATTORNEY, Nagil, Baxter & Seymour, P.C., Detroit, MI.

**JUDGES:** ROBERT HOLMES BELL, CHIEF UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** ROBERT HOLMES BELL

**OPINION:** Plaintiff Elizabeth Fazio filed this action in the Kent County, Michigan, Circuit Court alleging breach of contract and negligence. Defendant Northwest Airlines, Inc. removed the action to this Court on the basis of federal question and/or diversity jurisdiction. Defendant has now moved for dismissal of the complaint on the basis that the Warsaw Convention n1 completely preempts Plaintiff's state law causes of action and Plaintiff's action is time-barred under the Warsaw Convention.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The Warsaw Convention is the popular name of the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, 3014, T.S. No. 876 (1934), note following 49 U.S.C. § 40105.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*2]**

I.

Plaintiff alleges in her complaint that in June 2000 she and her husband purchased round-trip airline tickets from Defendant Northwest for travel from Grand Rapids, Michigan, to Italy, and back to Grand Rapids. (Compl. P 5). Plaintiff alleges that due to their disabilities, she and her husband contracted with Northwest to have wheelchair assistance at each of the airport stops on their itinerary. (Compl. PP 6-7). Plaintiff alleges that on October 9, 2000, Defendant breached the contract by failing to provide wheelchair transportation within the Da Vinci Airport in Rome, Italy, and that as a result Plaintiff's husband suffered a serious and significant fall and injury in the course of trying to transport himself through the Rome terminal. (Compl. PP 10-11). Plaintiff also alleges that Defendant breached the contract by failing to provide medical assistance to her husband on board the departing aircraft. (Compl. P 12). In addition to her breach of contract claim Plaintiff alleges that "while the Plaintiff and her husband were subject to the direction and control of the Defendant, the Defendant negligently managed and operated the pre-boarding process in such a manner that Plaintiff's **[*3]** husband suffered

the fall, injury and damage set forth in paragraph 11, above." (Compl. P 16).

**II.**

Defendant has moved to dismiss Plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the basis that Plaintiff has failed to state a claim upon which relief can be granted.

*HN1* In evaluating a Rule 12(b)(6) motion to dismiss this Court treats as true all of the well-pleaded allegations of the complaint, and construes all allegations in the light most favorable to the plaintiff. *Glassner v. R.J. Reynolds Tobacco Co.,* 223 F.3d 343, 346 (6th Cir. 2000). However, *HN2* the Court need not accept as true legal conclusions or unwarranted factual inferences. *In re Sofamor Danek Group, Inc.,* 123 F.3d 394, 400 (6th Cir. 1997). *HN3* "In order for a dismissal to be proper, it must appear beyond doubt that the plaintiff would not be able to recover under any set of facts that could be presented consistent with the allegations of the complaint." *Glassner,* 223 F.3d at 346 (quoting *Bower v. Federal Express Corp.,* 96 F.3d 200, 203 (6th Cir. 1996)).

**III.**

Defendant's **[*4]** motion to dismiss is based on its contention that the Warsaw Convention is the exclusive remedy for personal injuries sustained during international air travel, and that Plaintiff's claims are time-barred under the **Warsaw** Convention.

*HN4* It is undisputed that Article 17 of the **Warsaw** Convention provides the exclusive remedy for personal injuries suffered on-board aircraft, or in the course of any of the "operations of **embarking** or disembarking." **Warsaw** Convention Article 17, 49 Stat. 3018. The Supreme Court held in *El Al Israel Airlines v. Tseng,* 525 U.S. 155, 142 L. Ed. 2d 576, 119 S. Ct. 662 (1999), that "recovery for a personal injury suffered 'on board [an] aircraft or in the course of any of the operations of **embarking** or disembarking,' Art. 17, 49 Stat. 3018, if not allowed under the Convention, is not available at all." 525 U.S. at 161. Article 29 of the **Warsaw** Convention *HN5* provides that the right to damages shall be extinguished if an action is not brought within two years from the date of arrival at the destination. 49 U.S.C. § 40105. *See also Husmann v. TWA,* 169 F.3d 1151, 1152 n.3 (8th Cir. 1999).

This action was filed **[*5]** on October 9, 2003, more than two years after the completion of Plaintiff's international air travel on October 9, 2000, from Rome, Italy to Detroit, Michigan. Plaintiff does not deny that if this action is governed by the **Warsaw** Convention, the **Warsaw** Convention is the exclusive remedy, and the action is time-barred. Plaintiff contends, however, that her case does not fall within the scope of the **Warsaw** Convention because her allegations do not allege injuries that arose during "the operations of **embarking** or disembarking."

In *El Al* the Supreme Court agreed with the United States' assertions in its *amicus curiae* brief that *HN6* the **Warsaw** Convention "addresses and concerns, only and exclusively, the airline's liability for passenger injuries occurring 'on board the aircraft or in the course of any of the operations of **embarking** or disembarking.'" *El Al,* 525 U.S. at 171-72 (citations to U.S. Br. excluded).

The Convention's preemptive effect on local law extends no further than the Convention's own substantive scope. A carrier, therefore, is indisputably subject to liability under local law for injuries arising outside of that scope. e.g., for passenger **[*6]** injuries occurring before "any of the operations of embarking or

disembarking."

*Id.* at 172 (quoting U.S. *amicus curiae* Br.) (citations and quotations omitted).

The issue presented by this motion is whether the allegations in Plaintiff's complaint involve personal injuries that occurred "in the course of any of the operations of embarking or disembarking," or whether they involved injuries occurring before "any of the operations of embarking or disembarking."

Plaintiff has alleged that Defendant failed to provide assistance with wheelchair transportation "within the Rome airport" that was necessary to enable them to safely participate "in the pre-boarding and boarding process." (Compl. PP 10 & 17). Plaintiff has alleged that Defendant negligently managed and operated the pre-boarding process "while the Plaintiff and her husband were subject to the direction and control of the Defendant." (Compl. P 16). According to Plaintiff, the injuries occurred while her husband was riding on an escalator in the Da Vinci Airport. (Pl. Br. at 2). Plaintiff contends that because she has asserted a claim of negligence which occurred in the pre-boarding process, she has **[*7]** asserted a clam for injuries occurring before "any of the operations of embarking or disembarking" had taken place. (Pl. Resp. at 6).

Article 17 *HN7* does not define the period of time before passengers enter the interior of the airplane when the "operations of embarking" commence. *Day v. Trans World Airlines, Inc.,* 528 F.2d 31, 33 (2nd Cir. 1975). The fact that the accident occurred in an airport terminal is not sufficient to either include or exclude the accident from the scope of the Warsaw Convention. *Buonocore v. Trans World Airlines, Inc.,* 900 F.2d 8, 10 (2nd Cir. 1990). Instead, courts apply a flexible approach, considering factors such as the activity of the passenger at the time of the accident, the extent to which the airline was exercising control over the passenger at the time of injury, the imminence of actual boarding, and the physical proximity of the passenger to the gate. *Buonocore,* 900 F.2d at 10; *Evangelinos v. Trans World Airlines, Inc.,* 550 F.2d 152, 155 (3rd Cir. 1977); *Martinez Hernandez v. Air France,* 545 F.2d 279, 282 (1st Cir. 1976).

Plaintiff's focus on the word "preboarding" **[*8]** does not exempt her suit from the scope of the Warsaw Convention. In *El Al* the parties agreed that the plaintiff's allegation of injuries resulting from a search conducted during "standard El Al preboarding procedures" was an episode that "occurred in international transportation in the course of embarking." 525 U.S. at 163 & 167. *See also Evangelinos,* 550 F.2d at 156 (holding that the *HN8* preboarding searches were part of the "operations of embarking"); *Day,* 528 F.2d at 33-34 (same).

Moreover, contrary to Plaintiff's assertions, this is not at all like the hypothetical case of the malfunctioning escalator in the airline terminal described in *El Al.* 525 U.S. at 171. The liability in this case is not premised on conditions in the airport terminal, but on the airline's failure to transport Plaintiff and her husband to the boarding area by wheelchair in such a manner that they would not be required to maneuver the escalator as they made their way through the airport to the airplane for boarding.

Plaintiff's theory of liability against the airlines is premised on her contention that the airlines owed her and her husband **[*9]** a duty to assist in embarkation and disembarkation by providing wheelchair assistance through the airport to the airplane at each point on their itinerary. Plaintiff's allegations indisputably pertain to the "operations of embarking and disembarking" because Plaintiff's theory of liability expands the scope of the airline's operations of **embarking** and disembarking with respect to these two travelers. Accordingly,

construing the complaint in the light most favorable to Plaintiff, the Court is satisfied that Plaintiff's claims are governed by the **Warsaw** Convention.

Because Plaintiff's claims were not brought within two years of her arrival at her destination, her claims are barred under Article 29 of the Warsaw Convention.

For the reasons stated herein, Defendant's motion to dismiss will be granted. An order and judgment consistent with this opinion will be entered.

Date: March 15, 2004

/s/ Robert Holmes Bell

CHIEF UNITED STATES DISTRICT JUDGE

**ORDER AND JUDGMENT**

In accordance with the opinion entered this date,

**IT IS HEREBY ORDERED** that Defendant Northwest Airlines, Inc.'s motion to dismiss (Docket # 4) is **GRANTED.**

**IT IS FURTHER ORDERED** that **[*10] JUDGMENT** is entered in favor of Defendant and Plaintiff's complaint is **DISMISSED** in its entirety.

Date: March 15, 2004

/s/ Robert Holmes Bell

CHIEF UNITED STATES DISTRICT JUDGE

Source:   Legal > Cases - U.S. > Federal & State Cases, Combined  [i]
Terms:   warsaw /25 embarking and date geq (03/02/2004)  (Edit Search)
View:   Full
Date/Time:  Wednesday, March 2, 2005 - 4:54 PM EST

* Signal Legend:
● -   Warning: Negative treatment is indicated
[Q] -   Questioned: Validity questioned by citing refs
⚠ -   Caution: Possible negative treatment
◆ -   Positive treatment is indicated
Ⓐ -   Citing Refs. With Analysis Available
❶ -   Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.