# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

EILEEN DICK )
    Plaintiff )
     )
     )
v.      )       DOCKET NO: 05-10446
     )
AMERICAN AIRLINES, INC., and )
WORLDWIDE FLIGHT SERVICES, INC. )
    Defendants )
     )

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT WORLDWIDE FLIGHT SERVICES, INC.'s STATEMENT OF FACTS AND MOTION FOR SUMMARY JUDGMENT

NOW COMES the plaintiff, Eileen Dick, by and through counsel, and states the following

opposition to Worldwide Flight Services, Inc. Motion for Summary Judgment.

## STATEMENT OF MATERIAL FACTS DEMONSTRATING THE EXISTENCE OF

## GENUINE ISSUES TO BE TRIED

1) On February 25, 2002, the plaintiff and her mother were International passengers on two

    flights operated by the airline carrier, American Airlines.

2) On said date, the plaintiff and her mother began their trip in Trinidad and were to land in

    Miami, Florida before boarding a new flight to Toronto, Ontario, Canada.

3) On said date, the plaintiff and her mother were provided with wheelchair services from

    defendant Worldwide Flight Services, Inc. at the Miami-Dade International Airport.

4) On said date, the plaintiff was caused personal injuries while on an escalator in the Miami-

    Dade International Airport.

5) The personal injuries to the plaintiff occurred after the plaintiff disembarked the flight from

    Trinidad to Miami. ( See Exhibit A, Dick Depo. pg. 31)

6) On said date, there existed more than one hour between the time the plaintiff and her mother disembarked the flight from Trinidad to Miami and embarked on the flight to Toronto. (See Exhibit B).

7) The plaintiff went through customs while in Miami and was in a location not reserved specifically for International travel. (Dick Depo. pg. 49, 77)

8) In the time in between disembarkment in Miami and embarkment in Miami, the plaintiff and her mother had control over their own physical bodies and possessions and were free to make choices as to where they would go in this time. (Dick Depo. pg. 77)

9) The plaintiff went through customs at Miami-Dade International Airport before her injuries occurred. (Dick Depo pg. 40-50)

10) The defendant offers no evidence to contradict whether the injury occurred before or after she went through customs.

11) The plaintiff's alleged injuries occurred before she arrived at the departing gate with her boarding pass. (Dick Depo. pg. 45).

12) Worldwide provides the service to all passengers of American Airlines, not just those who are on International Flights. (Restated Amendment of Airline Services Contracts, provided as Exhibit B To Worldwide Flight Services Memorandum of Law in Support of Motion for Summary Judgment).

## ARGUMENT

The defendant, Worldwide Flight Services, Inc., is not entitled to summary judgment in accordance with Fed. R. Civ. P. 56 because there exists a genuine issues as to material facts in this case. The defendant claims that the plaintiff's claim is limited and this Court has jurisdiction over this case because Section III, Article 17 of the Warsaw Convention of 1929 ("Warsaw Convention), of which the United States was a signatory, covers the claim. The defendant is attempting to assert that

the plaintiff's claim is covered by the Warsaw Convention simply because the plaintiff's personal injuries occurred during international travel. However, it is well-established law that, "the convention does not apply to all claims of injuries suffered in conjunction with international air travel." Pflug v. Egypt Air Corp., 961F.2d 26, 28 (2d. Cir. 1992). The following will demonstrate that there exists the real possibility that the plaintiff's claims are not covered and were not intended to be covered by the Warsaw Convention and therefore the plaintiff's state law claims are not preempted by the Warsaw Convention.

I.     **The Nature of the Plaintiff's Injuries Falls Outside of the Scope of the Warsaw Convention**

According to Chapter III, Art 17 of the Warsaw Convention, the statute covers personal injuries to an international airline passenger, "if the accident which caused the damage so sustained took place on board the aircraft or in the course of any operations of embarking or disembarking." 49 U.S.C. § 40105 (1994). In deciding whether a case is covered under Article 17 of the Warsaw Convention, "courts have avoided blanket characterizations of which accidents are 'always' or 'never' covered by Article 17." Alleyn v. Port Authority of New York, 58 F. Supp. 2d 15, 22 (EDNY, 1999). Instead of arbitrarily applying the statute on all instances involving international flights, the courts take an independent look at each individual case to determine whether that case falls within the scope of the Warsaw Convention; " a review of the case law reveals that a court's determination hinges upon the specific facts of the case presented and how analogous or distinguished those facts are from the facts of previously decided cases." Id. at 20.

In its attempt to determine whether an individual case falls within the scope of the Warsaw Convention's definition of "embarking or disembarking" the Second Circuit developed a three-pronged test. Day v. Trans World Airlines, Inc., 528 F2d 31 (2d Cir.1975). In Day the court stated

that, "whether a plaintiff is found to have been embarking or disembarking so as to be covered under Article 17 is a fact specific question generally evaluated under a three part test (taking into account): 1) the plaintiff's activity at the time of the accident causing the injury; 2) the plaintiff's location; and 3) whether or not the plaintiff was under control of the carrier." Id. at 35-37.

The three-pronged test established in Day has been adopted by the First Circuit as well. McCarthy v. Northwest Airlines, Inc., 56 F3d. 313 (1st Cir. 1995). The court in McCarthy stated that, "there must be a tight tie between an accident and the physical act of entering an aircraft." Id. at 317; See Also: Evangelinos v. Trans World Airlines, Inc., 550 F.2d 152, 155 (3rd Cir. 1977). The McCarthy decision also made note of the location of the plaintiff at the time of the accident, stating, "the passenger must not only do something that, at the particular time, constitutes a necessary step in the boarding process, but also must do it in a place not too remote from the location at which he or she is slated actually to enter the designated aircraft." McCarthy v. Northwest Airlines at 317. The First Circuit has adopted and utilizes the three-pronged test of Day; the plaintiff's activities, location, and control are all taken into account when undertaking the individual analysis, these three "factors are inextricably intertwined." Id.

  *i.*  *Cases Analogous to Our Set of Facts*:

Utilizing the three-pronged test of Day and comparing similar cases to the instant case, it is clear that the plaintiff, Ms. Dick, was neither embarking nor disembarking on an international flight, and therefore her case is outside of the scope of Chapter III, Article 17 of the Warsaw Convention. Removal in this case, "could only have been proper if the Warsaw Convention completely preempted all state law claims." Donkor v. British Airways Corp., 62 F. Supp. 2d. 963, 967 (EDNY, 1999). However, it is clear from the following analysis that in the case of Ms. Dick, the Warsaw Convention is inapplicable.

In <u>Donkor</u>, the district court remanded the case back to state court for lack of subject matter jurisdiction where a woman who claimed injuries based on theories of tort and contract was allegedly caused injuries during a layover at a London Airport. <u>Donkor v. British Airways Corp.</u> 62 F. Supp. 2d at 967. The district court made note that the location of the plaintiff was important to the decision. Taking into account the location and the period of time the plaintiff was laid over the district court determined the "alleged injuries occurred after disembarkation." <u>Id.</u> Ms. Dick was injured on an escalator, which was a distance away from the airplane she had traveled in from Trinidad to Miami, and because of these reasons, the instant case is analogous to <u>Donkor</u> to a great extent and should be decided with the same result.

Additionally, <u>Donkor</u> established that it is the, "burden is on the party or parties seeking to establish coverage by the convention." to demonstrate the location of the plaintiff. <u>Id.</u> at 969. In <u>Donkor</u>, because there was no evidence offered by the moving party as to the location of the plaintiff at the time she suffered the injury, "no evidence is the equivalent of negative evidence." <u>Id.</u> at 969. In the instant case, Ms. Dick has acknowledged that at sometime in Miami, she went through customs. At her deposition, Ms. Dick could not recall whether or not this was prior to or following her injury on the escalator in Miami, however, the defendant has offered no evidence to demonstrate where the escalator in question was in relation to customs in the terminal. Because the defendant has failed to offer any evidence, this lack of evidence should be considered "negative evidence." <u>Id.</u>

The fact that Ms. Dick may have gone through customs could and should be fatal to the defendant's case. Several cases have demonstrated that certain locations outside of the areas designated for international travelers should be exempt from coverage under the Warsaw Convention. Passengers who had already descended the stairs of an aircraft and who had already checked through customs had their case dismissed from federal court because it was outside of the scope of the Warsaw Convention. <u>Martinez Hernandez v. Air France</u>, 545 F.2d 279, 280 (1st Cir. 1976). In, <u>Martinez</u>

Hernandez the court relied on the location of the plaintiffs to determine that they had fully disembarked from the flight. Id.

A woman who fell near baggage claim was also not covered under the Warsaw Convention. MacDonald v. Air Canada, 439 F.2d 1402, 1404 (1st Cir. 1975). In MacDonald, the court stated that, "it would seem that the operation of disembarking has terminated by the time the passenger has descended from the plane by the use of whatever mechanical means have been supplied and has reached a safe point inside of the terminal, even though he may remain in the status of a passenger of the carrier while inside the building." Id. at 1405. MacDonald recognized that the Warsaw Convention does not extend for the time the passenger remains inside the building, and is terminated when the plaintiff reached a "safe place." Id. The court in MacDonald also looked back at the history of the Warsaw Convention and noted that its crafters intended it to serve for the, "protection of air carriers from the crushing consequences of a catastrophic accident, a protection thought necessary for the economic health of the then emerging industry." Id.

In the instant case, much like the plaintiff in MacDonald, Ms. Dick was no longer disembarking the flight because she was now in a safe place away from the airplane she had just been a passenger on. The MacDonald court thought it to be irrelevant that a passenger remained "a passenger of the carrier." Id. Ms. Dick may still have been a passenger of the carrier, but that is not relevant to considering whether or not her injuries fell within the scope of the Warsaw Convention. She was outside of the immediate location of the plane she had just traveled on and had likely passed through customs and was in a public area. In today's climate of airport safety, only ticketed passengers are allowed past security checkpoints. This has nothing to do with Warsaw's qualifications of embarking or disembarking, but rather, everything to do with passenger safety. The Plaintiff was in a restricted area for ticketed passengers only, not because she was embarking or disembarking, but because air travel carries with it today added levels of security. Similarly, she was not near any plane she was embarking

on en route to her final destination in Toronto and the injury occurred many hours prior to the departure of the flight.

A case synonymous to the instant case is where a plaintiff was injured on an escalator, which was available to the general public. McCarthy v. Northwest Airlines, Inc. at 314. Here the plaintiff was attempting to embark on a flight and was rushing to reach the gate for departure. Id. The court in McCarthy concluded that they could not find, "a single instance when an accident occurred within a public area of a terminal facility." In the instant case, Ms. Dick had most likely crossed through customs into a public area of the facility. She had yet to embark on her next flight as she had yet gone through the boarding gate on her way to Toronto. This is similar to the situation where a plaintiff had checked in at the ticket counter but had been injured in a public area, prior to embarking. Buonocore v. Trans World Airlines, Inc., 900 F.2d 8 (2d Cir. 1990).

While the facts at hand are similar to those in Fazio, upon which the defendant relies, the language in McCarthy effectuates a strong statement in the First Circuit over the treatment of the Warsaw Convention and its hold over international travel. Fazio v. Northwest Airlines, Inc., 2004 US Dist Lexis 8423 at 2. In Fazio, the Plaintiff and her husband requested the Defendant provide wheelchair assistance during their travels and at the time of injury the Defendant held their tickets, passports and controlled their movements throughout the airport. While Dick was being directed by an American Airlines contract worker, she and her mother were not control under her control.

Like the McCarthy plaintiff, Dick was not obliged to take the escalator, and merely did so on the direction of the Defendant. McCarthy v. Northwest Airlines, Inc., 56 F.3rd 313 at 318. Ms. Dick relied upon American Airlines and its contract workers for advice in navigating between gates during the hour between flights. The Plaintiff retained the free will to other means of traversing between floors, ie. a separate elevator, escalator or stairway in a different section of the airport complex, but she

deferred to the expertise of the Defendant.    This assistance was separate from the embarkation and disembarkation of flights.

Unlike the Fazio Plaintiff, who needed assistance from the Defendant airline in their pre-boarding and boarding process, Dick received assistance in navigating between gates, not in embarking and disembarking planes. Fazio, at 6.  The Defendant commonly aided Dick's mother in large airports when the pair traveled to navigate throughout the airport, but was not necessarily needed in the physical act of embarking and disembarking.  In her deposition, the Plaintiff stated that she helped her mother walk off the plane and found the Defendant's employee and wheelchair waiting beyond the gate.  (Dick Depo. pg. 28 line 20-22)  The sheer size of Miami-Dade International Airport combined with the Dick's mother's age precipitated the need for some type of assistance.  Dick's mother needed a wheelchair from the defendants, not the assistance of its employee.  In fact, after guiding them through the airport to their connecting flight, the Defendant left the Plaintiff and her mother at the next gate, without supervision or accompaniment.  (Dick Depo. pg. 45, line 3-6).

While the location of the plaintiff is important, the control that the airline has over a passenger is also an important analysis to make in determining whether the Warsaw Convention applies. McCarthy v. Northwest Airlines, Inc. at 319.   In McCarthy, the plaintiff was led on a "fast trot" through the airport by personnel and was led down the escalator.  Id.  Nevertheless, the court in McCarthy claimed that "if the plaintiff did not desire to follow the agent down the escalator 'at a fast trot', she had the ability to proceed at her own pace, to take an alternate route, or simply to await a later flight." Id.  Here, the court concluded that the plaintiff was free to make her own decisions and choices and voluntarily chose to follow the airline personnel.  In another case, a woman was injured on a moving sidewalk, while traveling between two concourses on her way to a connecting flight.  The case was not a valid cause of action under the Warsaw Convention because, "although plaintiffs were proceeding from the arrival gate in Concourse C to the departure gate in Concourse B, they were

proceeding at their own pace and under their own control. They were not required to be at the departure gate until fifteen minutes before the scheduled departure time." Rabinowitz v. Scandinavian Airlines, 741 F. Supp. 441, 446 (SDNY 1990). The plaintiff in Rabinowitz was neither disembarking nor was she embarking, even though she had just departed the plane five minutes prior to sustaining her injury. Id.

Similarly in the instant case, Ms. Dick was in control of her own body and decisions and stated that she could have said, "wait a minute, hold on a minute, I want to go use the bathroom," "I want to buy a beer," or "I want to buy something."" (Dick Depo. pg. 77). Ms. Dick had the ability to make her own decisions, she was not at the time on the flight or at the will of the carrier, but rather she made a conscious and voluntary decision to go down the escalator in which she was injured on. Like the plaintiff in Rabinowitz, Ms. Dick was also on her way to a connecting flight, and had just departed the flight from Trinidad to Miami about 5 minutes prior. Id. In both cases, the plaintiff's were in a public area and were in control over their own actions, and because of this, neither party was disembarking or embarking a flight, and the injuries in both cases fell outside of the scope of the Warsaw Convention.

## II.    The Defendant, Worldwide Flight Services, Inc. is Not a "Carrier" Under the Warsaw Convention

Under the Warsaw Convention, the term "carrier" refers to an airline, which is in the transportation business. Pflug v. Egypt Air, 961 F.2d at 31-32. It has been decided in some circuits that agents who act in the scope of "carriers" can be considered carriers under the Warsaw Convention. Banishashemrad v. Lufthansa Cargo AG, 28 F. Supp 2d 1014, 1018. (WDTX 1998). But in the instant case, the defendant Worldwide Carrier Services ("Worldwide") was not conducting services in the scope of a "carrier," rather they were providing a convenience service to all passengers throughout the airport, on both domestic and international flights. We do not disagree that an agent

can be placed in the shoes of a carrier when acting in the scope of a carrier. But this does not apply to those companies, which act as "dual agents." <u>Dazo v. Globe Airport Sec. Servs.</u>, 295 F.3d 934 (9th Cir. 2002). In <u>Dazo</u> the Warsaw Convention did not preempt the state law claim because the defendant security checkpoint company was an agent for three different airlines. This case draws a distinct line between those who were agents for one distinct company versus that which provides services for many airlines.

Furthermore, the court in <u>Dazo</u> makes note that the operation of the security checkpoint was, " in furtherance of the contract of carriage of an international flight, but were basic airport security services required at all airports by domestic federal law, regardless of the flights' destination and regardless in fact, of whether the person being screened was even a passenger." <u>Id</u>. at 939. The service provided by the defendant agent in <u>Dazo</u> was not exclusively provided for international flights, and therefore the defendant could not be considered a "carrier" under the Warsaw Convention.

Likewise, the services provided by Worldwide in the instant case are also not those, which are done exclusively for international flights. Ms. Dick's mother would have received the same service if she was on a flight from Houston to Miami as opposed to Trinidad to Miami. Worldwide contracted with American Airlines to provide a service which was not reserved for international flights. The service provided by Worldwide did not discriminate between international and domestic passengers.


## CONCLUSION

The Plaintiff, Eileen Dick, respectfully requests that the Defendant's Motion for Summary Judgment be denied, as there are genuine issues of material fact and the defendants are not entitled to judgment as a matter of law.

The Plaintiff incorporates by reference the arguments set out in her response to the Motion for Summary Judgment made by Defendant Worldwide Flight Services, Inc..

The Plaintiff,
Eileen Dick
By her attorney,


/s/ Kathleen L. Kane
_____
Kathleen Kane, BBO # 660175
**SPILLANE LAW OFFICES**
1212 Hancock Street, suite 200
Quincy, MA 02169
(617) 328-9100



I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on May 30, 2006.

/s/ Kathleen L. Kane
_____
Kathleen L. Kane

1     Q.  So you and your mother waited to get off

2  the airplane, right?

3     A.  Yes.

4     Q.  And when you got off the airplane, was

5  there somebody there to meet you with a wheelchair?

6     A.  Yes.

7     Q.  Was there more than one person?

8     A.  For us or for other people?

9     Q.  For you.

10     A.  No, the wheelchair arrived and the

11  wheelchair person.

12     Q.  Do you recall any conversations with

13  anybody from American Airlines prior to your mother

14  getting into the wheelchair?

15     A.  Just when they announced the wheelchair

16  passengers, you know, to remain in your seats and

17  you will be picked up, you know, and just, you know,

18  they might say to you, as one of the wheelchair

19  people, "The wheelchair is coming, just sit there."

20     Q.  So you help your mother walk off the plane,

21  and then she sits in the wheelchair?

22     A.  Yes.

23     Q.  Did you have any conversation with the

24  person who met you with the wheelchair at that time?

```
 1        Q.  Let me stop you there, if you don't mind.

 2   How long -- how many minutes did it take you to

 3   reach that area of the airport?

 4        A.  Maybe about five minutes.  I'm not sure.

 5   I'm really not sure.

 6        Q.  Okay.  Did you understand that you were

 7   heading toward the gate for your connecting flight?

 8        A.  Yes.

 9        Q.  Okay.  Were you going anywhere else at that

10   times, as far as you knew?

11        A.  Apart from the gate for the connecting

12   flight?

13        Q.  Right, right.

14        A.  Not as far as I know.  We were going for my

15   connecting flight.

16        Q.  And did you and your mother have your

17   boarding passes with you?

18        A.  Yes.

19        Q.  Okay.  And did you understand that to be a

20   restricted area of the airport, that is, only

21   ticketed passengers could be in that area?

22        A.  Yes.

23        Q.  All right.  So you arrive at the area where

24   there's an elevator and an escalator, you said?
```

1    time?

2        A.   No.

3        Q.   What was the next thing that happened?

4        A.   Well, the next thing that happened -- I

5    don't know who all those people were, like, maybe

6    American Airline attendants.  Somebody for the

7    elevator came along, and they brought me along to an

8    area; and they got a supervisor or something and

9    started to look at me and ask me if I was all right.

10   And I told them what -- I was in pain and what was

11   happening.  And then they got -- they said, well,

12   wait, they will get an ambulance, an attendant, and

13   that sort of thing.  So the ambulance came about ten

14   minutes later with -- I mean, I didn't see the

15   ambulance, but they told me that.

16       Q.   So paramedics came?

17       A.   Paramedics came, yes.

18       Q.   So in about ten minutes some paramedics

19   came to take a look at you and your knee?

20       A.   Yes, yes.

21       Q.   And what did they do for you?

22       A.   Well, it was beginning to -- they asked me

23   would I like to go to the hospital; and I said,

24   "Well, it's difficult because I have my mother."

1    They looked at my mother, asked if she was all

2    right.  She was really scared and, you know,

3    frightened.  She was kind of looking at herself to

4    see if she was hurt.  And she kept saying no, she's

5    all right and she was just frightened and in shock

6    kind of thing.  And she was asking me if I was all

7    right.

8              And so they asked me -- when I looked at

9    it, it was beginning to get swollen a little bit at

10   this time -- if I would like to go to the hospital.

11   I thought about it for a bit; and I said no, I would

12   rather go home.

13      Q.  And did they provide you some ice for your

14   knee?

15      A.  Yes, they did.

16      Q.  Other than ice, did they provide you

17   anything else?

18      A.  No.  They did offer me if I wanted any,

19   like, pain medication and if I was sure I didn't

20   want to go to the hospital; and I said, "Not right

21   now."

22      Q.  Okay.  Now, during this time when you were

23   being attended to by the paramedics, do you recall

24   anything that any of the attendants said, the

1    wheelchair attendants said?

2        A.  No.

3        Q.  Do you recall anything that any American

4    Airlines personnel said to you at that time?

5        A.  No.

6        Q.  How long would you say --

7        A.  As a matter of fact, I don't even know if I

8    saw any American Airlines personnel at that time.

9        Q.  Do you understand that the attendants with

10   the wheelchair were not employees of American

11   Airlines?

12       A.  Not at the time, I did not.

13       Q.  Do you understand that now?

14       A.  I do now, but not at the time.

15       Q.  I may have just asked you this, but how

16   long were the paramedics with you, attending to your

17   knee?

18       A.  It could be about ten, fifteen minutes.

19       Q.  Okay.  And what happened next after they

20   took care of your knee and you indicated you wanted

21   to go home, you didn't feel like you wanted to go to

22   the hospital, that you wanted to continue your trip

23   home?

24       A.  We sat there for a while, of course, icing

1    it down; and then we got to the -- they took me

2    along to the other area where I was supposed to go

3    for the flight.

4        Q.   For the flight?

5        A.   For the flight.  And do not ask me what

6    area or what was -- I have no idea.  I was just

7    pushed along to the area where I was supposed to go

8    to for the flight.

9        Q.   So after the paramedics attended to you,

10   did -- were the same two wheelchair attendants with

11   you that took you two onto the gate for your

12   departing flight?

13       A.   The same wheelchair attendant, yes.

14       Q.   You had one pushing you and one pushing

15   your mother?

16       A.   Yes.

17       Q.   Okay.

18       A.   I only picked up a wheelchair attendant

19   after the incident.

20       Q.   That's right.

21       A.   Yes.

22       Q.   So you were taken -- so the next thing you

23   recall after being taken care of by the paramedics

24   was going on to the gate --

1     A.   Yes.

2     Q.   -- where your flight was leaving; is that

3  right?

4     A.   Yes.

5     Q.   During that time do you recall any

6  conversations with the wheelchair attendants?

7     A.   No.

8     Q.   Did you make it in time to meet your

9  connecting flight?

10    A.   No.  I'm thinking that I -- the flight --

11 I'm not sure if the flight was delayed or if we

12 missed the flight.  I have -- I think the flight was

13 delayed, but I'm not sure, but I know we got on,

14 because we did not get to Toronto until very late

15 that night.  And I know there was some kind of

16 delay, but whether it was -- to be fair, I do not

17 know if it was an American delay or if we missed the

18 flight because of the incident.

19    Q.   Okay.  You just remember that there may

20 have been some delay in the flight?

21    A.   Yes.

22    Q.   Do you know how long you waited for the

23 flight before you left?

24    A.   I waited for quite a bit, quite a bit.

1    Q.  Do you remember how long?

2    A.  No, I do not.

3    Q.  Now, once you got to the gate area with

4  your boarding pass, did you -- did the attendants

5  stay with you, or did they just leave you there?

6    A.  They left me there.

7    Q.  Did you have any conversations with either

8  one before they left?

9    A.  No.

10    Q.  Do you recall them saying anything to you

11  before you left?

12    A.  No.

13    Q.  While you waited for your plane, did you

14  talk to anybody from American Airlines that you can

15  recall?

16    A.  No, not until I was going to board the

17  plane and, you know, I asked if I could get some ice

18  again; and then they said, when I get on board, so

19  then they started giving me ice.  They knew what had

20  happened by then.

21    Q.  So --

22    A.  I do not know -- let me go back on this.

23    Q.  Sure.

24    A.  I remember there was an incident report.  I

1   do not know if that's American Airlines.

2        Q.  So before you left on your -- before you

3   left on your connecting flight from Miami to

4   Toronto, did you fill out an incident report?

5        A.  In the airport when it happened, there was

6   something.

7        Q.  I'm going to show you what's been marked as

8   Exhibit 1.  And I'm going to show you a page of a

9   document and just see if that's the incident report

10  you recall filling out.

11       A.  (Witness reviews document.)  Yes.

12       Q.  Is that your signature down at the bottom,

13  or did you sign it anywhere there that you can see?

14       A.  I'm not seeing my signature on here.

15       Q.  Okay.  Can I just see that for a second,

16  please.  So the squiggly marks down at the bottom --

17       A.  That's not me.

18       Q.  That's not you.  All right.

19            MR. WEIGAND:  Why don't we have this

20  marked as 1A.

21            (Marked, Exhibit 1A, Incident report.)

22       Q.  What's been marked as 1A, Ms. Dick, just so

23  we are clear, that's a copy of the accident report

24  that you recall filling out or participating in?

1       A.  Participating in, yes.

2       Q.  Do you recall who you spoke with?

3       A.  No, I do not.  Some suited guy they went

4    and got in an office.

5       Q.  Did you go to an office to speak to him?

6       A.  I didn't go.  They came to me.

7       Q.  Did they come to you right where --

8       A.  Right where I was sitting in the

9    wheelchair.

10      Q.  At the escalator?

11      A.  No, just as we moved a little bit away from

12   the escalator, in a sitting area right there.

13   That's where the ambulance attendants came to.

14              MR. WEIGAND:  Can I have that marked the

15   next exhibit.

16              (Marked, Exhibit 3, Copy of witness's

17   receipt for ticket and travel in January and

18   February 2002.)

19      Q.  Ms. Dick, I'm just going to show you what's

20   been marked as Exhibit 3.  And I believe that's a

21   copy of your receipt for your ticket and travel for

22   January and February 2002.  Does that sound right to

23   you?

24      A.  (Witness reviews document.)  Yes.

1    Q.  Okay.  And again, the ticket indicates a

2    trip from Toronto to Miami, Miami to Trinidad, and

3    then back on the 25th of February from Trinidad to

4    Miami, and Miami on to Toronto, correct?

5    A.  Yes.

6    Q.  All right.  When you -- while you were at

7    the Miami airport and you were traveling -- strike

8    that.  When you were with the wheelchair attendant,

9    were they directing you where to go while you were

10   in Miami?

11   A.  Were they directing me where to go?

12   Q.  Yes.

13   A.  They were taking me to where I was going.

14   They weren't giving me directions because I was in

15   the wheelchair, so they were pushing me to where --

16   they knew what flight I was going to and what gate I

17   was going to.

18   Q.  How about before the incident, when you got

19   off the plane and before you fell on the escalator,

20   you were with a wheelchair attendant; was she

21   directing you and showing you where to go?

22   A.  She was leading the way, yes.

23   Q.  Okay.  You did not pass out through

24   security at any time before you left Miami; is that

1    correct?

2        A.   Excuse me?  Say that again.

3        Q.   You didn't pass out through the security

4    part of the airport before you left; is that

5    correct?

6        A.   No, I did not.  You mean, did I get out of

7    the airport to go through security?

8        Q.   Right.

9        A.   No, I didn't.

10       Q.   And your bags were already checked,

11   correct, your carry-on -- other than your carry-on

12   bags, did you bring other luggage with you on the

13   trip?

14       A.   Yes, I had other luggage on the trip.

15       Q.   And they were already on the plane?

16       A.   Yes.

17       Q.   Did you go through customs at all while you

18   were in Miami, or did that take place when you got

19   to Toronto?

20       A.   I went through customs when I was in Miami.

21       Q.   Okay.

22       A.   Yes, that's what I was trying -- yes, we

23   went through customs.

24       Q.   Did you go through customs before you got

1  on the escalator or after?

2    A.  That I cannot remember.  More than likely

3  it is before, yes.  That I cannot remember.

4    Q.  How many minutes would you say passed from

5  the time that you got off the airplane when you

6  arrived to Miami and the time of the fall?

7  Approximately is fine.

8    A.  About five minutes.

9    Q.  Okay.  And how long --

10    A.  It was a full flight; so, I mean, I don't

11  know.  We were last on the flight, so, you know --

12  to get off, as I said, so it could be five minutes,

13  it could be ten minutes.  I am not sure.

14    Q.  And that's fine.  How long did it take you

15  to get from -- once you -- after you were -- got

16  into the wheelchair yourself after the fall, how

17  long did it take you to get to your connecting

18  flight or the gate?

19    A.  About ten minutes.

20    Q.  Okay.  And you don't recall the gate number

21  at all?

22    A.  I do not.

23    Q.  Do you know if the gate number was an E?

24  Do you recall having an E number?

1  are going, and you say you are going to such and

2  such a place.  They know what gate it is, or it's

3  posted so you can look up and say, "Yes, I'm going

4  there."

5      Q.  Okay.  And as you traveled to your next

6  gate, the attorney had asked you, did you feel you

7  were under the direction and control of the

8  personnel who was pushing your mother in the

9  wheelchair.  She was directing you because you had

10 told her where you had to go in the airport; is that

11 correct?

12     A.  Yes.

13     Q.  And in terms of being in control, if you

14 had decided to stop or to go someplace else in the

15 airport, you certainly could have; is that not the

16 case?

17     A.  I would say if I wanted to, I could say,

18 "Wait a minute, hold on a minute, I want to go to

19 the bathroom," "I want to buy a beer," or "I want to

20 buy something," yeah.

21     Q.  Okay.  Thank you.  That's all I have.

22     A.  Yes.

23

24

THANK YOU FOR SELECTING AMERICAN AIRLINES. PLEAS
FOLLOWING PAGES AS THEY CONTAIN IMPORTANT INFORMA
TRIP. NOTE: YOU WILL BE REQUIRED TO PRESENT AT (
ID ISSUED BY A STATE/GOVERNMENT AUTHORITY.

ADV #
7374NMO

EMMANUEL J DICK
66 OAKMEADOW BLVD
TORONTO, ON, CA
M1E4G5

PLEASE DO NOT HESITATE TO CONTACT US IF WE CAN E
ASSISTANCE. OUR TOLL-FREE NUMBER IS 1-800-433-7
HAVE A VERY PLEASANT TRIP.

**AmericanAirlines**
AMERICAN AIRLINES
BOARDING PASS

NAME OF PASSENGER
DICK/EILEEN
AA  FROM 7374NMO
X/O  PORT OF SPAIN          ADV
MIAMI INTERNTNL
AMERICAN AIRLINES
CARRIER  FLIGHT    CLASS  DATE      TIME
AA  1818  N  25FEB10 23A
GATE          BOARDING TIME   SEAT       SMOKE
6            811A

ADDITIONAL SEAT INFORMATION        **11E** NO
PCS.  CK. WT.   UNCK. WT.
BAGGAGE ID NR.  SEQ NO.  UNCK. WT.   **GROUP**
COUPON  AIRLINE

FORM SERIAL NO.                                **5**

3SE  /POS

ITINERARY FOR- EILEEN DICK                          DATE 22 DEC 01

27JAN - SUNDAY
    LV    TORONTO ON          1159A    FLT1561    AMERICAN AIRLINES
    AR    MIAMI INTERNTNL      319P               ECONOMY

    LV    MIAMI INTERNTNL      450P    FLT1819    AMERICAN AIRLINES
    AR    PORT OF SPAIN        927P               ECONOMY

25FEB - MONDAY
    LV    PORT OF SPAIN        853A    FLT1818    AMERICAN AIRLINES
    AR    MIAMI INTERNTNL     1155A               ECONOMY

    LV    MIAMI INTERNTNL      115P    FLT1562    AMERICAN AIRLINES
    AR    TORONTO ON           435P               ECONOMY